**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                 No. CR 21-1221 JB

WILLIAM D. COLBERT,

      Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Statements and Tangible Evidence, filed December 21, 2021 (Doc. 24)("Suppression Motion"). The Court held evidentiary hearings on August 31, 2022, and on October 4, 2022. <u>See</u> Clerk's Minutes, filed August 31, 2022 (Doc. 48)("August Clerk's Minutes"); Clerk's Minutes, filed October 4, 2022 (Doc. 55)("October Clerk's Minutes"). The primary issues are: (i) whether police officers unlawfully arrested Defendant William D. Colbert in violation of the Fourth Amendment of the Constitution of the United States when they arrested him inside a residence without an arrest warrant; (ii) whether the allegedly unlawful arrest tainted Colbert's subsequent grant of consent to search the residence; and (iii) whether Colbert gave consent to search the residence freely and voluntarily. The Court concludes that: (i) the officers' warrantless in-home arrest of Colbert was unlawful and that exigent circumstances do not justify the arrest; (ii) Colbert's signing of a consent-to-search form which the officers explained to him attenuates the taint of the unlawful arrest; and (iii) Colbert gave his consent freely and voluntarily. Accordingly, the Court denies the Suppression Motion.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982); Fed. R. Evid. 104(a).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments.  In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)("We need not resolve whether Crawford[ v. Washington, 541 U.S. 36 (2004)]'s[1] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error

_____

[1]Crawford v. Washington stands for the proposition that testimonial out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross-examine the witness.  See 541 U.S. at 53-54.

cannot be adjudged 'plain.'");[2] United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir.

2010)(unpublished)("It is beyond reasonable debate that Ramirez's counsel were not ineffective

in failing to make a Confrontation Clause challenge to the use of the confidential informant. The

Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay

statements made in suppression hearings."). Cf. United States v. Hernandez, 778 F. Supp. 2d 1211,

1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to

detention hearings").[3]

---

[2]United States v. Garcia is an unpublished opinion, but the Court may rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Garcia and United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[3]Colbert does not raise any arguments under Crawford v. Washington against any evidence in this case. Nevertheless, the Court notes that it previously has concluded that Crawford v. Washington does not apply to suppression hearings. See United States v. Streett, 363 F. Supp. 3d. 1212, 1229 n.3 (D.N.M. 2018)(Browning, J.). Since the Court's decision in United States v. Streett, the legal landscape has not changed significantly, and the Court stands by its conclusion. The Court has identified only one court that has held Crawford v. Washington applies to suppression hearings, see Verdell v. Buchanan, No. 3:19-cv-188, 2019 WL 2579174, at *8 (S.D. Ohio June 24, 2019)(Merz, M.J.)("The Magistrate Judge accepts Verdell's assertion that the Confrontation Clause applies to suppression hearings, although the cases he cites . . . do not stand for that proposition."); most courts, including the Court, have decided that Crawford v. Washington does not apply to suppression hearings. See Ebert v. Gaetz, 610 F.3d 404, 414 (7th Cir. 2010)(concluding that the confrontation right does not apply at a suppression hearing); United States v. Garcia, 324 F. App'x at 708 ("There is no binding precedent from the Supreme Court or this court concerning whether Crawford applies to pretrial suppression hearings. To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not

1.     On August 3, 2021, Deputy United States Marshal Joshua Marreel, a full-time enforcement deputy with the Southwest Investigative Fugitive Task Force, then-Task Force Officer David Booth[4], and other officers were attempting to locate and execute an arrest warrant on Jerome Marcel Bland for a grade C probation violation.  See Transcript of Motion Proceedings

---

benefit Mr. Garcia.”); United States v. Robinson, 663 F. App'x 215, 218 (3d Cir. 2016)(“The Supreme Court has never suggested . . . that the Confrontation Clause applies during a pre-trial suppression hearing”)(citing Crawford v. Washington, 541 U.S. at 53-54; United States v. Raddatz, 447 U.S. 667, 679 (1980)(“This Court on other occasions has noted that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself.  At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.”); Barber v. Page, 390 U.S. 719, 725 (1968)(“The right to confrontation is basically a trial right.”)); United States v. Morales Rittinger, No. 2:16-CR-053-D(2), 2017 WL 367491, at *3 n.2 (N.D. Tex. January 25, 2017)(Fitzwater, J.)(“Absent controlling authority that Crawford applies to a suppression hearing . . . the court holds that it does not apply.”); United States v. Shaw, No. 16-cr-642 (RJS), 2017 WL 1380598, at *7 (S.D.N.Y. April 13, 2017)(Sullivan, J.)(“This Court . . . concludes that the Sixth Amendment right to confrontation does not apply to pretrial suppression hearings.”); Desmarat v. Artus, No. 09-CV-231 (JG), 2009 WL 2867900, at *11 (E.D.N.Y. September 3, 2009)(Gleeson, J.)(“Crawford is inapplicable to statements made at pretrial suppression hearings.”); Washburn v. United States, No. 3:05-CV-774 RM, 2007 WL 670953, at *2 (N.D. Ind. February 27, 2007)(Miller, C.J.)(“This court concluded that Crawford v. Washington doesn't apply to a pre-trial suppression hearing . . . .”); United States v. Wellman, No. 1:08-cr-00043, 2009 WL 37184, at *3 (S.D.W. Va. January 7, 2009) (Johnson, J.)(“Crawford applies only to trials and not to suppression hearings.”). Cf. United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007)(“[W]e hold that Crawford does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence.”); United States v. Rucker, 545 F. App'x 567, 571 (8th Cir. 2013)(concluding that “[c]ourts may consider hearsay evidence at suppression hearings,” and thus, that the lower court's admission of hearsay did not violate the defendant's confrontation rights under Crawford v. Washington); United States v. Saneaux, 365 F. Supp. 2d 493, 498 n.5 (S.D.N.Y. 2005)(Haight, S.J.)(concluding that Crawford v. Washington does not apply to determining whether a statement is admissible under the coconspirators hearsay exception: “[B]ecause the Court is not bound by the Rules of Evidence in the disposition of preliminary matters such as this one, I may properly consider such evidence even if it cannot be introduced at trial.”).

[4]David Booth formerly was a task force officer but has since become a deputy with the Bernalillo County Sheriff's Department.  See Aug. 31 Tr. at 108:22-23 (Ramirez); id. at 109:11-12 (Booth).

at 22:4-23:2 (dated August 31, 2022), filed September 14, 2022 (Doc. 51)("Aug. 31 Tr.")(Marreel, Ramirez); id. at 111:15-22 (Booth, Ramirez).

2.      The arrest warrant lists "447 WISCONSIN NE APT C Albuquerque NM 87108" as Bland's address.  Bench Warrant at 1 (dated June 23, 2021)(admitted on August 31, 2022, at the suppression hearing as U.S. Hearing Ex. 17).  See Aug. 31 Tr. at 25:5-6 (Marreel); id. at 112:3 (Booth).

3.      Marreel and Booth surveilled generally the area around 447 Wisconsin Street NE, an address on Texas Street NE, and 524 Vermont Street NE.  See Aug. 31 Tr. at 25:9-25 (Marreel, Ramirez); id. at 112:8-9 (Booth).

4.      524 Vermont Street NE lies on Vermont Street NE's east side.  See Photograph of Aerial View over 524 Vermont Street NE (undated)(admitted on August 31, 2022, at suppression hearing as United States Ex. 1)("524 Vermont St. NE Aerial Photo.").

5.      524 Vermont Street NE lies between 528 Vermont Street NE to the north, 520 Vermont Street NE to the south, and the backyard of a house on 523 Virginia Street NE to the east. See 524 Vermont St. NE Aerial Photo.; Google Maps, 524 Vermont St NE, Albuquerque, NM 87108, https://goo.gl/maps/VHvu3NnoU3Z34ApD8 (last visited August 9, 2023).

6.      The lot at 520 Vermont Street NE contains a house with a detached garage to its north, separated by a small gap, and a backyard to the two structures' east.  See 524 Vermont St. NE Aerial Photo.; Photograph of 520 Vermont Street NE's Front (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 4).

7.      An apartment complex and parking lot stand on the 524 Vermont Street NE lot. See 524 Vermont St. NE Aerial Photo.

8.      Apartment A is on the complex's west side on the ground floor.  See Aug. 31 Tr. at 38:24-25 (Marreel).

9.      Apartment A's front door is its only entrance.  See Aug. 31 Tr. at 121:1-10 (Booth, Ramirez).

10.      The following is an aerial view showing 524 Vermont Street NE -- the white building in the center with the parking lot -- and 520 Vermont Street NE directly below:



524 Vermont St. NE Aerial Photo.

11.      In the early afternoon, "roughly right after lunch," Aug. 31 Tr. at 31:16-17 (Marreel), as Marreel was driving past 524 Vermont Street NE, he spotted Bland "on foot walking

into the northeast apartment, which [Marreel] . . . later found out to be Apartment A," Aug. 31 Tr. at 31:8-10 (Marreel).  See id. at 30:24-31:17 (Marreel, Ramirez); id. at 112:14-16 (Booth).

12.     Upon identifying Bland, Marreel radioed the other Task Force members who, together with Marreel, set up a perimeter around the block to surveil the residence into which Marreel observed Bland enter.  See Aug. 31 Tr. at 31:23-32:11 (Marreel, Ramirez); id. at 112:17-20 (Booth, Ramirez).

13.     The operation was taking place in "a high crime area in Albuquerque, if not the highest crime area in Albuquerque." Transcript of October 4, 2022, Hearing at 239:14-16 (taken October 4, 2022), filed October 25, 2022 (Doc. 53)("Oct. 4 Tr.")(Salcido).

14.     During the surveillance operation, Marreel noted an individual walking up and down the street conducting "counter-surveillance," and observed two Black males exit 524 Vermont Street NE Apartment A at different times, meet with vehicles which would pull up to the apartment complex, and conduct what the believed to be "hand-to-hand" drug sales.  Aug. 31 Tr. at 34:9-17 (Marreel, Ramirez).  See id. at 33:17-34:10 (Marreel, Ramirez); id. at 35:16-18 (Marreel); id. at 117:17-22 (Booth, Ramirez).

15.     The person conducting counter-surveillance "[o]ccasionally . . . would go back in, come back out."  Aug. 31 Tr. at 37:10-11.

16.     Marreel did not observe Bland exit the residence during these sales.  See Aug. 31 Tr. at 35:10 (Marreel).

17.     The two individuals who exited Apartment A and conducted hand-to-hand sales were Colbert and Ruben Edwards.  See Aug. 31 Tr. at 35:19-25 (Marreel, Ramirez); id. at 117:23-118:15 (Booth, Ramirez); id. 118:24-120:24 (Court, Booth, Fernandez, Ramirez).

18.     Edwards was wearing camouflage shorts and a black T-shirt.  See Aug. 31 Tr. at 35:15-16 (Marreel); id. at 222:4-7 (Salcido).

19.     Colbert was wearing a gray T-shirt, but the officers did not identify what type of pants he was wearing.  See Aug. 31 Tr. at 35:13-15 (Marreel).

20.     Although Marreel did not see drugs in Edwards' or Colbert's hands while the two men engaged the vehicles, Booth witnessed Colbert exchange currency.  See Aug. 31 Tr. at 78:23-79:2 (Fernandez, Marreel); id. at 160:14-18 (Booth, Fernandez).

21.     Marreel witnessed "three to four hand-to-hands," after which four individuals, including Edwards and Bland, exited the residence; the other two individuals -- the person conducting counter-surveillance and an unidentified fourth individual -- entered a white Mercedes Benz and left the area.  Aug. 31 Tr. at 37:12.  See id. at 37:16-38:7 (Marreel, Ramirez); id. at 121:13-15 (Booth).

22.     Colbert was not among the four individuals who left the residence.  See Aug. 31 Tr. at 38:8-10 (Marreel, Ramirez).

23.     After the Mercedes Benz left the area, Bland, who was carrying a red backpack, approached and entered a black Kia's driver-side door, while Edwards entered the Kia's front passenger door.  See Aug. 31 Tr. at 38:17-22 (Marreel, Ramirez); id. at 40:13-15 (Marreel); id. at 123:5-16 (Booth, Ramirez).

24.     Marreel and Booth radioed the other Task Force members to alert them that they positively had identified Bland exiting Apartment A.  See Aug. 31 Tr. at 40:16-20 (Marreel, Ramirez); id. at 122:11-14 (Booth).

25.     Booth initiated "a takedown of that vehicle," which involved a "vehicle pin," whereby he "ma[d]e contact with the vehicle . . . and appl[ied] pressure onto that vehicle, to

basically immobilize it."  Aug. 31 Tr. at 41:5-20 (Marreel, Ramirez).  See id. at 43:1-5 (Marreel, Ramirez); id. at 124:6-16 (Booth, Ramirez).

26.     Booth opened the driver-side door to his United States Marshal's Service-issued vehicle and began directing Bland to "put your hands up; turn the vehicle off."  Aug. 31 Tr. at 125:14-19 (Booth).

27.     While Booth kept contact against the Kia, Bland placed it alternately between reverse and drive, attempting to free the vehicle.  See Aug. 31 Tr. at 125:22-126:3 (Booth).

28.     As Booth performed the maneuver, Marreel and Deputy United States Marshal Jim Glissen approached the passenger side of Booth's vehicle, using the passenger door as cover.  See Aug. 31 Tr. at 126:11-127:5 (Booth, Ramirez).

29.     Both Booth and Marreel issued orders to Bland to shut off and exit the Kia.  See Aug. 31 Tr. at 43:8-44:8 (Marreel, Ramirez).

30.     Bland was able to drive over a nearby obstacle and escape the vehicle pin.  See Aug. 31 Tr. at 44:13-25 (Marreel, Ramirez); id. at 127:6-15 (Booth, Ramirez).

31.     Bland drove past the apartment complex's north side, turned south to drive past the building's east side, and crossed southwest through 520 Vermont Street NE's backyard before getting stuck between the south side of the house at 520 Vermont Street NE and the fence that separates 520 Vermont Street NE from 516 Vermont Street NE.  See Aug. 31 Tr. at 45:1-8 (Marreel, Ramirez); id. at 50:1-4 (Marreel, Ramirez); id. at 127:16-20 (Booth, Ramirez); id. at 128:7-15 (Booth); Marked Copy of Photograph of Aerial View over 524 Vermont Street NE (undated)(admitted on August 31, 2022, at suppression hearing as United States Ex. 1A)("Marked Aerial View").

32.     There is no sight line from Apartment A to the Kia's location when it became stuck. See Aug. 31 Tr. at 95:18-96:7 (Fernandez, Marreel).

33.     Bland and Edwards exited the Kia via the sunroof, and attempted to flee through 520 Vermont Street NE's backyard.  See Aug. 31 Tr. at 53:7-10 (Marreel); id. at 62:22-23 (Marreel).

34.     Edwards was holding the red backpack.  See Aug. 31 Tr. at 129:21-23 (Booth).

35.     Bland initially ran back and forth looking for a route to escape, at which point officers issued orders to Bland and Edward to stop, and to put their hands up.  See Aug. 31 Tr. at 55:18-23 (Marreel).

36.     Once officers began issuing orders, Bland fled between 520 Vermont Street NE's residence and detached garage towards Vermont Street NE, while Edwards ran to Apartment A's southwest corner and began yelling into Apartment A's rear window.  See Aug. 31 Tr. at 55:23-56:3 (Marreel); id. at 57:3-12 (Marreel, Ramirez); id. at 129:24-130:5 (Booth); id. at 131:10-22 (Booth, Ramirez); id. at 132:11-12 (Booth).

37.     The officers did not hear what Edwards shouted.  See Aug. 31 Tr. at 132:5-8 (Booth, Ramirez); id. at 154:21-23 (Booth).

38.     Apartment A's rear window looks south onto 520 Vermont Street NE.  See Marked Aerial View.

39.     Objects were covering Apartment A's rear window.  See Aug. 31 Tr. at 132:19-21 (Booth); Photograph of Colbert's Window, Television, and Air Conditioning Unit (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 16)("Interior Bedroom Photo.").

40.     The rear window was closed.  See Aug. 31 Tr. at 147:23 (Booth).

41.     Shortly after reaching Apartment A's rear window, Edwards began complying with the officers' commands.  See Aug. 31 Tr. at 131:22-23 (Booth).

42.     Booth and Supervising Deputy United States Marshal Vince Gambone took Edwards into custody.  See Aug. 31 Tr. at 60:4-6 (Marreel); id. at 131:24-132:4 (Booth); id. at 154:3 (Booth).

43.     Officers took Bland into custody at approximately the same time.  See Aug. 31 Tr. at 99:9-12 (Fernandez, Marreel).

44.     Neither Bland nor Edwards were carrying firearms.  See Aug. 31 Tr. at 84:8-15 (Fernandez, Marreel); Oct. 4 Tr. at 266:16-21 (Fernandez, Salcido).

45.     One individual remained unaccounted for in Apartment A.  See Aug. 31 Tr. at 58:25-59:1 (Marreel).

46.     Marreel was concerned that the unaccounted-for individual could have access to firearms inside Apartment A, and that Apartment A's rear window could present a threat.  See Aug. 31 Tr. at 59:21-61:20 (Marreel, Ramirez).

47.     The officers were concerned that the unaccounted-for individual could have been barricading himself or herself inside Apartment A, retrieving weapons, destroying evidence, or burrowing through neighboring apartment walls.  See Oct. 4 Tr. at 239:21-25 Salcido); id. at 242:21-243:1 (Ramirez, Salcido); id. at 246:4-15 (Ramirez, Salcido); id. at 248:10-24 (Ramirez, Salcido)

48.     The incident caused a loud commotion, to which police lights and sirens contributed.  See Aug. 31 Tr. at  105:8-9 (Marreel); id. at 149:1-5 (Booth, Fernandez).

49.     Marreel did not observe anyone look out of the rear window from Apartment A. See Aug. 31 Tr. at 93:25-94:1 (Fernandez, Marreel).

50.     Marreel did not observe anyone make threats out of Apartment A's rear window. See Aug. 31 Tr. at 94:2-3 (Fernandez, Marreel).

51.     Marreel did not observe any weapons in Apartment A through its rear window.  See Aug. 31 Tr. at 94:4-6 (Fernandez, Marreel).

52.     The officers did not know whether the remaining individual in Apartment A had heard the commotion or was aware of the police presence around the apartment.  See Aug. 31 Tr. 101:19-22 (Fernandez, Marreel); id. at 107:9-12 (Fernandez, Marreel); id. at 149:9-10 (Booth)("It was a functioning siren.  I couldn't tell you how far they could hear it.").

53.     After taking Edwards and Bland into custody, Booth approached the Kia, broke its windshield and rear window, shifted its gear from drive to park, and turned off the engine.  See Aug. 31 Tr. at 62:11-13 (Marreel); id. at 63:3-5 (Marreel); id. at 135:4-16 (Booth).

54.     Marreel held up a shield between Edwards and Apartment A's window for "at max over three minutes" before Booth turned off the Kia.  Aug. 31 Tr. at 107:1-7 (Fernandez, Marreel).

55.     The shield was a III-A-rated ballistic shield with a small Plexiglas window used for protection from gunfire.  See Aug. 31 Tr. at 93:8-10 (Marreel).

56.     The officers did not find a gun in the Kia or anywhere outside of Apartment A.  See Oct. 4 Tr. at 267:4-6 (Fernandez, Salcido); id. at 267:17-19 (Fernandez, Salcido).

57.     Officers did not hear gunshots at any point during the operation.  See Aug. 31 Tr. at 84:23-25 (Fernandez, Marreel).

58.     Edwards and Bland left the red backpack behind in the middle of 520 Vermont Street NE's backyard.  See Aug. 31 Tr. at 64:19-21 (Marreel).

59.     Sometime after the officers turned off the Kia, Task Force Officer Matthew Salcido, a Deportation Officer with Immigration and Customs Enforcement, searched the red backpack and

was "waiting for a response from DEA."  Oct. 4 Tr. at 238:11-12 (Salcido).  See Aug. 31 Tr. at 215:12-14 (Salcido).

60.     In the red backpack was one pound of crystal methamphetamine, marijuana, a Batman-themed pencil case, fentanyl, black tar heroin, crack cocaine, powdered cocaine, a scale, and cash.  See Aug. 31 Tr. at 65:21-66:9 (Marreel, Ramirez); id. at 67:3 (Marreel); id. at 67:18 (Marreel); id. at 68:1-2 (Marreel); id. at 68:15-18 (Marreel, Ramirez); id. at 69:1-2 (Marreel); id. at 69:9 (Marreel); id. at 69:15 (Marreel); Oct. 4 Tr. at 295:16-23 (Coffey, Ramirez); Photograph of Red Backpack on Ground (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 9a); Photograph of Red Backpack Close-Up (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 9b); Photograph of Red Backpack with Plastic Bag Partially Removed (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 9c); Photograph of Plastic Bag with White Substance (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 9d); Photograph of Plastic Bag with Marijuana (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 9e); Photograph of Closed Batman Pencil Case (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 9f); Photograph of Open Batman Pencil Case with Cash (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 9g); Photograph of Six Plastic Bags with Various Substances and Scale (undated)(admitted on August 31, 2022, at the suppression hearing as United States Ex. 9h).

61.     The red backpack's contents are consistent with use in drug trafficking rather than with personal use only.  See Oct. 4 Tr. at 293:16-20 (Coffey, Ramirez).

62.     Officers did not find any guns in the red backpack.  See Aug. 31 Tr. at 84:16-18 (Fernandez, Marreel).

63.     Officers contacted the Drug Enforcement Administration ("DEA") regarding the red backpack and its contents, and Marreel and Glissen maintained security over the bag until DEA agents arrived on the scene.  See Aug. 31 Tr. at 70:5-15 (Marreel, Ramirez).

64.     "[F]airly quick[ly]" after the officers arrested Bland and Edwards and after Booth shut off the Kia, Gambone instructed the officers to enter and clear Apartment A to ensure officer safety.  Aug. 31 Tr. at 98:21-25 (Marreel, Ramirez).  See id. at 62:15-16 (Marreel); id. at 63:17-18 (Marreel); id. at 98:24-99:8 (Marreel); id. at 134:18-21 (Booth); id. at 153:25-154:5 (Booth, Fernandez).

65.     Marreel maintained cover, or protective lookout, over Apartment A's rear window "in case an individual would come out or . . . evidence was being discarded out that back window." Aug. 31 Tr. at 64:7-9 (Marreel).

66.     Salcido took "point" of a group that approached Apartment A.  Oct. 4 Tr. at 244:4 (Salcido).

67.     Salcido directed Task Force Officer Mitch Benstein to retrieve breaching tools, including a ram and a Halligan.  See Oct. 4 Tr. at 244:23-245:4 (Salcido).

68.     A Halligan is "a multipurpose tool for prying, twisting, punching, or striking.  It consists of a claw (or fork), a blade (wedge or adze), and a tapered pick, which is especially useful in quickly breaching many types of locked doors."     Wikipedia, Halligan bar, https://en.wikipedia.org/wiki/Halligan_bar (last edited January 2, 2023).  See Oct. 4 Tr. at 244:23-245:4 (Salcido).

69.     Officers approached Apartment A, knocked on the apartment door, announced their presence, and directed any occupants to come to the door.  See Aug. 31 Tr. at 135:20-136:13 (Booth, Ramirez).

70.     Salcido knocked and made announcements for "[p]robably close to a good minute" before Benstein retuned with the breaching tools.  Oct. 4 Tr. at 245:14-20 (Ramirez, Salcido).

71.     Salcido used the Halligan successfully to breach Apartment A's wrought iron security door and its wooden main door.  See Oct. 4 Tr. at 247:5-248:9 (Ramirez, Salcido).

72.     As officers moved through the residence, they did not see anyone located in the kitchen, the living room, the restroom, or the east bedroom.  See Aug. 31 Tr. at 138:18-140:6 (Booth, Ramirez); Oct. 4 Tr. at 250:1-2 (Ramirez, Salcido); id. 250:10-24 (Ramirez, Salcido); id. 251:2-12 (Ramirez, Salcido); id. at 251:22-252:5 (Ramirez, Salcido).

73.     Booth and Salcido came to Apartment A's west bedroom, at which point Booth announced his presence, knocked on the door, and, receiving no response, used his foot to force open the locked door.  See Aug. 31 Tr. at 140:16-19 (Booth); Oct. 4 Tr. at 253:4-7 (Salcido).

74.     While Booth was knocking, he held his weapon in front of him.  See Oct. 4 Tr. at 254:18-20 (Salcido).

75.     When Booth kicked the door, the door's lower half broke apart and went inside the bedroom.  See Oct. 4 Tr. at 254:23-25 (Salcido).

76.     The door's top half remained shut, because it was fastened with a latch made from electrical wire.  See Oct. 4 Tr. at 255:3-9 (Salcido).

77.     Although the door did not open completely, Booth could see Colbert inside the room on the bed, at which point Booth began giving Colbert commands.  See Aug. 31 Tr. at 140:19-24 (Booth)

78.     As Colbert approached the door, Salcido could see his bare legs.  Oct. 4 Tr. at 254:25-255:1 (Salcido).

79.     When Booth observed Colbert, Colbert was "clothed."  Aug. 31 Tr. at 142:15 (Booth).  See id. at 142:14-24 (Booth, Ramirez).

80.     Booth and Salcido did not identify anyone else in the bedroom.  See Aug. 31 Tr. at 141:4-6 (Booth, Ramirez).

81.     Colbert complied slowly with the commands and opened the door, at which point the officers took him into custody.  See Aug. 31 Tr. at 140:24-141:3 (Booth).

82.     Officers handcuffed Colbert with his hands behind his back.  See Oct. 4 Tr. at 256:16-18 (Ramirez, Salcido).

83.     Officers removed Colbert from Apartment A immediately after taking him into custody.  See Oct. 4 Tr. at 255:23-256:1 (Ramirez, Salcido).

84.     Sometime after the officers took Colbert into custody, Deputy United States Marshal Jerry Thompson and DEA Agent Kyle Coffey arrived at 524 Vermont Street NE upon learning from DEA Group Supervisor Brian Shields that officers had discovered "approximately one pound or more of methamphetamine."  Aug. 31 Tr. at 180:25-181:1 (Thompson).  See id. at 180:22-181:5 (Ramirez, Thompson).

85.     Coffey and Thompson arrived after the enforcement activities had ended, after the officers had taken Colbert into custody, and once "the scene was secure and safe."  Oct. 4 Tr. at 291:16-17 (Coffey).  See Aug. 31 Tr. at 181:5 (Coffey); Oct. 4 Tr. at 296:24-297:1 (Coffey).

86.     Coffey and Thompson wandered the scene, observing the incapacitated black Kia, various car parts, and Glissen guarding the red backpack, before returning to the residence's west side.  See Aug. 31 Tr. at 182:9-185:9 (Fernandez, Ramirez, Thompson); Oct. 4 Tr. at 289:2-291:8 (Coffey, Ramirez).

87.     There were as many as twenty officers and marshals on the arrest scene.  See Oct. 4 Tr. at 293:16-19 (Coffey).

88.     After discussing with the other officers on the scene what had occurred, Coffey and Thompson decided to speak with Colbert.  See Aug. 31 Tr. at 203:11-18 (Fernandez, Thompson).

89.     Coffey and Thompson took Colbert, who was in custody, across Vermont Street NE and slightly to the south to conduct a "custodial interview."  Aug. 31 Tr. at 186:4 (Thompson).  See id. at 185:13-186:10 (Ramirez, Thompson); Oct. 4 Tr. at 297:12-21 (Coffey).

90.     No other agents were present while Coffey and Thompson spoke to Colbert.  See Aug. 31 Tr. at 187:23-188:1 (Ramirez, Thompson)).

91.     The two agents dealt with Colbert in this manner, "[b]ecause people would hear what we're talking about during the interview," Aug 31 Tr. at 186:16-17 (Thompson), and so that Colbert would not "feel an overwhelming sense of law enforcement," Oct. 4 Tr. at 298:12 (Coffey).

92.     Coffey asked Colbert whether Colbert would be willing to answer some questions and speak with Coffey, to which Colbert replied that he would be willing to speak with Coffey.  See Oct. 4 Tr. at 299:23-25 (Coffey).

93.     The conversation's tone was "conversational" and "[r]elatively relaxed."  Oct. 4 Tr. at 390:22-24 (Coffey).

94.     Coffey pulled a DEA 13A card[5] out of his wallet and read Colbert his Miranda[6] advisements.  See Aug. 31 Tr. at 186:21-187:2 (Thompson).

---

[5]A DEA 13A card is "a card with preprinted Miranda instructions."  Oct. 4 Tr. at 300:4-5 (Coffey).  See Form DEA-13A at 1 (dated September 2009)(admitted on October 4, 2022, at suppression hearing as United States Ex. 38).

[6]Miranda v. Arizona, 384 U.S. 436 (1966)("Miranda"), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States

95.     Thompson was wearing "a vest with law enforcement markings" that said: "Police US Marshal."  Aug. 31 Tr. at 187:16-17 (Thompson).

96.     Coffey was dressed in tennis shoes, shorts, and a t-shirt, which covered his holstered gun.  See Oct. 4 Tr. at 301:19-302:12 (Coffey, Ramirez).

97.     Coffey did not display his badge of authority, because he was not wearing a belt. See Oct. 4 Tr. at 302:1-4 (Coffey).

98.     Neither Thompson nor Coffey had their guns drawn.  See Aug. 31 Tr. at 187:18-22 (Ramirez, Thompson); Oct. 4 Tr. at 301:13-16 (Coffey, Ramirez).

99.     Coffey read Colbert his Miranda advisements at 3:56 p.m.  See Consent Form at 1.

100.    At most two hours and fifteen minutes elapsed between Colbert's arrest and Coffey's reading Colbert his Miranda advisements.[7]

---

v. Perdue, 8 F.3d at 1463 (quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme Court provides the warning's substance that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

384 U.S. at 444-45.

[7]As the Court discusses in depth below, the United States bears the burden to demonstrate that, if Colbert's arrest was unlawful, that his subsequent consent is sufficiently attenuated from the unlawful arrest, for which the consent's temporal proximity to the unlawful arrest is a relevant factor.  See Analysis, infra at 179; Kaupp v. Texas, 538 U.S. 626 633 (2003).  The United States has not met its burden to demonstrate that Colbert's consent was not temporally proximate to the unlawful entry and arrest.  For reasons which the Court discusses here, the Court concludes that at

most two hours and fifteen minutes elapsed between Colbert's arrest and Coffey's reading of Colbert's <u>Miranda</u> advisements.

The testimony which the United States elicited at the hearing indicates that Marreel first spotted Bland entering Apartment A and informed the other officers of Bland's location in the "early afternoon, roughly right after lunch." Factual Background, <u>supra</u> ¶ 11, at 6 (quoting Aug. 31 Tr. at 31:16-17 (Marreel)). Marreel then began surveilling 524 Vermont Street, and observed Colbert and Edwards conducting hand-to-hand sales and a third individual conducting countersurveillance. <u>See</u> Factual Background, <u>supra</u> ¶ 14, at 7 (quoting Aug. 31 Tr. at 34:9-17 (Marreel, Ramirez), and citing Aug. 31 Tr. at 35:16-18 (Marreel); <u>id.</u> at 117:17-22 (Booth, Ramirez)). Marreel continued surveilling the apartment until Bland exited, at which point Booth began his pinning operation against the black Kia. <u>See</u> Factual Background, <u>supra</u> ¶¶ 21-25, at 8. None of the United States' witnesses or exhibits indicate what time the officers observed Bland leaving the apartment. At most, Marreel had time to observe Colbert and Edwards conduct "'three to four hand-to-hands.'" Factual Background, <u>supra</u> ¶ 16, at 7 (quoting Aug. 31 Tr. at 37:12 (Marreel)). He also had sufficient time to observe that the individual conducting countersurveillance "[o]ccasionally . . . would go back in, come back out." Factual Background, <u>supra</u> ¶ 15, at 7 (quoting Aug. 31 Tr. at 37:10-11). After the pinning operation and Bland and Edwards attempt to flee, Marreel held up a shield between Edwards and Apartment A's window for "at max over three minutes" before Booth turned off the black Kia. Factual Background, <u>supra</u> ¶ 54, at 13 (quoting Aug. 31 Tr. at 107:1-7 (Fernandez, Marreel)). Sometime after the officers turned the Kia off, Salcido searched the red backpack and was "waiting for a response from DEA." Factual Background, <u>supra</u> ¶ 58, at 12 (quoting Oct. 4 Tr. at 238:11-12 (Salcido)). Salcido noted that "[a]t that point . . . it was a cumulative decision to do a security sweep of Apartment A," Oct. 4 Tr. at 238:11-14 (Salcido), which took place "fairly quick[ly]" after the officers arrested Bland and Edwards, Factual Background, <u>supra</u> ¶ 63, at 13 (quoting Aug. 31 Tr. at 98:21-25 (Marreel, Ramirez)). Salcido knocked on Apartment A's front door for "[p]robably close to a good minute" before Benstein retrieved breaching tools. Factual Background, <u>supra</u> ¶ 69, at 14 (quoting Oct. 4 Tr. at 245:14-20 (Ramirez, Salcido)). Coffey does not state exactly when he arrived on the scene, but indicates that he arrived after "the scene was secure and safe." Factual Background, <u>supra</u> ¶ 84, at 16 (quoting Oct. 4 Tr. at 291:16-17 (Coffey)). He states that he "arriv[ed] to the scene a little bit classified as late, or after the enforcement activities were over" -- after Booth and Salcido already had arrested Colbert. Factual Background, <u>supra</u> ¶ 84, at 16 (citing Oct. 4 Tr. at 296:24-297:1 (Coffey)). The DEA 88 Consent to Search Form (dated August 3, 2021)(admitted on August 31, 2022, at suppression hearing as United States Ex. 20)("Consent Form") indicates that Coffey read Colbert his <u>Miranda</u> advisements at 3:56 p.m. <u>See</u> Factual Background, ¶ 98, at 18 (citing Consent Form at 1).

On the basis of these facts, the United States has not shown that substantial time elapsed between Colbert's arrest and his consent to search. Marreel saw Bland enter Apartment A in the early afternoon, meaning that at most four hours elapsed between the surveillance operation's commencement and Colbert's consent to speak to Coffey. The surveillance operation did not begin right at 12:00 p.m., however, as Marreel refers to sometime "right after lunch." Factual Background, <u>supra</u> ¶ 11, at 6 (quoting Aug. 31 Tr. at 31:16-17 (Marreel)). The officers did not enter Apartment A immediately after the surveillance operation began, because sufficient time elapsed for Marreel to witness at least three hand-to-hand sales before Bland exited the apartment.

101.    While Coffey read Colbert his <u>Miranda</u> advisements, Colbert was coherent, understood English, and, when given the chance to ask questions, did not ask any questions.  <u>See</u> Aug. 31 Tr. at 188:2-13 (Ramirez, Thompson); Oct. 4 Tr. at 299:7-14 (Coffey, Ramirez); ); <u>id.</u> at 299:20 (Coffey); <u>id.</u> at 303:4-9 (Coffey, Ramirez).

102.    Each time Coffey read one of the <u>Miranda</u> advisements, he asked Colbert whether he understood, to which Colbert replied yes.  <u>See</u> Oct. 4 Tr. at 303:10-23 (Coffey, Ramirez).

103.    After Coffey finished reading Colbert his <u>Miranda</u> advisements, Colbert stated verbally that he was willing to speak to Coffey.  <u>See</u> Aug. 31 Tr. at 188:14-22 (Ramirez, Thompson).

104.    Coffey and Colbert discussed "the residence and apartment at 524 [Vermont Street, NE], specifically Apartment A . . . ."  Aug. 31 Tr. at 189:6-7 (Thompson).

105.    During this discussion, Colbert stated that he lived in Apartment A.  <u>See</u> Aug. 31 Tr. at 189:11-13 (Ramirez, Thompson); Oct. 4 Tr. at 309:3-6 (Coffey).

106.    Colbert stated that his bedroom was "the bedroom that has the wall that runs adjacent to the parking lot there," referring to the westernmost wall.  Oct. 4 Tr. at 209:20-22 (Coffey).  <u>See</u> <u>id.</u> at 310:10-13 (Coffey).

107.    Colbert also stated that his personal bedroom was the same one in which the officers had found him earlier that day.  <u>See</u> Oct. 4 Tr. at 310:13-15 (Coffey).

---

<u>See</u> Factual Background, <u>supra</u> ¶ 16, at 7 (quoting Aug. 31 Tr. at 37:12).  The Court determines that right after lunch refers to 1:00 p.m., that the officers surveilled Apartment A for thirty minutes, and that no more than fifteen minutes elapsed between Bland exiting Apartment A and Colbert's arrest.  Because Coffey read Colbert his <u>Miranda</u> advisements at 3:58 p.m., <u>see</u> Factual Background, <u>supra</u> ¶ 98, at 18 (citing Consent Form at 1), the Court concludes that no more than two hours and fifteen minutes elapsed between Colbert's arrest and Coffey reading him his <u>Miranda</u> advisements.

108.    Coffey asked whether there was anything like drugs or weapons in the apartment, to which Colbert replied "that there were guns and drugs in his apartment."  Oct. 4 Tr. at 311:3-4 (Coffey).  See id. at 310:19-311:4 (Coffey).

109.    Coffey requested Colbert's consent to search Apartment A.  See Aug. 31 Tr. at 189:14-16 (Ramirez, Thompson); Oct. 4 Tr. at 311:18-19 (Coffey).

110.    Colbert responded that he consented to Coffey's search of the apartment.  See Oct. 4 Tr. at 311:19 (Coffey).

111.    Coffey left to retrieve a DEA 88 Consent to Search Form (dated August 3, 2021)(admitted on August 31, 2022, at suppression hearing as United States Ex. 20)("Consent Form"), which Coffey then presented to Colbert.  See Oct. 4 Tr. at 311:21-25 (Coffey).

112.    Coffey read each section of the Consent Form aloud to Colbert before giving Colbert a chance to ask questions.  See Aug. 31 Tr. at 191:4-10 (Ramirez, Thompson).

113.    Colbert did not ask any questions about the Consent Form.  See Oct. 4 Tr. at 316:4-8 (Coffey, Ramirez).

114.    The Consent Form's § 1 states: "I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH: (Describe the person, places or things to be searched.)," and provides a blank space for specifics regarding the search.  Consent Form § 1, at 1.

115.    In the space provided in § 1, "524 Vermont St NE, Apartment A, Albuquerque, NM, 87108 -- Entire Apartment A" is listed.  Consent Form § 1, at 1.

116.    When Coffey first read the Consent Form aloud to Colbert, the space under § 1 was blank, and Coffey verbally stated "524 Vermont Street, Northeast, Apartment A."  Oct. 4 Tr. at 313:1-3 (Coffey).

117.    Section 2 states: "I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY."  Consent Form § 2, at 1.

118.    Section 3 states: "I FREELY CONSENT TO THIS SEARCH."  Consent Form § 3, at 1.

119.    Below § 3 are lines for the date, the consenting individual's signature, and two witnesses' signatures.  See Consent Form at 1.

120.    After Coffey read Colbert each of the Consent Form's sections, he asked Colbert whether Colbert would sign to form to indicate his agreement with what Coffey read.  See Oct. 4 Tr. at 313:4-7 (Coffey).

121.    At that time, Coffey wrote "524 Vermont Street, Northeast, Apartment A, Albuquerque, New Mexico," in the blank space under § 1.  Oct. 4 Tr. at 313:7-9 (Coffey); Consent Form § 1, at 1.

122.    Coffey asked Colbert whether "this is you[r] whole apartment, not just the specific bedroom; correct?"  Oct. 4 Tr. at 313:9-12 (Coffey).

123.    Colbert stated "yes," indicating that Apartment A was his apartment.  Oct. 4 Tr. at 313:12-13 (Coffey).

124.    Accordingly, Coffey wrote "entire Apartment A" in the blank space under § 1.  Oct. 4 Tr. at 313:14 (Coffey).

125.    Coffey instructed Colbert to read each section and initial next to each number, but not to initial or sign if he did not agree with each statement.  See Oct. 4 Tr. at 315:19-24 (Coffey).

126.    If Colbert had wanted to limit the search to specific areas of the apartment, he had the opportunity to impose limitations.[8]

127.    Colbert indicated that he understood, initialed next to each section and signed the Consent Form.  See Consent Form at 1; Aug. 31 Tr. at 191:11-193:3 (Ramirez, Thompson); Oct. 4 Tr. at 315:24-316:3 (Coffey).

128.    Coffey and Thompson signed the Consent Form as witnesses.  See Consent Form at 1.

129.    Coffey did not threaten Colbert or make any promises of leniency before Colbert signed the Consent Form, and Colbert was not handcuffed as he signed and initialed the Consent Form.  See Aug. 31 Tr. at 193:8-16 (Ramirez, Thompson); Oct. 4 Tr. at 316:11-18 (Coffey, Ramirez).

130.    Colbert was handcuffed before and after signing and initialing the Consent Form, and while Coffey read him the Miranda advisements.  See Aug. 31 Tr. at 194:19-195:15 (Fernandez, Thompson).

131.    Coffey and Thompson did not tell Colbert explicitly that he was not obligated to sign the Consent Form.  See Aug. 31 Tr. at 198:24-199:3 (Fernandez, Thompson).

132.    Coffey and Thompson did not use implied or express duress or coercion to extract Colbert's consent to search Apartment A.[9]

---

[8]The Court reaches this conclusion based on the conversation that Colbert and Coffey had regarding the search's scope, including Coffey's clarification regarding whether the officers could search the entire apartment, and Coffey's instruction to Colbert that Colbert did not need to initial or sign parts of the Consent Form with which he did not agree.  See Factual Background, supra ¶¶ 119-124, at 22.

[9]The Court reaches this conclusion in its Analysis, infra at 175, after considering the circumstances surrounding Colbert's conversation with Coffey, as well as Coffey and Thompson's

133.    Under the totality of the circumstances, Colbert consented to the search of Apartment A freely and voluntarily.[10]

134.    After speaking with Colbert, Coffey and Thompson returned custody over Colbert to two Deputy United States Marshals who were on the scene.  See Oct. 4 Tr. at 317:20-21 (Coffey).

135.    Coffey instructed the Marshals to stay with Colbert in case Colbert decided to revoke his consent to search Apartment A.  See Oct. 4 Tr. at 317:23-25 (Coffey).

136.    Colbert was not prohibited or otherwise restricted from rescinding his consent at any time.  See Oct. 4 Tr. at 388:25-389:24 (Coffey, Fernandez).

137.    When Colbert gave his consent to search Apartment A, Coffey and Thompson did not have a warrant to search the apartment.  See Aug. 31 Tr. at 204:16-21 (Fernandez, Thompson).

138.    None of the officers had initiated the process of obtaining a search warrant before Colbert gave his consent to search the Apartment.  See Aug. 31 Tr. at 204:19-205:6 (Fernandez, Thompson).[11]

---

dress, demeanor, and actions during the conversation.

[10]The Court reaches this conclusion in its Analysis, infra at 179, where it considers the circumstances surrounding Colbert's arrest and his conversation with Coffey before signing the Consent Form.

[11]The Tenth Circuit in United States v. Cuaron, 700 F.2d 582 (10th Cir. 1983), explains: "It is true . . . that the government presented no evidence of the time needed to obtain a telephone warrant.  As a general rule the government must shoulder this burden." 700 F.2d at 590 n.6.  Based on the testimony elicited at the hearings -- none of which indicates that the officers had a search warrant, were in the process of obtaining a search warrant, or intended to obtain a search warrant -- as well as the United States' Response to the Suppression Motion, in which the United States asserts that "there is ample evidence to support probable cause and to obtain a search warrant.  Had the defendant declined to provide consent, law enforcement would have had sufficient information to support the issuance of a search warrant for Apartment A," Suppression Response at 20, the Court concludes that officers did not take any steps to obtain a warrant.

139.    The United States District of New Mexico has an on-duty Magistrate Judge ready to take telephone calls from officers seeking warrants, which makes the warrant-seeking process relatively quick.[12]

140.    The officers waited until Colbert provided consent to search before re-entering Apartment A.  See Aug. 31 Tr. at 205:7-13 (Fernandez, Thompson); Oct. 4 Tr. at 364:9-13 (Coffey)("[P]robable cause could be used to obtain a search warrant . . . .  But his consent would provide us what we need legally to enter his apartment and conduct a search . . . .").

141.    Although the officers on the scene had conducted a "search for persons," they had not searched Apartment A yet for contraband.  Oct. 4 Tr. at 318:22-24 (Coffey).

142.    Coffey and Thompson joined the team searching Apartment A.  See Aug. 31 Tr. at 205:11-16 (Fernandez, Thompson); Oct. 4 Tr. at 318:15-18 (Coffey).

143.    Colbert's bedroom window is the same window to which Edwards ran after escaping the black Kia.  See Aug. 31 Tr. at 141:13-19 (Booth, Ramirez); Interior Bedroom Photo.

144.    Blinds and a semi-transparent tapestry covered Colbert's bedroom window.  See Interior Bedroom Photo.

145.    While Coffey searched Colbert's bedroom, he moved the bed and other items away from the closet door, which caused an AR-15 rifle to fall over and land on the ground.  See Oct. 4 Tr. at 323:21-324:2 (Coffey); id. at 325:21 (Coffey); id. at 331:3-4 (Coffey); Photograph of Rifle in Closet (undated)(admitted on October 4, 2022, at the suppression hearing as United States Ex. 32).

---

[12]The Court makes this finding based on its experience and on its discussions with Magistrate Judges in the District of New Mexico.

146.     As officers secured the rifle, they observed that the magazine was loaded.  See Oct. 4 Tr. at 327:1-5 (Coffey).

147.     The rifle's magazine was an "extended" or "drum" magazine, which holds more ammunition than a standard thirty-two or thirty-three-round magazine.[13]  Oct. 4 Tr. at 327:13-17 (Coffey).

148.     In addition to the loaded magazine, there was a bullet inserted in the rifle's chamber.  See Oct. 4 Tr. at 330:31-34; Photograph of Rifle's Chamber (undated)(admitted on October 4, 2022, at suppression hearing as United States Ex. 34).

149.     Coffey identified a pair of jeans in Colbert's bedroom which contained methamphetamine, fentanyl pills, several twenty-dollar bills, "other small items," and a piece of Colbert's mail.  Oct. 4 Tr. at 332:4-334:2 (Court, Coffey Fernandez, Ramirez).  See Photograph of Jeans Pocket (undated)(admitted on October 4, 2022, at suppression hearing as United States Ex. 25); Photograph of Drug Package Removed from Jeans Pocket (undated)(admitted on October 4, 2022, at suppression hearing as United States Ex. 26); Photograph of Jeans Contents (undated)(admitted on October 4, 2022, at suppression hearing as United States Ex. 27).

150.     Officers located an additional four firearms in Apartment A's east bedroom.  See Oct. 4 Tr. at 331:5-10 (Coffey, Ramirez).

---

[13]"[T]he most common self-loading rifles in the United States have a standard magazine capacity of between 20 and 30 rounds."  Matthew Larosiere, Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions, Cato Inst. (July 17, 2018), https://www.cato.org/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions.  Drum magazines, meanwhile, "store rounds in a spiral around the center of the magazine," and have a capacity that "is generally between 50 and 100 rounds."  Drum magazine, Wikipedia (last updated July 2, 2023), https://en.wikipedia.org/wiki/Drum_magazine (last visited July 25, 2023).

151.    Officers located a white bag with blue rubber bands, cotton, orange sharps containers,[14] syringes, fentanyl test kits, and Narcan.  See Oct. 4 Tr. at 337:4-339:5 (Coffey, Ramirez); Photograph of Drug Paraphernalia (undated)(admitted on October 4, 2022, at suppression hearing as United States Ex. 36).

152.    Narcan is the brand name for the drug naloxone, which is "a medicine that rapidly reverses an opioid overdose.  Examples of opioids include heroin[ and] fentanyl . . . ."  Nat'l Insts. of Health, Naloxone DrugFacts (Jan. 2022), https://nida.nih.gov/publications/drugfacts/naloxone (last visited February 15, 2023).

153.    The officers' discovery of the contraband inside Apartment A was not inevitable before Colbert gave his consent to search the apartment.[15]

154.    As part of Coffey's investigation, Coffey obtained Colbert's criminal history from the Chicago Police Department, a jurisdiction in which Colbert previously resided.  See Oct. 4 Tr. at 340:21-24 (Coffey, Ramirez); id. at 341:13-23 (Coffey, Ramirez); Criminal History Report of William D. Colbert (dated January 20, 2022) at 2-13 (admitted on October 4, 2022, at suppression hearing as United States Ex. 39).

---

[14]"The [Food and Drug Administration ("FDA")] recommends that used needles and other sharps be immediately placed in FDA-cleared sharps disposal containers . . . .  FDA-cleared sharps disposal containers are made from rigid plastic and come marked with a line that indicates when the container should be considered full, which means it's time to dispose of the container."  Sharps Disposal Containers, U.S. Food & Drug Admin. (April 28, 2021), https://www.fda.gov/medical-devices/safely-using-sharps-needles-and-syringes-home-work-and-travel/sharps-disposal-containers (last visited July 25, 2023).  See Oct. 4 Tr. at 338:14-18 (Coffey).

[15]The Court reaches this conclusion below, see Analysis, supra at 192, upon its application of the factual evidence to the factors which underlie the inevitable-discovery doctrine as an exception to the exclusionary rule.

155.    Colbert's Criminal History Report shows a total of thirty-three arrests and eight convictions between 1987 and 2014.  See Oct. 4 Tr. at 343:8-10 (Coffey, Ramirez); Criminal History Report at 2.

## PROCEDURAL BACKGROUND

Coffey charged Colbert with three violations: (i) 21 U.S.C. §§ 841(a)(1), (b)(1)(B), for possession with intent to distributed fifty grams and more of a mixture and substance containing methamphetamine; (ii) 21 U.S.C. §§ 841(a)(1), (b)(1)(B), for possession with intent to distribute forty grams and more of fentanyl, and (iii) 18 U.S.C. § 924(c), for possession of a firearm in furtherance of drug trafficking.  See Criminal Complaint at 1, filed August 4, 2021 (Doc. 2).  A Grand Jury indicted Colbert on two counts: (i) that Colbert "unlawfully, knowingly and intentionally possessed with the intent to distribute a controlled substance, and the offense involved 40 grams and more of a mixture and substance containing a detectable amount of fentanyl"; and (ii) that Colbert "unlawfully, knowingly, and intentionally possessed with the intent to distribute a controlled substance, and the offense involved 50 grams and more of a mixture and substance containing a detectable amount of methamphetamine."  Indictment at 1-2, filed August 25, 2021 (Doc. 11)(court only).   Both counts are violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  See Indictment at 1-2.

While in custody at Cibola County Corrections, Colbert mailed to the Clerk of Court a handwritten Motion to Suppress Evidence, Dismiss Charges, release Defendant, and Charge U.S. Marshals, filed September 10, 2021 (Doc. 20)("Pro Se Motion").  In the Pro Se Motion, Colbert asserts that he is not a resident of 524 Vermont Street NE, that he was visiting a friend there, that the United States Marshals did not produce a warrant to search the residence, and that he did not authorize a search of the residence.  See Pro Se Motion at 1.  He asserts that the United States

Marshals turned off their lapel cameras and argues that the United States Marshals are "henchmen for the U.S. RICO," who operate under the United States Attorney's Office and "use illegal search methods to harm citizens of the United States . . . ."  Pro Se Motion at 1-2.  Colbert also argues that elected officials have overthrown the New Mexico government, because they have not filed surety bonds with the New Mexico Secretary of State, and that the United States Attorney's Office "gives aid and comfort to the N.M. RICO."  Pro Se Motion at 2.  Colbert then moves "to suppress all evidence in this case, dismiss this case, release Defendant, and pay Defendant for his time incarcerated at the maximum amount allowed by law."  Pro Se Motion at 3.  He argues that he "can not be charged for drugs that are in possession of another person.  The drugs did not belong to the Defendant.  The drugs were found inside someone elses [sic] residence that the U.S. Marshals entered illegally."  Pro Se Motion at 3.  Finally, Colbert moves to charge and arrest the United States Marshals for their involvement in the alleged illegal activity and the United States Attorney "for being the Principal who collects unlawful debts in violation of the RICO Act, 18 USC 1962."  Pro Se Motion at 3.  Colbert subsequently withdrew this motion, leaving the Court to consider only the Suppression Motion.  See Defendant's Notice of Withdrawal of Motions at 1, filed February 28, 2023 (Doc. 65).

### 1. Colbert's Suppression Motion.

On December 21, 2021, Colbert, this time via his counsel, filed the Suppression Motion currently before the Court.  In the Suppression Motion, Colbert moves, "pursuant to the Fourth Amendment of the United States Constitution and Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure[,] to suppress the tangible evidence forming the basis of the instant indictment, and any statements made following [Colbert's] unlawful arrest."  Suppression Motion at 1.  Colbert makes three arguments: (i) that officers arrested him unlawfully inside Apartment A; (ii) that the

unlawful arrest tainted the subsequent search, which was premised on Colbert's consent; and (iii) that, even if the Court concludes that the arrest was not unlawful, Colbert's consent was not free and voluntary, and the search therefore was unlawful.  See Suppression Motion ¶¶ 7-31, at 3-14.

Colbert's first argument is that officers arrested him unlawfully inside Apartment A.  See Suppression Motion ¶¶ 7-21, at 3-10.  Colbert asserts that it is "a simple matter" to establish that officers placed him under arrest, as he "was removed from a residence after the police forcefully breached two doors, and gave him commands to submit to their authority.  There is also an admission by the officers that he was 'taken into custody.'"  Suppression Motion ¶ 7, at 4 (no citation given for quotation)(citing United States v. Serna, 406 F. Supp. 3d 1084, 1104 (D.N.M. 2019)(Browning, J.)(citing United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994))).

Colbert then asserts that officers conducted this arrest without a search or an arrest warrant and, therefore, the arrest is unlawful, noting that "[t]here is a strong and long-standing presumption against warrantless in-home arrests."  Suppression Motion ¶ 8, at 4 (citing Payton v. New York, 445 U.S. 573, 586 (1980)).[16]  Colbert notes that there is an exigent-circumstances exception to a warrantless search or seizure's presumptive unreasonableness, which requires that the Plaintiff United States of America prove four factors when arguing that an officer's fear that a suspect may destroy evidence constitutes a circumstance sufficiently exigent to permit an otherwise warrantless

---

[16]Colbert notes that there is some discussion whether he resides in Apartment A and, therefore, whether he has standing to move for the suppression of evidence.  See Suppression Motion ¶ 8, at 4 n.1.  He asserts that he is, at minimum, a social guest in Apartment A and therefore had a reasonable expectation of privacy within the Apartment.  See Suppression Motion ¶ 8, at 4 n.1 (quoting Ward v. City of Hobbs, 398 F. Supp. 3d 991, 1092-93 (D.N.M. 2019)(Browning, J.)).

entry into a home.  See Suppression Motion ¶ 9, at 5.  Specifically, Colbert asserts that the entry into the home must be:

> "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse."

Suppression Motion ¶ 10, at 5 (quoting United States v. Aquino, 836 F.2d 1268, 1272 (10th Cir. 1988)).  Colbert contends that the United States fails to satisfy each United States v. Aquino factor.  See Suppression Motion ¶ 12, at 6.

Regarding the first prong, Colbert argues that the United States has not shown "'clear evidence of probable cause,'" because, although officers observed what they believed were hand-to-hand drug transactions, they did not confirm these suspicions in any way.  Suppression Motion ¶ 12, at 6 (no citation given for quotation).  According to Colbert, this lack of investigation does not comport with the Fourth Amendment's requirement that "'officers . . . reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention.'"  Suppression Motion ¶ 12, at 6 (quoting United States v. Serna, 406 F. Supp. 3d at 1107 (citing Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).  Colbert further argues that the officer's observations may provide reasonable suspicion that individuals outside Apartment A conducted hand-to-hand drug deals, but that reasonable suspicion is a lower standard than probable cause, and certainly does not provide "'[c]lear evidence of probable cause.'"  Suppression Motion ¶ 13, at 6-7 (no citation given for quotation)(emphasis in Suppression Motion).

Colbert next argues that the United States has not met the second prong, which "requires both a serious crime and evidence that the destruction of evidence is likely."  Suppression Motion

¶ 14, at 7.  He notes that, although the United States Court of Appeals for the Tenth Circuit has stated that the sale of illicit drugs is a serious crime, "the Tenth Circuit appears to have been focused on very large quantities or actual manufacturing, not the pittance that can be exchanged in two hand-to-hand sales whose objects of exchange were unobservable, even at close distance." Suppression Motion ¶ 14, at 7 (citing United States v. Serna, 406 F. Supp. 3d at 1273; United States v. Cuaron, 700 F.3d 582 (10th Cir. 1983); United States v. Scroger, 98 F.3d 1256, 1259 (10th Cir. 1996)).  Colbert argues that two hand-to-hand sales is not a "grave crime" and that concluding that such activity counts as a serious crime "would allow the government to satisfy this element in every suspected drug case."  Suppression Motion ¶ 14, at 7.  Colbert also argues that, in this case, there is no indication that destruction of evidence was likely.  See Suppression Motion ¶ 15, at 7.  He states that no one who left Apartment A on August 3, 2021, evinced an intent to destroy evidence, and that, "with the amount of drugs and paraphernalia found outside in the red backpack, there was no clear indication that any evidence was left inside of Apartment A." Suppression Motion ¶ 15, at 7-8.  Colbert also asserts that suspected drugs' existence on its own does not demonstrate a likelihood that drug evidence will be destroyed and that "finding the likelihood of destruction just because there were suspected drugs threatens to impermissibly swallow the standard."  Suppression Motion ¶ 16, at 7.

Colbert argues that the United States cannot meet the third prong, which limits the entry's scope to the minimum necessary to prevent the evidence's destruction.  See Suppression Motion ¶ 17, at 8.  He asserts that, because there was no indication that anyone likely was to destroy evidence, no intrusion was necessary at all, and that, even if some intrusion had been necessary, the officers' entry on August 3, 2021, exceeded the minimum intrusion necessary.  See Suppression Motion ¶ 17, at 8.  He states that, "[a]fter storming the apartment and doing a full

protective sweep, officers quickly discerned that only Mr. Colbert was inside of the apartment. Simply making sure that Mr. Colbert was seized inside of the home would have been sufficient to eliminate the possibility of any evidence destruction." Suppression Motion ¶ 18, at 8. He also argues that, once officers seized him in Apartment A, they could have sought a warrant before further intruding. See Suppression Motion ¶ 18, at 8-9.

Colbert argues finally that the United States cannot meet the fourth prong, which requires "'clearly defined indicators of exigency that are not subject to police manipulation or abuse.'" Suppression Motion ¶ 19, at 9 (no citation given for quotation). He asserts that, as discussed above, there is no indication that evidence was at risk of destruction, there was "no apparent risk to anyone's health or safety, and Mr. Colbert did not pose any clear risk of dangerousness," and that Colbert was not present during the "fracas that occurred outside of Apartment A." Suppression Motion ¶ 19, at 9. Colbert also argues that "[f]inding prong four satisfied here risks a dangerous expansion of the exception to warrants for in-home arrests . . . . Even if probable cause existed for his arrest, this would be an ordinary felony for which an in-home arrest would not be permitted." Suppression Motion ¶ 20, at 9. He warns that "[a]llowing [expansion] here would give sweeping new authority . . . . Police would be encouraged to stage all drug interdiction operations in residential communities so as to gain unprecedented access to otherwise private spaces." Suppression Motion ¶ 20, at 9. Colbert concludes his first argument by stating that his "arrest features precisely the concern that 'police not be placed in a situation where they can create the exception' or 'exploit such opportunities without sufficient regard for the privacy interests of the individuals involved.'" Suppression Motion ¶ 21, at 10 (quoting United States v. Aquino, 836 F.2d at 1272). According to Colbert, "[p]ermitting Mr. Colbert's in-home warrantless arrest would

allow the police to exploit the opportunity created by an arrest warrant for Mr. Bland, without any regard for Mr. Colbert's deepest privacy interest."  Suppression Motion ¶ 21, at 10.

Colbert's second argument is that, although he consented to officers searching Apartment A, this consent resulted from his unlawful arrest and that, therefore, the search premised on his consent also is unlawful.  See Suppression Motion ¶¶ 22-24 , at 10-11.  He first notes that the Tenth Circuit and other Courts of Appeals consider consent to be invalid if a prior Fourth Amendment violation has tainted it.  See Suppression Motion ¶ 22, at 10 (citing United States v. Melendez-Garcia, 28 F.3d at 1054); United State v. Hernandez, 279 F.3d 302, 307 (5th Cir. 2002); United States v. Melendez-Gonzalez, 727 F.2d 407, 414 (5th Cir. 1984)).  Colbert asserts that the Court must suppress the alleged contraband found inside Apartment A, "[b]ecause the officers had no separate basis to search Apartment A, and the alleged consent fails as linked to an antecedent Fourth Amendment violation . . . ."  Suppression Motion ¶ 24, at 10 (citing Wong Sun v. United States, 371 U.S. 471, 485 (1963); United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000)).

Colbert's third argument is that, even if the arrest is lawful, Colbert did not give his consent freely and voluntarily, and that, therefore, the search premised on that consent is unlawful.  See Suppression Motion ¶¶ 25-31, at 11-14.  Colbert acknowledges that consent to search is an exception to the general rule that a warrantless home search is presumptively unreasonable, but asserts that the individual consenting to the search must consent freely and voluntarily.  See Suppression Motion ¶ 26, at 11-12 (citing United States v. Harrison, 639 F.3d 1273, 1278 (10th Cir. 2011); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); Florida v. Royer, 460 U.S. 491, 497 (1983); United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir. 2006); United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004)).  He argues that implicit or explicit coercion, implied

threats, and covert force undermine free and voluntary consent, and asserts that determining whether consent to search is voluntary or coerced requires courts to analyze the totality of the circumstances. See Suppression Motion ¶ 26, at 12 (quoting Schneckloth v. Bustamonte, 412 U.S. at 227-28). The totality of the circumstances analysis requires courts to consider "'physical mistreatment, use of violence, threats, . . . aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons.'" Suppression Motion ¶ 27, at 13 (quoting United States v. Harrison, 639 F.3d at 1278 (quoting United States v. Sawyer. 441 F.3d 890, 895 (10th Cir. 2006))(ellipsis added in Suppression Motion, but not in United States v. Harrison or United States v. Sawyer). Colbert asserts that "the nature of the encounter was extraordinarily coercive," because police took him into custody and removed him from Apartment A after breaking through the apartment's front door and his bedroom's door. Suppression Motion ¶ 28, at 13. According to Colbert, "[s]hortly following that military style breach, officers presented Mr. Colbert with a form and told him to sign." Suppression Motion ¶ 28, at 13. According to Colbert, this force, coupled with his being in handcuffs, negated his ability to give free and voluntary consent. See Suppression Motion ¶ 29, at 13-14. Colbert also takes issue with the officers' use of a pre-printed form, which, he argues, "gave little room for lawful consent." Suppression Motion ¶ 30, at 14. He argues that, "if a person cannot delimit the scope of the search, then it cannot as easily be construed as a consensual search. Further, whether consent is freely given turns on whether Mr. Colbert was free to subsequently deny the request to search." Suppression Motion ¶ 30, at 14 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991); United States v. Guerrero, 472 F.3d 784, 786 (10th Cir. 2007)). He asserts that "[t]here is no reasonable interpretation of the encounter that suggests Mr. Colbert was at liberty to revoke his consent once the cuffs were put back on, and he was further detained in a police cruiser."

Suppression Motion ¶ 30, at 14.  Colbert argues that, because he did not freely and voluntarily consent to the search, the Court must suppress any evidence which officers obtained on the consent's basis.  See Suppression Motion ¶ 31, at 14.

### 2.    The United States' Response to the Suppression Motion.

The United States responds.  See United States' Response in Opposition to Defendant's Motion to Suppress Statements and Tangible Evidence, filed January 21, 2022 (Doc. 32)("Suppression Response").  They argue that: (i) Colbert has not established standing to contest the entry and search; (ii) if Colbert has standing, the officers had probable cause to believe he was trafficking illegal narcotics; (iii) the incident on August 3 and Colbert's nonresponsiveness to the officers' announcements "gave rise to concern that he would destroy evidence of narcotics trafficking"; (iv) Colbert's admissions to law enforcement and his consent to search are the result of a valid Miranda waiver; and (v) even if the consent was unlawfully obtained, the officers had sufficient evidence to support a search warrant such that they inevitably would have discovered the evidence in Apartment A.  Suppression Response at 1-2.

The United States first addresses its standing argument.  See Suppression Response at 9-12.  The United States argues that Colbert has the burden to establish that he has standing to object to the search on Fourth Amendment grounds, that he must show that he had a reasonable expectation of privacy in the searched area, and that he may not object to the search on a third party's behalf.  See Suppression Response at 9 (citing United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996); United States v. Ladeaux, 454 F.3d 1107, 1112 (10th Cir. 2006); United States v. DeLuca, 269 F.3d 1128, 1131 (10th Cir. 2001)).  The United States also asserts that the Court should look to the totality of the circumstances in evaluating

whether Colbert has standing to object to the search.  See Suppression Response at 9 (citing Rawlings v. Kentucky, 48 U.S. 98, 104 (1980)).  The United States also notes that an overnight guest has standing to object to a search.  See Suppression Response (quoting Minnesota v. Carter, 525 U.S. 83, 90 (1988)).  The United States explains that Colbert has provided conflicting information about his relationship to 524 Vermont Street NE, Apartment A, having first indicated that he resides there, but later asserting that he merely was stopping by the apartment to visit a friend.  See Suppression Response at 10 (citing First Motion at 1).  The United States argues that there are insufficient facts to establish Colbert's subjective expectation of privacy in Apartment A.  See Suppression Response at 10-12.

The United States turns next to its argument that there was probable cause to believe that Colbert was trafficking narcotics.  See Suppression Response at 12-14.  They argue that probable cause supports a warrantless entry "'when under the totality of the circumstances there is a reasonable probability that a crime is being committed.'"  Suppression Response at 12 (quoting United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999)).  They argue that, to identify probable cause, the Court should ask whether a prudent officer would believe, based on the facts and circumstances of which the officer was aware, that the defendant was committing an offense.  See Suppression Response at 12-13 (quoting United States v. Snow, 82 F.3d 935, 942 (10th Cir. 1996)).  The United States asserts that the officers surveilling Apartment A had probable cause to believe Colbert engaged in narcotics trafficking based on their observations, on the red backpack's contents, on Edward's statements through Apartment A's rear window, and on the belief that one individual remained in Apartment A.  See Suppression Response at 13.  The United States also contends that trafficking drugs is a serious crime and that "[i]t was the defendant who created the

exigency by failing to come to the door, then hiding in a locked room."  Suppression Response at 13.

The United States next addresses the exigent circumstances exception to the general prohibition on warrantless home entries and the risk that Colbert could have destroyed evidence. See Suppression Response at 14-15.  Like Colbert, the United States acknowledges that the Tenth Circuit has recognized an exception to the warrantless entry prohibition where the entry: (i) is pursuant to probable cause; (ii) is in response to a serious crime and in circumstances where destruction of evidence is likely; (iii) is limited in scope to the minimum intrusion necessary to prevent the destruction of evidence; and  (iv) is supported by clear, non-manipulable exigency indicators.  See Suppression Response at 14 (citing United States v. Aquino, 836 F.2d at 1272).  It argues that the Court should "'evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers.'"  Suppression Response at 14 (quoting United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993)).

The United States argues that the Tenth Circuit considers drug trafficking to be a serious crime which justifies a warrantless entry when officers believe that evidence will be destroyed. See Suppression Response at 14-15 (citing United States v. Aquino, 836 F.2d at 1273).  It argues that, based on the red backpack's contents, the officers believed that the remaining individual in Apartment A had begun destroying evidence.  See Suppression Response at 15.  The United States also argues that the officers limited their entry to the minimum effort necessary to prevent the evidence's destruction, only entering Apartment A when Colbert did not respond to their announcements, and breaking into Colbert's room only after he continued to ignore commands. See Suppression Response at 15.    The United States notes that the officers did not search Apartment A for contraband during the protective sweep.  See Suppression Response at 15.

The United States next addresses its assertion that Colbert consented to the officers' search of Apartment A.  See Suppression Response at 15-19.  It argues that searches to which a defendant consents freely and voluntarily are an exception to the Fourth Amendment's search warrant and probable-cause requirements.  See Suppression Response at 16 (citing Schneckloth v. Bustamonte, 412 U.S. at 219; United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)).  Voluntariness "requires that: (i) the government '"proffer clear and positive testimony that consent was unequivocal and specific and intelligently given"'; and (ii) 'the officers must have used no "implied or express duress or coercion."'"  Suppression Response at 16 (quoting United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003))).  The United States contends that determining whether consent is free and voluntary requires the Court to consider objectively the totality of the circumstances, including the presence of multiple officers, the officer's tone of voice, the retention of the person's personal items, the presence of others, the officer's advisement that the person is free to leave, the visibility of an officer's weapon, and the officer's physically touching the person.  See Suppression Response at 17 (quoting United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 1997); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997); United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003)).  The United States notes that, in the absence of other factors, an individual may consent voluntarily to a search even when that individual is detained.  See Suppression Response at 18 (citing United States v. Jones, 701 F.3d 1300, 1318 (10th Cir. 2012); United States v. Olivares-Campos, 276 F. App'x 816, 824 (10th Cir. 2008); United States v. Contreras, 506 F.3d 1031, 1037 (10th Cir. 2007); United States v. Herrell, 41 F. App'x 224, 232 (10th Cir. 2002); United States v. Mendez, 118 F.3d 1426, 1432 (10th Cir. 1997); United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996); United States v. Soto, 988 F.2d 1548, 1557 (10th

Cir. 1993)).  The United States further argues that signing a consent form is a factor that weighs strongly in favor of a conclusion that the search was voluntary.  See Suppression Response at 18-19 (citing Eidson v. Owens, 515 F.3d 1139, 1147 (10th Cir. 2008); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994); United States v. Rodriguez-Garcia, 983 F.2d 1563, 1567-68 (10th Cir. 1994); United States v. Murphy, 16 F. Supp. 2d 397, 401 (S.D.N.Y. 1998)(Kaplan, J.); United States v. Harmon, 785 F. Supp. 2d 1146, 1173 (D.N.M. 2011)(Browning, J.)).  The United States asserts finally that, if a suspect does not object to an officer's search, that failure to object indicates that "'the search was within the scope of consent.'"  Suppression Response at 19 (quoting United States v. Gordon, 173 F.3d at 766)(citing United States v. Luna-Santa, 128 F. App'x 42, 48 (10th Cir. 2005)).  The United States concludes its argument on this point by asserting that Colbert previously had been arrested thirty-three times and convicted eight times, six of which involved trafficking and possessing illegal narcotics.  See Suppression Response at 19.  The United States asserts that Colbert "is far more familiar with his constitutional protections than he portrays," and notes that, "[d]espite this extensive criminal history, the defendant elected to make statements about the occupancy of Apartment A, the fact that apartment A contained illegal narcotics, and the defendant signed a consent to search form for Apartment A."  Suppression Response at 19.

The United States turns finally to its contention that the officers inevitably would have discovered the evidence in Apartment A even if there were no exigent circumstances and Colbert did not consent to the search.  See Suppression Response at 19-20.  The United States asserts that "'illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"  Suppression Response at 19-20 (quoting United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. 431, 444 (1984))).  The United States acknowledges that it bears the burden to prove by a preponderance of the evidence

that it would have discovered the same evidence without violating the Fourth Amendment.  See Suppression Motion at 19 (quoting United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  It also notes that "there must be a 'lawful police investigation [that] inevitably would have discovered' the evidence in question."  Suppression Response at 19 (quoting United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986)).  The United States asserts that, here,

> there is ample evidence to support probable cause and to obtain a search warrant. Had the defendant declined to provide consent, law enforcement would have had sufficient information to support the issuance of a search warrant for Apartment A. In that instance, the items seized from Apartment A would have been inevitably discovered.

Suppression Response at 19.  Accordingly, the United States requests that the Court deny Colbert's Suppression Motion.  See Suppression Response at 19.

### 3. Colbert's Reply to the Suppression Response.

Colbert replied on February 1, 2022.  See Reply to Government's Response to Motion to Suppress, filed February 1, 2022 (Doc. 35)("Suppression Reply").  In the Suppression Reply, Colbert argues that: (i) the United States should not rely on the Pro Se Motion to support its claim that Colbert does not have standing to bring his Fourth Amendment challenge; (ii) the United States misstates the law regarding warrantless in-home arrests; and (iii) the inevitable-discovery exception does not apply here, because there was no parallel lawful process.  Suppression Reply ¶¶ 1-10, at 1-6.  Turning first to whether Colbert has standing to bring a Fourth Amendment objection, Colbert, via his counsel, notes that "[t]he Government's attack on Mr. Colbert's standing is premised on a *pro se* motion Mr. Colbert filed a little more than a month after he was arrested." Suppression Reply ¶ 1, at 1.  Colbert, via his counsel, repudiates the claims that Colbert makes in his Pro Se Motion, particularly as they concern accusations that the United States Marshals and the United States Attorney's Office have collected unlawful debts in violation of the RICO Act,

18 U.S.C. § 1962.  See Suppression Reply ¶ 2, at 1-2.  In addition to criticizing the United States'

"invitation to [take seriously the Pro Se Motion's arguments]" as "unbecoming," Colbert notes

that relying on the Pro Se Motion "is contrary to each of its core legal arguments."  Suppression

Reply ¶ 3, at 2.  Specifically, Colbert notes that the United States argues that Colbert's consent to

search Apartment A was authoritative and that items in Apartment A belonged to Colbert.  See

Suppression Reply ¶ 3, at 2.  Colbert argues also that not being on the lease does not divest him of

standing to contest a Fourth Amendment violation, and asserts that the United States "believes Mr.

Colbert had access to and control over Apartment A.  That the Government is now arguing to the

contrary is only because it wishes to avoid contending with the important constitutional issues

present in this case."  Suppression Reply ¶ 4, at 2-3.

Colbert's next argument is that the United States misstates the law regarding warrantless

in-home arrests.  See Suppression Reply ¶¶ 5-7, at 3-5.  Colbert notes that the United States cites

to United States v. Gordon, 173 F.3d at 766, for the proposition that "'[p]robable cause to support

a warrantless entry exists 'when under the totality of the circumstances there is a reasonable

probability that a crime is being committed.''"  Suppression Reply ¶ 5, at 3 (quoting Suppression

Response at 12 (quoting United States v. Gordon, 173 F.3d at 766))(alteration added in

Suppression Reply).  Colbert asserts that there are three problems with the United States' argument

and citation to United States v. Gordon, namely that: (i) the quoted language does not appear in

the United States v. Gordon opinion; (ii) the statement is inaccurate regarding warrantless arrests

generally; and (iii) the statement is inaccurate regarding the intersection of warrantless entry and

in-home arrests.  See Suppression Reply ¶ 6, at 3.  He argues that, for warrantless arrests generally,

"law enforcement does not have to believe a crime is 'being committed' only that one was

committed."  Suppression Reply ¶ 6, at 3 (no citation given for quotation)(citing United States v.

Gordon, 173 F.3d at 766).  Colbert further distinguishes United States v. Gordon by noting that

the Tenth Circuit in that case does not resolve a question regarding an entry, but considers instead

a luggage search on a public conveyance.  See Suppression Reply ¶ 6, at 3.  Colbert then highlights

the United States' argument that the factors surrounding the August 3, 2021, incident "'led the

USMS-SWIFT team to believe evidence was being destroyed in Apartment A.'"  Suppression

Reply ¶ 7, at 4 (quoting Suppression Response at 13).  He argues that "what the USMS-SWIFT

team 'believed' is not a legal standard observed by any court."  Suppression Reply ¶ 7, at 4 (no

citation given for quotation).  He argues also that it is factually dubious to contend that "it was 'the

defendant who created the exigency by failing to come to the door.'"  Suppression Reply ¶ 7, at 4

(quoting Suppression Response at 13).  Instead, Colbert contends that he did not fail to come to

the door, but was rather "under no obligation to voluntarily leave Apartment A or to charge towards

a law-enforcement demolition team to avoid 'creating exigency.'"  Suppression Reply ¶ 7, at 4 (no

citation given for quotation).

Colbert's final argument is that the United States' reliance on the inevitable-discovery

doctrine is inapposite in this case.  See Suppression Reply ¶¶ 8-10, at 5-6.  Colbert construes the

United States as asserting that "the Fourth Amendment violation can be forgiven because there

was 'ample evidence to support probable cause and to obtain a search warrant,'" and argues that

this statement is an oversimplification of the Tenth Circuit's thinking in United States v.

Cunningham.  Suppression Reply ¶ 8, at 5 (quoting Suppression Response at 20 (citing United

States v. Cunningham, 413 F.3d at 1203)).  Colbert asserts that the Tenth Circuit has put forward

a more complete four-part test, which directs courts to consider:

"1) the extent to which the warrant process has been completed at the time those
seeking the warrant learn of the search; 2) the strength of the showing of probable
cause at the time the search occurred; 3) whether a warrant ultimately was obtained,

albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

Suppression Reply ¶ 8, at 5 (quoting United States v. Cunningham, 413 F.3d at 1203-04). Colbert distinguishes United States v. Cunningham on its facts, noting that, in that case, "officers had obtained a warrant specific to their investigation of the subject['s] home, before it sought consent to search. Here, there was no ongoing process to obtain a warrant." Suppression Reply ¶ 9, at 5-6. Colbert argues next that the United States has not met United States v. Cunningham's first, third, and fourth prongs, and that the parties disagree regarding the second prong. See Suppression Reply ¶ 10, at 6. Regarding the first and third prongs, Colbert asserts that the United States has not met them at all. See Suppression Reply ¶ 10, at 6. Regarding the second prong, he reiterates his argument from the Suppression Motion that "it is not clear that any additional drugs were in the home after an entire drug operation spilled out of the then recently seized red backpack." Suppression Reply ¶ 10, at 6. Finally, regarding the fourth prong, Colbert argues that it "appears designed to deter the sort of activity that occurred here." Suppression Reply ¶ 10, at 6. He highlights the officers' rushed entry into Apartment A as an example of impermissible "'jumping the gun,'" and asserts that, instead of entering Apartment A without a warrant, they could have sealed the premises and contacted a magistrate judge, which, he asserts, is what the officers in United States v. Cunningham did. Suppression Reply ¶ 10, at 6. Accordingly, Colbert repeats his request that the Court suppress all tangible evidence and statements. See Suppression Motion ¶ 11, at 6.

   **4.    The Suppression Hearing.**

   The Court held a two-day evidentiary hearing on August 31, 2022, and October 4, 2022, to hear arguments on the Suppression Motion. See August Clerk's Minutes; October Clerk's

Minutes.  Colbert presented opening arguments in support of the Suppression Motion.  See Aug. 31 Tr. at 3:24-7:9 (Court, Fernandez).  He analogized this case to United States v. Reeves, 524 F.3d 1161 (10th Cir. 2008), in which, he argues, the Tenth Circuit reversed the trial court's decision not to suppress evidence, because exigent circumstances did not support the subsequent in-home arrest, and because the consent which the defendant in that case gave was not remote from the Fourth Amendment violation.  See Aug. 31 Tr. at 3:25-4:19 (Fernandez).  Colbert notes that, although the officers may have had a suspicion that there was evidence inside of Apartment A, they had no real information to that effect.  See Aug. 31 Tr. at 6:20-7:2 (Fernandez).  The Court discussed whether both probable cause and exigent circumstances are necessary to permit a warrantless search.  See Aug. 31 Tr. at 5:1-6:15 (Court, Fernandez).

The United States spoke next, noting first that it does not agree that Colbert has standing to raise his Fourth Amendment challenge.  See Aug. 31 Tr. at 7:13-16 (Ramirez).  Colbert responded, stating that the Tenth Circuit in United States v. Poe, 556 F.3d 1113 (10th Cir. 2009), announced that an individual need not be settled in a location to have a reasonable expectation of privacy that implicates the Fourth Amendment.  See Aug. 31 Tr. at 9:8-10:2 (Fernandez).  The United States asserted that Colbert has changed his stance on whether he is a resident of 524 Vermont Street NE, Apartment A, and explained that it had not been able to discern whether Colbert is representing that is a resident, an uninvited guest, or some other status.  See Aug. 31 Tr. at 12:22-16:1 (Ramirez); id. at 16:8-13 (Ramirez).  Colbert countered that whether he is a resident of 524 Vermont Street NE, Apartment A, is not the relevant inquiry and that he must show that he was, at minimum, a social guest.  See Aug. 31 Tr. at 16:15-9 (Fernandez).  The Court noted the arguments, but stated that it was not in a position to make a finding regarding Colbert's standing

at the hearing and avoid the evidentiary hearing, and that it would allow the parties to continue to present evidence.  See Aug. 31 Tr. at 8:8-17 (Court).

The United States called five witnesses to testify regarding the August 3, 2021, incident. First, it called Marreel, who testified to the surveillance operation, Bland and Edwards' arrests, the initial entry into Apartment A, and the red backpack's contents.   See Aug. 31 Tr. at 19:2-70:20 (Court, Fernandez, Marreel, Ramirez).  Second, the United States called Booth, who testified to the surveillance operation, Bland and Edwards' arrests, the entry and search of Apartment A, and Colbert's arrest.  See Aug. 31 Tr. at 108:21-143:9 (Court, Booth, Fernandez, Ramirez).  Third, the United States called Thompson, who testified to arriving on the scene after Colbert's arrest, Coffey's custodial interview with Colbert, and Colbert's signing the Consent Form.  See Aug. 31 Tr. at 178:3-194:11 (Court, Fernandez, Ramirez, Thompson).  Fourth, the United States called Salcido, who testified to the August 3, 2021, incident, Bland and Edwards' arrests, concerns regarding an unidentified individual in Apartment A, the entry into and search of Apartment A, the risk that someone could have destroyed evidence in Apartment A, and Colbert's arrest.  See Aug. 31 Tr. at 215:1-223:25 (Court, Fernandez, Ramirez, Salcido); Oct. 4 Tr. at 229:12-259:20 (Court, Fernandez, Ramirez, Salcido).[17]   Finally, the United States called Coffey to testify to arriving on the scene after Colbert's arrest, the red backpack's contents, Coffey's custodial interview with Colbert, Coffey's reading the Miranda advisements to Colbert, Colbert's signing the Consent Form, Colbert's assertions about his residence, Coffey's involvement in the

---

[17]Salcido gave his testimony over two days, beginning in the late afternoon on August 31, 2022, and continuing once the hearing resumed on October 4, 2022.  See Aug. 31 Tr. at 224:1-3 (Court).

subsequent search for contraband in Apartment A, and Colbert's Chicago criminal record.  Oct. 4
Tr. at 284:24-343:23 (Court, Booth, Fernandez, Ramirez).

In lieu of oral closing arguments, the parties agreed to file written closing arguments.  See
Oct. 4 Tr. at 391:12-392:2 (Court, Fernandez, Ramirez).  Colbert and the United States both noted
that, based on discussions with Colbert, the United States withdraws any objections to Colbert's
standing to bring the Fourth Amendment challenge.  See Oct. 4 Tr. at 392:7-393:3 (Fernandez,
Ramirez).  Colbert concluded by reviewing the legal framework regarding protective sweeps,
citing Maryland v. Buie, 494 U.S. 325 (1990)("Buie"), and the probable cause and exigent
circumstances requirements for a warrantless search, citing United States v. Najar, 451 F.3d 710
(10th Cir. 2006), and United States v. Hendrix, 664 F.3d 1334 (10th Cir. 2011).  See Oct. 4 Tr. at
393:7-395:22 (Fernandez).  He argued that the officers on the scene on their own created a sense
of exigency and a fear for officer safety, but that none of those concerns were based on information
about what was inside of Apartment A.  See Oct. 4 Tr. at 395:23-398:4 (Fernandez, Ramirez).  He
then reiterated his argument that he did not freely and voluntarily consent to the search based on
the circumstances surrounding his arrest.  See Oct. 4 Tr. at 398:5-400:12 (Fernandez)(citing Payton
v. New York, 445 U.S. 573 (1980); United States v. Ledesma, 447 F.3d at 1314).

   5.      **Colbert's Written Closing Arguments.**

Colbert submitted a written closing argument.  See Final Arguments on Motion to Suppress
Statements and Tangible Evidence, filed November 21, 2022 (Doc. 57)("Colbert Closing").  He
argues first that no officer saw him selling drugs, noting that the hearing testimony is inconsistent,
and that officers consistently identified two men only, one wearing camouflage -- Bland --and
Edwards.  See Colbert Closing ¶¶ 7-10, at 4-6.  He asserts that "[t]he fundamental question
regarding the officers' home invasion -- since it took place without a warrant -- is whether it was

otherwise justified" and that, without evidence that officers witnessed Colbert dealing drugs, the United States cannot show that the entry was justified.  Colbert Closing ¶ 11, at 6.

Colbert next argues that Bland and Edwards' arrests were insufficient to justify the officers' entry into Apartment A and Colbert's subsequent arrest.  See Colbert Closing at 8.  Colbert notes that, during the incident outside of Apartment A, officers found no weapons on Bland and Edwards, and Colbert did not alert officers to his presence.  See Colbert Closing ¶ 17, at 8.  Colbert asserts that, although the parties spent much of the hearing discussing Bland and Edwards' arrest, the United States never made the connection to Colbert's arrest, "as if a penumbra of illegal activity was enough to justify an in-home arrest."  Colbert Closing ¶ 19, at 9-10.  Colbert argues that, despite the officers' stated safety and destruction-of-evidence rationales, the "officers had no clear evidence that there was any additional evidence to be destroyed," and that the techniques which the officers used to enter Apartment A would have been insufficient to prevent the destruction of evidence.  Colbert Closing ¶¶ 21-22, at 10-11.

Colbert turns next to his legal arguments, arguing that officers arrested him unlawfully inside Apartment A, that he did not give his consent to search freely and voluntarily, and that, therefore, the evidence which the officers seized from Apartment A is tainted and unusable as evidence.  See Colbert Closing ¶¶ 27-49, at 13-23.  He asserts that, when officers seek to justify a search based on exigent circumstance, they must have "an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others," and the search's scope and manner must be reasonable.  Colbert Closing ¶ 27, at 13 (quoting United States v. Najar, 451 F.3d at 718).  Additionally, he asserts that, when officers seek to prevent the imminent destruction of evidence, the search must be: (i) "pursuant to clear evidence of probable cause"; (ii) "available only for serious crimes and in circumstances whether the destruction of evidence is

- 48 -

likely"; (iii) "limited in scope to the minimum intrusion necessary to prevent the destruction of evidence"; and (iv) "supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse."  Colbert Closing ¶ 28, at 13-14 (quoting United States v. Hendrix, 644 F.3d at 1338).  Colbert argues that, because it is unclear that Colbert conducted hand-to-hand sales outside of Apartment A, there is no clear evidence of probable cause, and that, even if officers had seen Colbert participate in what looked like hand-to-hand sales, they only had reasonable suspicion, not probable cause.  See Colbert Closing ¶¶ 29-30, at 14.  He argues that hand-to-hand sales are not a serious enough crime to satisfy the United States v. Hendrix standard and that there is no indication that any evidence was at risk of destruction, such that there were no clearly defined indicators of exigency.  See Colbert Closing ¶ 31, at 14-15.

Colbert also argues that the "officers were unable to show that they had an objectively reasonable basis to believe there was an immediate need to protect the lives or safety of themselves or others."  Colbert Closing ¶ 32, at 15.  He argues that the testimony around Bland and Edwards' arrests does not show that Colbert was dangerous in the same way that Bland and Edwards were, and that no officer saw any weapon before entering Apartment A.  See Colbert Closing ¶ 33, at 15-16.  Regarding the weapons that the officers found later in Apartment A, Colbert argues that the United States impermissibly relates this discovery, which occurred after the search began, to the officers' belief that the situation was dangerous before entering Apartment A.  See Colbert Closing ¶ 34, at 16.  He argues that, even if the officers witnessed Colbert conducting hand-to-hand drug sales, those sales were peaceable and indicated no threat to anyone.  See Colbert Closing ¶ 37, at 17-18.  Finally, he argues that, even if the officers needed to conduct a protective sweep, the officers' search here surpassed that necessity, and that, in any event, caselaw surrounding protective sweeps "assume[s] a primary and legitimate in-home arrest after which the search is

expanded to include areas in which dangerous people might be hiding."  Colbert Closing ¶ 39, at

18-19 (citing Maryland v. Buie, 494 U.S. at 335; United States v. Bagley, 877 P.3d 1151 (10th

Cir. 2017)).

Colbert's final argument is that his consent was not free and voluntary.  See Colbert Closing

¶¶ 40-49, at 19-23.  First, he argues that "[t]he alleged consent followed close in time to his

unlawful arrest" and that, therefore, it is not sufficiently removed to cure the taint of the unlawful

arrest.  Colbert Closing ¶ 40, at 19 (citing United States v. Melendez-Garcia, 28 F.3d 1046, 1054

(10th Cir. 1994)).  Colbert also argues that the United States has not shown sufficient evidence to

demonstrate that Colbert's consent was free and voluntary, namely: "(1) clear and positive

testimony that consent was unequivocal, specific, and intelligently given, and (2) that there was

no implied or express duress or coercion."  Colbert Closing ¶ 41, at 19-20 (citing United States v.

Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)).  Colbert argues that the Consent Form is insufficient

to demonstrate these elements in light of the "military style raid that occurred just moment before."

Colbert Closing ¶ 44, at 20-21.  Colbert identifies implied and express coercion based on how

officers interrogated him, while in handcuffs, across the street from Apartment A and in isolation

from others, and compares the situation to one where a defendant held the door open for officers

and invited them into his residence, which the Court determined constituted consent.  See Colbert

Closing ¶¶ 45-46, at 21 (citing Parsons v. Velasquez, 551 F. Supp. 3d 1085, 1202-03 (D.N.M.

2021)(Browning, J.)).  He argues that, even though Coffey's demeanor may have been calm, the

conversation's tenor does not detract from the totality of the circumstances, which demonstrate

that "the overall scene was chaotic and police dominated, with teams of heavily armed officers

who proved their willingness to use force."  Colbert Closing ¶¶ 47-48, at 22.  Colbert argues that

courts must be wary of even implicit or subtle coercion, which he asserts was present here.  See

Colbert Closing ¶ 28, at 22-23 (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973)). Accordingly, Colbert requests that the Court suppress all tangible evidence and statements.  <u>See</u> Colbert Closing ¶ 49, at 23.

      **6.**      <u>**The United States' Written Closing Arguments**</u>.

The United States submitted a written closing argument.  <u>See</u> United States' Amended Closing Argument, filed November 22, 2022 (Doc. 59)("U.S. Closing").[18]  The United States divides the occurrences on August 3, 2021, into six segments: (i) the efforts to locate and arrest Bland and the conduct officers observed while surveilling the area around Apartment A; (ii) Edwards' running to Apartment A and shouting something to an unidentified occupant; (iii) Edwards' discarding the red backpack with indications of narcotics trafficking; (iv) the protective sweep of Apartment A; (v) Colbert's <u>Miranda</u> waiver and consent to search Apartment A; and (vi) the dangers inside of Apartment A.  <u>See</u> U.S. Closing at 1-2.  After reviewing the witnesses' qualifications, <u>see</u> U.S. Closing at 2-5, the United States turns to the events of August 3, 2021, <u>see</u> U.S. Closing at 5-27.

The United States lays out the events which comprise the first two segments -- the surveillance, takedown of the black Kia, and Bland and Edwards' arrests -- before arguing that the officers on the scene were justified in conducting a protective sweep of Apartment A.  <u>See</u> U.S. Closing at 9-12 (citing <u>Maryland v. Buie</u>, 494 U.S. at 327).  The United States asserts that a protective sweep under <u>Buie</u> is "'a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.'"  U.S. Closing at 9 (quoting <u>Buie</u>, 494 U.S. at 327).  They argue that a protective sweep is justified and constitutionally permissible where

---

[18]The United States notes that it amends the original United States' Closing Argument, filed November 21, 2022 (Doc. 58), to correct typographical errors.  <u>See</u> U.S. Closing at 1 n.1.

officers have reasonable suspicion based on articulable facts which lead the officers to believe there is an individual in the area to be swept that presents a danger to those on the scene, and that the sweep must last only as long as necessary to "'dispel the reasonable suspicion of danger and . . . no longer than it takes to complete the arrest and depart the premises.'"  U.S. Closing at 10 (quoting Buie, 494 U.S. at 335-36).  The United States notes that the Supreme Court of the United States of America has allowed protective sweeps in two locations: (i) "'closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched'"; and (ii) "elsewhere in the house upon specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house."  U.S. Closing at 10 (quoting Buie, 494 U.S. at 334).  The United States presents a number of Tenth Circuit cases as examples of what articulable facts support the second category of searches, and also notes that the Tenth Circuit has allowed Buie protective sweeps inside of a home even when the arrest took place outside of the home.  See U.S. Closing at 10-11 (citing United States v. Denson, 775 F.3d 1214, 1219-20 (10th Cir. 2014); United States v. Hauk, 412 F.3d 1179, 1192 (10th Cir. 2005); United States v. Cavely, 318 F.3d 987, 994-96 (10th Cir. 2003); United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996); United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995)).  The United States argues that, here, law enforcement on the scene knew that Colbert was located in Apartment A, had seen Colbert conducting hand-to-hand drug sales, knew that guns often accompany drugs, and had observed Edwards calling into Apartment A's rear window after he and Bland had attempted to flee.  See U.S. closing at 11.  The United States argues that, although Marreel used a shield to protect the officers arresting Edwards, he could not fully block the window, and that, even after Edwards was in custody, officers continued investigating the red backpack, which was in 520 Vermont Street NE's backyard.  See U.S. Closing at 11-12.  The United States argues that these

circumstances -- particularly Colbert's presence in Apartment A -- were sufficiently exigent to justify a protective sweep.  See U.S. Closing at 12.

The United States turns to its third segment -- Edwards' discarding the red backpack -- and asserts that, on the basis of the backpack's contents, "[t]he investigation then became that of a serious drug offense . . . .  At that point, there was probable cause to believe a serious drug offense occurred, evidence of drug trafficking would be found in the residence, and the defendant participated in drug trafficking."  U.S. Closing at 13.  The United States argues that officers have probable cause when the facts "warrant a man of reasonable caution" to believe that an offense is taking place or that contraband or evidence is located in a particular place.  U.S. Closing at 13-14 (quoting Dunaway v. New York, 442 U.S. 200, 208 (1979), and citing United States v. Rey, 663 F. Supp. 2d 1086, 1111-12 (D.N.M. 2009)(Browning, J.)).  The United States argues that, because officers saw Edwards and Colbert conducting hand-to-hand transactions out of Apartment A, because the red backpack, which Edwards and Bland carried out of Apartment A, held large quantities of drugs and paraphernalia, and because Edwards communicated to someone inside Apartment A immediately before his arrest, officers had probable cause to believe Colbert was involved in drug trafficking, evidence of which was located in Apartment A.  See U.S. Closing at 14-15.

The United States' fourth segment discusses the protective sweep of Apartment A based on the exigencies that a serious drug offense and the possible destruction of evidence created.  See U.S. Closing at 15-20.  The United States asserts that, when evaluating the likelihood of destruction of evidence, the Court should apply a "'prudent, cautious, and trained officer[]'" standard.  U.S. Closing at 15 (quoting United States v. Wicks, 995 F.2d at 970, and citing United States v.

Creighton, 639 F.3d 1281, 1288 (10th Cir. 2011)).  The United States notes additionally that the

Tenth Circuit applies a four-pronged test, which requires that the officer's entry be

> "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse."

U.S. Closing at 15 (quoting United States v. Aquino, 836 F.2d at 1272).  The United States asserts

that the Tenth Circuit considers drug trafficking to be a sufficiently serious crime to justify a

warrantless home entry if officers believe that evidence will be destroyed if they do not

immediately gain access to the home.  See U.S. Closing at 15 (citing United States v. Aquino, 836

F.2d at 1273).  The United States contends again that officers had probable cause to believe that

whoever was inside Apartment A was engaging in a serious crime, that officers had experience

with destroyed evidence in the past, and that the circumstance of Bland and Edwards' arrests

justified their belief that Colbert would try to destroy evidence.  See U.S. Closing at 16.

Additionally, the United States argues that "there can be no doubt that the defendant was aware of

the activity happening outside of Apartment A," because of the police lights, sirens and general

commotion surrounding Bland and Edwards' arrests.  U.S. Closing at 17.  After describing the

protective sweep, the United States argues that the officers limited their entry to the minimum

necessary to prevent the destruction of evidence, clearing the kitchen, living room, hallway, the

restroom, the east bedroom, and finally, after encountering the west bedroom with Colbert inside,

broke open the door and arrested him, without conducting a full search until Colbert gave consent.

See U.S. Closing at 18-19.  Finally, the United States asserts that, under the fourth prong, officers

impermissibly create exigent circumstances only "when they engage or threaten to engage in

conduct that violates the Fourth Amendment."  U.S. Closing at 20 (citing Kentucky v. King, 563

U.S. 452, 462 (2011)).  The United State argues that, here, officers had probable cause to believe that Colbert was engaging in drug trafficking before they entered Apartment A and that they did not go to 524 Vermont Street NE that day intending to enter the apartment.  See U.S. Closing at 20.

The United States' fifth segment concerns Colbert's Miranda waiver and consent to search Apartment A.  See U.S. Closing at 20-27.  After describing the events leading up to the search and Colbert's signing of the Consent Form, the United States asserts that an individual who waives his or her privilege against self-incrimination under the Fifth Amendment to the Constitution of the United States of America must do so "'voluntarily, knowingly and intelligently,'" which requires that the individual must not be under coercion to waive his or her rights, and must have sufficient comprehension regarding what rights he or she is abandoning, and what consequences that abandonment entails.  U.S. Closing at 23 (quoting United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008), and citing United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)).  The United States notes also that an individual's consent to search provides an exception to the Fourth Amendment's search-warrant and probable-cause requirements, so long as the individual gives consent freely and voluntarily.  See U.S. Closing at 24 (citing Schneckloth v. Bustamonte, 412 U.S. at 219; United States v. Pena, 143 F.3d at 1366).  The United States notes that the Tenth Circuit requires that the government proffer testimony that the individual's consent was unequivocal and that he or she gave it intelligently, and that the officers did not rely on implied or express duress or coercion, and provides a non-exhaustive list of factors for the Court to consider. See U.S. Closing at 24 (citing United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010); United States v. Ledesma, 447 F.3d at 1314; United States v. Anderson, 114 F.3d at 1064).  The United States asserts that an individual can consent voluntarily even when detained and that a signed

consent form is a strong indication of voluntary consent.  See U.S. Closing at 25-26 (citing United States v. Jones, 701 F.3d 1300, 1318 (10th Cir. 2012); Eidson v. Owens, 515 F.3d 1139, 1147 (10th Cir. 2008); United States v. Harmon, 785 F. Supp. 2d 1146, 1173 (D.N.M. 2011)(Browning, J.)).   The United States argues that, here, Colbert consented to the officers' search of Apartment A knowingly and voluntarily, and not under duress or coercion, because: (i) Colbert is an adult who has extensive experience within the criminal justice system; (ii) Coffey and Thompson did not have their guns drawn; and (iii) Coffey read Colbert his Miranda rights and the Consent Form verbatim, and informed Colbert that he did not need to initial or sign the form. See U.S. closing at 26-27.  The United States' sixth segment describes the items that the officers recovered pursuant to the search and asserts that the officers' "concerns . . . regarding Apartment A were well founded."  U.S. Closing at 27.  Accordingly, the United States reiterates its request that the Court deny the Suppression Motion.  See U.S. Closing at 28.

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.   In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.   The hallmark of the Fourth Amendment is

reasonableness."   United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)

(Browning, J.).   See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he

ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah

v. Stuart, 547 U.S. 398 (1978)).   "In the criminal context, reasonableness usually requires a

showing of probable cause."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M.

2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v.

Earls, 536 U.S. 822, 828 (2002)).   The Supreme Court has stated in the law enforcement context

that "searches conducted outside the judicial process, without prior approval by judge or

magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few

specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357

(1967)(footnotes omitted).

### 1.    **Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when

a search implicating the Fourth Amendment has occurred, the district court must determine

whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham

City v. Stuart, 547 U.S. 398, 403 (2006)).   See Samson v. California, 547 U.S. 843, 848

(2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the

circumstances' to determine whether a search is reasonable within the meaning of the Fourth

Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).   "Although the Fourth

Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,'

a lesser degree satisfies the Constitution when the balance of governmental and private interests

makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121.  The Supreme Court

has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect

all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649

U.S. 325, 338 (1985)).

     "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree

to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed

for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848

(quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178,

1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances

test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the

degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it

is needed for the promotion of legitimate governmental interests'" (quoting United States v.

Knights, 534 U.S. at 119-20)).

>     As the text of the Fourth Amendment indicates, the ultimate measure of the
> constitutionality of a governmental search is "reasonableness."   At least in a
> case . . . where there was no clear practice, either approving or disapproving the
> type of search at issue, at the time the constitutional provision was enacted, whether
> a particular search meets the reasonableness standard "'is judged by balancing its
> intrusion on the individual's Fourth Amendment interests against its promotion of
> legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

>     The test of reasonableness under the Fourth Amendment is not capable of
> precise definition or mechanical application.   In each case [determining
> reasonableness] requires a balancing of the need for the particular search against
> the invasion of personal rights that the search entails.   Courts must consider the
> scope of the particular intrusion, the manner in which it is conducted, the

justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring) (quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006))(alteration in Florida v. Jardines, but not in Georgia v. Randolph).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority, noted: "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at

work, in a car, or in a public park."  515 U.S. at 654 (citing New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)).

    2.    **Consensual Searches**.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. at 219.  When an individual consents to a police search and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d at 1366 (quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d at 1314 (citing and quoting numerous

sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. February 19, 2010)(Browning, J)(alterations in United States v. Sedillo, but not in United States v. Ledesma or United States v. Anderson).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).  The inquiry is an objective one.  See United States v. Ringold, 335 F.3d at 1172.  "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity."  United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "'should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way.'"  United States v. Drayton, 536 U.S. 194, 205 (2002)(quoting Imm. & Naturalization Serv. v. Delgado, 466 U.S. 210, 219 (1984)).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing

of the weapon." United States v. Drayton, 536 U.S. at 205.  Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words.  "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." United States v. Guerrero, 472 F.3d at 789-90.  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'" (quoting United States v. Guerrero, 472 F.3d at 789-90)).  For example, in United States v. Ringold, the Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See United States v. Ringold, 335 F.3d at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag.  See 173 F.3d at 765.  The officer then asked to see the suspect's train passenger ticket and identification, inquired into his travel plans, and asked if he had any luggage.  See 173 F.3d at 765.  The officer did not inform the suspect that he was free to leave or not answer her questions.  See 173 F.3d at 765.  The officer asked to search the suspect's luggage and the suspect gave his consent.  See 173 F.3d at 765.  She asked him whether he had any contraband, informing him that contraband was the subject of her search.  See 173 F.3d at 765. When the officer encountered the suspect's locked bag, she asked him if he could open it.  See 173 F.3d at 765.  Although the suspect did not respond verbally, he "removed the key from his pocket

and handed it to [the officer]." 173 F.3d at 766.  The Tenth Circuit concluded that the suspect's

"voluntary relinquishment of the key evidenced his consent to search the locked duffle bag."  173

F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was

inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his

luggage.  See 173 F.3d at 766.  The ultimate issue in determining the scope of consent is what a

reasonable person would have understood the suspect's consent to include.  See United States v.

Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search

remains within the boundaries of the consent given based on the totality of the circumstances.  See

United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect the

object of his search and the suspect consents to a search for that object within a certain area, the

Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search

of any area within the confines of the officer's request where the object may be found.  United

States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs,

he consented to a search of any area in the motel room where one might hide drugs").  See United

States v. McRae, 81 F.3d at 1538 (holding that search did not exceed the scope of consent given

when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband

when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that,

"where a suspect does not limit the scope of a search, . . . an officer is justified in searching the

entire vehicle"); United States v. Santurio, 29 F.3d at 553 (holding that the removal of "a few

screws from the strip holding down the carpet which covered the metal compartment containing

the packages of cocaine" did not exceed the scope of consent to search the car); United States v.

Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the defendant consented to a

search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect does not object to the officer's search, it indicates that "the search was within the scope of consent." United States v. Gordon, 173 F.3d at 766. See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics). Accordingly, in United States v. Gordon, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags. 173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")). The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." 173 F.3d at 766.

## LAW REGARDING DESTRUCTION OF EVIDENCE AS AN EXIGENT CIRCUMSTANCE

Exigent circumstances may overcome "[t]he presumption of unconstitutionality for warrantless searches." United States v. Mongold, 528 F. App'x 944, 948 (10th Cir. 2013)(unpublished). Exigencies may arise from threats to a person's physical safety, the likely destruction of evidence, and the "'hot pursuit,'" United States v. Mongold, 528 F. App'x at 948 (quoting Kentucky v. King, 563 U.S. at 460), of suspects, see United States v. Mongold, 528 F. App'x at 948 (citing Kentucky v. King, 563 U.S. at 460). In such situations, "'the exigencies . . . make the needs of law enforcement so compelling that [a] warrantless search is

objectively reasonable under the Fourth Amendment.'" United States v. Mongold, 528 F. App'x at 948 (quoting Kentucky v. King, 563 U.S. at 460, and citing United States v. Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011))(alteration in Kentucky v. King and in United States v. Mongold).

"'The existence of exigent circumstances is a mixed question of law and fact.'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)). "The government bears the burden of proving that exigent circumstances rendered a warrantless search reasonable." United States v. Martinez, 643 F.3d at 1296 (citing United States v. Anderson, 154 F.3d at 1233). "'[W]hen the exception must justify the warrantless entry of a home,'" the government's burden is "'especially heavy.'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 717).

When an exigency involves a "risk of personal danger," United States v. Najar, 451 F.3d at 718, the Tenth Circuit requires that the government satisfy a two-part test: "'(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable,'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 718). The Tenth Circuit adopted this test after the Supreme Court, in Brigham City v. Stuart, 547 U.S. at 406-07, held officers' subjective motivations irrelevant and probable cause unnecessary for the emergency-aid exception. See United States v. Najar, 451 F.3d at 718. This holding upturned the Tenth Circuit's earlier three-part test, which required that "'the search must not be motivated by an intent to arrest or seize evidence,'" and that "'there must be some reasonable basis, approaching probable cause, to associate the emergency with the place to be searched.'" United States v. Najar, 451 F.3d at 718 (quoting United States v. Thomas, 372 F.3d 1173, 1177 (10th Cir. 2004)). Accordingly, now, to satisfy "[t]he emergency aid exception," the government must demonstrate "'an objectively

reasonable basis for believing that a person within the house is in need of immediate aid,' not on an officer's subjective belief."  United States v. Martinez, 643 F.3d at 1296 (quoting Michigan v. Fisher, 558 U.S. 45, 47 (2009)).

That the Supreme Court rejected probable cause for the emergency-aid exception has not affected the Tenth Circuit's test for the destruction-of-evidence exception.  See United States v. Mongold, 528 F. App'x at 949 (applying the United States v. Aquino test for the destruction-of-evidence exception, which includes a probable cause requirement).  Cf. United States v. Najar, No. CR 03-0735 JB, 2004 WL 3426123, at *6 (D.N.M. September 3, 2004)(Browning, J.)("For probable cause in the usual sense not to be needed, the police must be responding to a true emergency rather than a crime, *and* the police must reasonably believe a person inside needs immediate assistance, and entry is needed to protect or preserve life, or to avoid serious injury." (emphasis in original)), aff'd, 451 F.3d 710 (10th Cir. 2006).  Under United States v. Aquino, the government must meet a four-part test for the destruction-of-evidence exception:

> An exception to the warrant requirement that allows police fearing the destruction of evidence to enter the home of an unknown suspect should be (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse.

United States v. Aquino, 836 F.2d at 1272.  "The second element includes two components: (a) the exception is only available for serious crimes; and (b) destruction of evidence must be likely." United States v. Mongold, 528 F. App'x at 949.

With respect to the first requirement -- that there be clear evidence of probable cause -- the Tenth Circuit has noted that "'probable cause requires only a *probability* or substantial chance of criminal activity, not an *actual showing* of such activity.'"  United States v. Cruz, 977 F.3d 998,

1005-06 (10th Cir. 2020)(quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 243 n.13 (1983)).  In <u>United States v. Aquino</u>, the Tenth Circuit found probable cause satisfied where an individual whom police knew was traveling to pick up drugs entered and exited the defendant's home twice and, after the second time, produced a small quantity of cocaine.  See <u>United States v. Aquino</u>, 836 F.2d at 1272.  The Tenth Circuit states that, even though officers were not sure that the defendant had provided the cocaine, officers had probable cause to search the defendant's home without a warrant for additional drugs "[a]s soon as the police saw the cocaine, but not before . . . ."  <u>United States v. Aquino</u>, 836 F.2d at 1273-74.  The Tenth Circuit has concluded that officers did not have probable cause to search a residence on suspicion of drug trafficking where the officer had received complaints of excessive traffic at the defendant's residence, observed multiple cars parked and coming and going at the residence but did not verify the cars' owners or interview anyone leaving the home, heard "scurrying," and smelled marijuana near the residence.  <u>United States v. Margold</u>, 528 F. App'x at 950-51.  The Tenth Circuit determined, however, that the officer had sufficient probable cause to believe that the defendant possessed marijuana.  See <u>United States v. Margold</u>, 528 F. App'x at 951.

The Tenth Circuit has noted that, for the second requirement's first prong -- that a serious crime be at issue -- "'[s]erious crime' is not well defined.  In *Illinois v. McArthur*, 531 U.S. 326, 336 . . . (2001), and *Welsh v. Wisconsin*, 466 U.S. 740, 753 . . . (1984), the Supreme Court explained that penalties are the best indication of whether a crime is 'serious[.]'"  <u>United States v. Mongold</u>, 528 F. App'x at 949.  The Tenth Circuit has determined that a misdemeanor like marijuana possession is not a serious crime.  See <u>United States v. Mongold</u>, 528 F. App'x at 949 (citing <u>United States v. Carter</u>, 360 F.3d 1235 (10th Cir. 2004)).  Drug trafficking, on the other hand, is a sufficiently serious crime.  See <u>United States v. Scroger</u>, 98 F.3d at1260 ("[I]t is well established

that drug manufacturing is a serious crime."); United States v. Aquino, 836 F.2d at 1273 ("Our cases indicate that the sale of illegal drugs is a sufficiently severe offense to justify a warrantless entry . . . .").

The Tenth Circuit has stated that an important consideration for the second requirement's second prong -- that destruction of evidence be likely -- "is the time necessary to procure a warrant . . . .  [I]n order to justify a warrantless entry, the police had to have a reasonable basis for believing that suspects would destroy evidence [before they could get a search warrant]." United States v. Aquino, 836 F.2d at 1272.  Courts have found a likelihood of destruction of evidence where police activity is likely to arouse suspicions that officers are aware of the illegal activity. See, e.g., United States v. Aquino, 836 F.2d at 1272 (stating that "individuals were present during the arrests who gave evasive answers to police questions.  The required release of these persons created the possibility that news of the arrests would reach others in the drug connection," but noting that "we have never held that the police can automatically justify the warrantless entry of a home merely be engaging in a two-part drug transaction and interrupting it after the first part"); United States v. Wicks, 995 F.2d at 971 (listing cases); United States v. Bustillos-Dominguez, No. 13 CR 3160 WJ, 2014 WL 12789100, at *5 (D.N.M. August 29, 2014)(Johnson, J.)("It was . . . reasonable for a prudent and trained officer or agent to believe that Defendant would become suspicious that Moncivais[, who was delivering drugs to an undercover agent for the defendant,] failed to return.").  Additionally, when officers make their presence known, and then hear "shuffling and movement" and a "toilet flushing," these sounds are sufficient to justify the officer's belief that the occupants are attempting to destroy evidence.  United States v. Carr, 939 F.2d at 1447.

The third requirement is that the intrusion be limited in scope.  See United States v. Aquino,

836 F.2d at 1272.  The Tenth Circuit has stated that, where officers search a home to find an individual, but do "not search anywhere else in the house" until they obtain the defendant's consent, the search appropriately is limited in scope.  United States v. Cruz, 977 F.3d at 1008. Officers who conduct a protective sweep of a residence before obtaining a search warrant similarly meet this requirement.  See United States v. Scroger, 98 F.3d at 1260.

The final requirement is that there be "clearly defined indicators of exigency that are not subject to police manipulation or abuse."  United States v. Aquino, 836 F.2d at 1272.  One indicator of exigency is the amount of time that elapses between when police become aware of the circumstance and the time that they conduct the warrantless search.  See United States v. Wicks, 995 F.2d at 980 (Ebel, J., concurring)("Most of 'our previous cases involving exigent circumstances have emphasized that the police "began the process of obtaining a warrant as soon as they had probable cause.""" (quoting United States v. Mendoza-Salgado, 964 F.2d 9993, 1010 n.7 (10th Cir. 1992)(quoting United States v. Aquino, 836 F.2d at 1273))).  The Tenth Circuit has concluded that a time gap as short as one day is enough to preclude a finding of exigency.  See United States v. Stewart, 867 F.2d at 585.  The Tenth Circuit is also "cognizant of the fact that the time necessary to obtain a warrant is relevant to a determination of whether circumstances are exigent."  United States v. Chavez, 812 F.2d 1295, 1300 (10th Cir. 1987).  See United States v. Cuaron, 700 F.2d at 589 (stating that, "[i]n accordance with the congressional intent embodied in Fed. R. Crim. P. 41(c)(2), we conclude that trial courts must consider the availability of a telephone warrant in determining whether exigent circumstances existed, unless the critical nature of the circumstances clearly prevented the effective use of any warrant procedure," but excusing the officers for not obtaining a telephone warrant, because "[a]t the time of Jon's arrest, the officers could not count on even thirty minutes to obtain a telephone warrant")   Regarding police

manipulation and abuse, the Tenth Circuit has announced that "police manipulation is present only when officers 'engag[e] or threaten[] to engage in conduct that violates the Fourth Amendment.'" United States v. Cruz, 977 F.3d at 1008 (quoting United States v. Hendrix, 664 F.3d at 1339-40)(alterations in United States v. Cruz, but not in United States v. Hendrix); Kentucky v. King, 563 U.S. at 462 ("Where . . . the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed.").  Accordingly, officers do not create exigencies when they do not obtain warrants before approaching a residence, but create exigencies when they threaten to enter a residence without permission.  See United States v. Cruz, 977 F.3d at 1009 (citing United States v. Hendrix, 664 F.3d at 1340).

### LAW REGARDING PROTECTIVE SWEEPS AS AN EXCEPTION TO THE WARRANT REQUIREMENT

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Buie, 494 U.S. at 327.  In Buie, the Supreme Court holds:

> [A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.  Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene . . . .
>
> We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.  The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

<u>Buie</u>, 494 U.S. at 335-36.   The Tenth Circuit views this standard as comprising two separate prongs:

> Under the first exception (Prong One) the police may, in conjunction with an arrest in a home, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." [*Buie*, 494 U.S.] at 334 . . . . Under the second exception (Prong Two), police may conduct a "protective sweep" beyond areas immediately adjoining the arrest if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 335 . . . .

<u>United States v. Nelson</u>, 868 F.3d 885, 888 (10th Cir. 2017).   In both situations, "a protective sweep may only be performed incident to an arrest."   <u>United States v. Garza</u>, 125 F. App'x 927, 931 (10th Cir. 2005).

Regarding prong one, the requirement that the spaces be immediately adjoining is literal. In <u>United States v. Bagley</u>, 877 F.3d 1151 (10th Cir. 2017), for example, the Tenth Circuit notes that, without information about "the length of the hallway or the distance between Mr. Bagley and the southeast bedroom," it could not determine whether Bagley's location was "adjacent" to the southeast bedroom when officers arrested him, even though the officers may have arrested him inside the home.  877 F.3d at 1155 (citing <u>United States v. Burrows</u>, 48 F.3d 1011, 1016 (7th Cir. 1995)).  Similarly, the Tenth Circuit has been hesitant to conclude that, for prong one's purposes, spaces inside of a home are adjoining an arrest's location where the arrest takes place outside.  <u>See</u> <u>United States v. Bagley</u>, 877 F.3d at 1155 ("If he was outside the house, *Buie's* first situation would probably not allow a protective sweep in the southeast bedroom. *See United States v. White*, 748 F.3d 507, 510 (3d Cir. 2014)(stating that a protective sweep cannot be justified under *Buie's* first situation when the arrest occurs outside the house).").

"A protective sweep is 'appropriate only where officers reasonably perceive an immediate danger to their safety.'" United States v. Hogan, 38 F.3d 1148 (10th Cir. 1994)(quoting United States v. Owens, 782 F.2d 146, 151 (10th Cir. 1986)). To satisfy prong two, then, officers on the scene must have knowledge, which specific and articulable facts support, regarding a third person's potentially dangerous presence in the area to be swept; without such knowledge, "the government is per se unable to make the affirmative showing that Buie requires." United States v. Nelson, 868 F.3d at 889; United States v. Bagley, 877 F.3d at 1156 (citing United States v. Nelson, 868 F.3d at 889; United States v. Carter, 360 F.3d 1235, 1242-43 (10th Cir. 2004)). When considering an arrest that takes place outside the home, the Tenth Circuit has noted that "[t]he risk [of an ambush] is substantially diminished with the officers effect the arrest outside the home." United States v. Carter, 360 F.3d at 1242 (citing Buie, 494 U.S. at 333). The Tenth Circuit states: "Of course, there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in Buie." United States v. Carter, 360 F.3d at 1242-43. The officers, therefore, must point to specific, articulable facts that: (i) there is a structure near the arrest scene which may harbor a third individual; and (ii) the third individual presents a danger to the officers. See United States v. Cavely, 318 F.3d at 996 (concluding that a protective sweep was valid where officers knew: (i) of ongoing methamphetamine production in the home; (ii) that defendant was in possession of cash and methamphetamine; (iii) that defendant has exited the home carrying an explosive fuel; (iv) that the defendant had a friend in the home who did not answer the door; and (v) that firearms had been found in the home during a previous search); Fishbein ex rel. Fishbein v. City of Glenwood Springs, Colorado, 469 F.3d 957, 962 (10th Cir. 2006)(upholding a protective sweep where "[o]fficers knew that the Fishbeins had at least one

teenaged son and that firearms had recently been present inside the home”); United States v. Tucker, 166 F.3d 1223 (table), 1999 WL 44073, at *2 (10th Cir. February 2, 1999)(upholding protective sweep where “the officers were told the numerous suspects . . . had a history of violent behavior and were known to possess firearms,” and noting the district court’s conclusion “that the rustling noises could have suggested to the officers that someone else was in the dwelling”); United States v. Banks, 884 F.3d at 1015 (upholding protective sweep where officers heard sounds and saw movement suggesting a third person was in the house and knew that the third person “had a history of behaving violently and of failing to comply with law enforcement”); United States v. Hauk, 412 F.3d at 1187 (upholding protective sweep where officers knew the defendant violated parole on a narcotics trafficking conviction, had an anonymous tip that the defendant was selling drugs out of his house and had guns in the house, witnessed someone enter the house who may have still been inside, and witnessed the defendant attempt to slam the door on them). But see United States v. Hogan, 38 F.3d at 1150 (concluding that a protective sweep was not justified where there was no evidence that the defendant’s accomplice was in the home a month after the crime, where the defendant was not home when officers arrived, and where the officers were not in hot pursuit); United States v. Garza, 125 F. App’x at 932-33 (concluding that a protective sweep was not justified where “officers had no knowledge of who occupied either [of two hotel rooms] or if the occupants had histories of firearms violations, drug trafficking, or violent crime,” even though there had been a high volume of foot traffic and telephone calls to one of the rooms, and the hotel was located in a high-crime area); United States v. Roof, 103 F. App’x 652, 658 (10th Cir. 2004)(concluding that a protective sweep was not justified where officers were uncertain whether anyone remained in the home, did not perceive any lights or sounds emanating from the garage, and knew that the garage door was closed, “making it even less likely that a dangerous

person would 'unexpectedly launch an attack' on the deputies from within" (quoting Buie, 494 U.S. at 333)).  Although the Tenth Circuit has acknowledged that drug distribution often involves weapons, see United States v. Melendez-Garcia, 28 F.3d at 1052, it has been reluctant to create a carve out to the Fourth Amendment for all drug-related arrests and conclude that officers reasonably fear for their safety in all drug crimes, see United States v. Garza, 125 F. App'x at 932 (stating that it is "not persuaded" by the United States' argument that officers had a reasonable basis to fear for their safety, because "drug distribution is 'likely to involve the use of weapons'" (quoting Terry v. Ohio, 392 U.S. at 28)); United States v. Hauk, 412 F.3d at 1187 ("Neither do we endorse the Task Force's practice of automatic protective sweeps based on the assumption that 'drug houses' are inherently dangerous . . . . [W]e decline to endorse the suggestion that the Fourth Amendment accommodates a 'drug house' exception.").  See also United States v. Melendez-Garcia, 28 F.3d at 1052-53 (noting, in the context of a stop pursuant to Terry v. Ohio, that "there was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the Terry stop," and explaining that, "[i]n the absence of such evidence, the naked fact that drugs are suspected will not support a per se justification for the use of guns and handcuffs in a Terry stop").  The Tenth Circuit also notes in United States v. Garza that a suspect's failure to open the door or to respond to officers is not a sufficient basis to believe that the suspect is threatening.  See 125 F. App'x at 932 ("Because Mr. Garza had no obligation to respond to the officers, the government's argument that Mr. Garza's failure to respond created a safety threat sufficient to allow a protective sweep carries little weight.").

The Court previously has considered whether officers were justified in conducting a protective sweep.   In United States v. Torres-Castro, 374 F. Supp. 2d 994 (D.N.M. 2005) (Browning, J.), the Court considers the temporal relationship between an arrest and a protective sweep, and concludes that, because the officers conducted a protective sweep and then engaged in a "prolonged consensual encounter" with the defendant before moving him to another room and placing him under arrest, the protective sweep was not "incident to Torres-Castro's arrest."  374 F. Supp. 2d at 1022.   See United States v. Huerta-Rodriguez, No. CR 09-3206 JB, 2010 WL 4929044, at *14 n.20 (D.N.M. October 20, 2010)(Browning, J.)(concluding that a protective sweep was not valid, because it occurred before officers arrested the defendant).  The Court notes that, but for the discontinuous sequence of events, the following facts could have supported the protective sweep: (i) the officers observed shotgun shells within arms-reach of a blind corner adjacent to the living room in which the officers and suspects were located; (ii) the defendant previously had "threatened to shoot anyone who attempted to take the juvenile away from him"[19]; (iii) the officers had seen individuals inside moving to areas that the protective sweep covered; (iv) the officers saw an individual looking out the window as the officers approached; and (v) the

---

[19]The Court notes:

> Given that there are numerous legitimate and lawful reasons for storing a firearm in one's residence, information regarding the mere presence of a firearm in a home cannot provide the sole basis for a protective sweep.  When combined with information indicating that an occupant has threatened to use the firearm in a violent and unlawful manner, however, officers may possess a reasonable suspicion that such an occupant lurking in the residence presents a danger to those at the arrest scene.

United States v. Torres-Castro, 374 F. Supp. 2d at 1022 (citing United States v. King, 222 F.3d 1280, 1284-85 (10th Cir. 2000).

individual then said something to the other occupants, who began to move to the residence's back. See 374 F. Supp. 2d at 1022.

## RELEVANT LAW REGARDING MIRANDA RIGHTS

In Miranda, the Supreme Court announced that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444. Put differently, the Fifth Amendment to the Constitution of the United States of America, U.S. Const. amend. V, requires law enforcement officials to give Miranda warnings to a person subject to "'custodial interrogation.'" United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(quoting Miranda, 384 U.S. at 444). Specifically, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444. A person is in custody if "'his freedom of action is curtailed to a degree associated with formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). The court must examine "whether 'a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations in United States v. Hudson but not in Berkemer v. McCarty).

### 1.    Custodial Interrogation.

A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not trigger until the suspect is in a custodial interrogation context. See McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991); United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n order to

implicate *Miranda* and *Edwards*,[20] there must be a custodial interrogation."). "'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Berkemer v. McCarty, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444). There are "'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)(quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)(internal quotation marks, alteration, and footnote omitted in J.D.B. v. North Carolina)). See United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998). "'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" J.D.B. v. North Carolina, 564 U.S. at 270 (quoting Thompson v. Keohane, 516 U.S. at 112 (internal quotation marks, alteration, and footnote omitted in J.D.B. v. North Carolina)). A suspect's Miranda rights, such as a suspect's right to counsel, may trigger before a law-enforcement officer gives a Miranda warning. See United States v. Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

What amounts to custody, however, is only half of the inquiry. See United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)("'The fact that [a defendant is] in custody,' however, 'does not automatically render [an] exchange an interrogation.'" (quoting Fox v. Ward, 200 F.3d 1286,

---

[20]Edwards v. Arizona, 451 U.S. 477 (1981), holds that, once an individual expresses a desire for counsel, the person is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. at 484-85.

1298 (10th Cir. 2000)(alterations in United States v. Cash but not in Fox v. Ward)).  A suspect in custody may not invoke his Miranda rights if he is not interrogated.  See Rhode Island v. Innis, 446 U.S. 291, 293, 300 (1980).  Interrogation does not require "express questioning of a defendant while in custody."  Rhode Island v. Innis, 446 U.S. at 298-99.  The Supreme Court explained that Miranda was concerned with more than just questioning, but also the "'interrogation environment,'" which implicated practices that "did not involve express questioning."  Rhode Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 458).  "For example, one of the practices discussed in Miranda was the use of line-ups in which a coached witness would pick the defendant as the perpetrator.  This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation."  Rhode Island v. Innis, 446 U.S. at 299 (citing Miranda, 384 U.S. at 453).

> A variation on this theme discussed in *Miranda* was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution.

Rhode Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 453).  Accordingly, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. at 301 (quoting Miranda, 384 U.S at 439).  See United States v. Cash, 733 F.3d at 1277 ("[I]nterrogation extends *only* to words or actions that the officers should have known were reasonably likely to elicit an incriminating response." (quoting Fox v. Ward, 200 F.3d at 1298)(emphasis in United States v. Cash, but not in Fox v. Ward)).  "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of

the police." <u>Rhode Island v. Innis</u>, 446 U.S. at 301.  <u>See</u> <u>United States v. Yepa</u>, 862 F.3d 1252, 1257 (10th Cir. 2017).

"[C]onduct 'normally attendant to arrest and custody'" is "not the 'functional equivalent' of interrogation." <u>Fox v. Ward</u>, 200 F.3d at 1298 (quoting <u>Rhode Island v. Innis</u>, 446 U.S. at 301)(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards did not constitute interrogation).  The Tenth Circuit has concluded, however, that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent." <u>United States v. Bautista</u>, 145 F.3d at 1147 n.3 (citing <u>United States v. Kelsey</u>, 951 F.2d 1196, 1199 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")).  <u>See</u> <u>Connecticut v. Barrett</u>, 479 U.S. 523, 531 (1987)("[C]ustodial interrogation is inherently coercive and . . . a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning.").  The Tenth Circuit, however, has since walked back from <u>United States v. Bautista</u> and <u>United States v. Kelsey</u>.  In <u>United States v. Cash</u>, a suspect was handcuffed and placed in the back of a squad car after a scuffle with the police, but those actions did not amount to an interrogation even though questioning was imminent.  <u>See</u> <u>United States v. Cash</u>, 733 F.3d at 1278-79.  Rather, the Tenth Circuit focused its inquiry on specific exchanges between the suspect and officers to determine whether the officer's questions were "'reasonably likely to elicit an incriminating response'" as <u>Rhode Island v. Innis</u> commands.  <u>United States v. Cash</u>, 733 F.3d at 1278-79 (quoting <u>Rhode Island v. Innis</u>, 446 U.S. at 301).  <u>See</u> <u>United States v. Yepa</u>, 862 F.3d at 1258-61; <u>United States v. Benard</u>, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions.  In United States v. Romero, 743 F. Supp. 2d 1281, the Court applied Rhode Island v. Innis and concluded that a suspect was interrogated but was not in custody, so Miranda did not apply.  See United States v. Romero, 743 F. Supp. 2d at 1332.  The Court determined that officers interrogated the suspect, because officers asked the suspect about his whereabouts on a Friday night, and the officer knew that the suspect was the last person to see the victim alive on Friday.  See United States v. Romero, 743 F. Supp. 2d at 1332.  The Court concluded, however, that the suspect was not in custody, because there was "nothing excessively coercive . . . about the circumstances of the questioning." United States v. Romero, 743 F. Supp. 2d at 1334.  The suspect sat in a police vehicle while questioned, but: (i) he sat in the front seat; (ii) the car's back door was open, suggesting informality; (iii) both windows were rolled down, also suggesting informality and indicating that the suspect was not in a non-public questioning room; (iv) there was no prolonged accusatory questioning; (v) the suspect was not taken to a police station; (vi) law enforcement officers did not display their weapons; and (vii) the officers never touched the suspect.  See 743 F. Supp. 2d at 1334-35.  See also United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018) (Browning, J.)(stating that a defendant in handcuffs was in custody, but that no interrogation occurred when the officer did not ask the defendant any questions reasonably likely to elicit an incriminating response); United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018) (Browning, J.)(concluding that law enforcement officers interrogated a defendant when they asked him questions, but that the interrogation was not custodial, because the officers informed the defendant that he was not under arrest and could stop the interview; because the officers did not engage in accusatory questioning; and because, although multiple officers joined the questioning, they separated the defendant from those individuals who would provide him moral support, and

the defendant could see an officer's firearm, the officers did not contact the defendant physically or suggest that the defendant had to comply); id. at 1362-63 (concluding that the defendant was not in custody when law enforcement officers informed him that he did not need to answer their questions; when the officers did not engage in accusatory, prolonged questioning and asked few questions; when the defendant of his own volition separated himself from those who could lend moral support; and when the officers did not physically or orally suggest that the defendant must comply with their requests); United States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurred where the defendant was advised of his rights, made the incriminating statements after making his telephone call, admitted that he received no pressure to waive his rights, and was not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(concluding that no Fifth Amendment violation occurred where police interviewed the defendant in surroundings familiar to him, informed him of his rights, engaged in no coercive conduct, and gave the defendant a choice to speak with them and sign an advice of rights form).

   2.   **Miranda Waiver.**

   Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "'voluntarily, knowingly and intelligently.'" United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(quoting United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)). An express statement is not required; the waiver can be inferred from the defendant's actions and words. See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citing United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997)). "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience,

and conduct of the accused.'"  United States v. Burson, 531 F.3d at 1256 (quoting Maynard v.

Boone, 468 F.3d 665, 676 (10th Cir. 2006)).   The government generally bears the burden of

proving, by a preponderance of the evidence, that a valid waiver occurred.  See United States v.

Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11.  The Tenth Circuit has

noted that this standard incorporates two distinct requirements:

> "First, the relinquishment of the right must have been voluntary in the sense
> that it was the product of a free and deliberate choice rather than intimidation,
> coercion, or deception.  Second, the waiver must have been made with a full
> awareness of both the nature of the right being abandoned and the consequences of
> the decision to abandon it.  Only if the totality of the circumstances surrounding the
> interrogation reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the Miranda rights have been
> waived."

United States v. Morris, 287 F.3d at 988 (quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)).

In determining whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs

a totality of the circumstances approach.  See United States v. Burson, 531 F.3d at 1256-57 (citing

Colorado v. Spring, 479 U.S. at 573).  "In determining whether rights were voluntarily waived, we

consider: the suspect's age, intelligence, and education; whether the suspect was informed of his

or her rights; the length and nature of the suspect's detention and interrogation; and the use or

threat of physical force against the suspect."  United States v. Smith, 606 F.3d 1270, 1276 (10th

Cir. 2010)(citing Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004); United States v. Minjares-

Alvarez, 264 F.3d 980, 985 (10th Cir. 2001)).  A "state of intoxication does not automatically

render a statement involuntary."  United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993).

"Rather the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the

giving of a confession.'"  United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson v. United

States, 530 U.S. 428, 434 (2000)("Dickerson")(alterations in United States v. Smith, but not in Dickerson)).

In United States v. Tafoya, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.), the Court considered whether a suspect knowingly waived his Miranda rights after he was given the warning and responded to the officer's questioning related to the investigation.  See 399 F. Supp. 2d at 1238.  Although the suspect was "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him.  399 F. Supp. 2d at 1238-39.  On those facts, the Court concluded that the suspect had "made voluntary" statements.  399 F. Supp. 2d at 1239.  See United States v. Begay, 310 F. Supp. 3d at 1364-65 (D.N.M. 2018)(Browning, J.)(concluding that the defendant voluntarily waived Miranda rights during an interrogation).  In United States v. Salazar, No. CR 18-3500 JB, 2020 WL 520941 (D.N.M. Jan. 31, 2020)(Browning, J.), the Court determined that a defendant's confession pursuant to interrogation was improper where the interrogating officers overbore the defendant's will by: (i) promising the defendant leniency; (ii) offering themselves as protection for the defendant and his children against violent retribution; and (iii) threatened to incarcerated the defendant's girlfriend.  See 2020 WL 520941, at *46.  The officers employed all three of these tactics at once, at which point the defendant began weeping and asking the officers what they want him to do.  See 2020 WL 520941, at *46.

3.    **Requests for an Attorney.**

The Fifth and Fourteenth Amendments provide the accused a "right to have counsel present during custodial interrogation."  Edwards v. Arizona, 451 U.S. at 482.  In Miranda, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent

questioning.  If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.  The Supreme Court expanded on that principle in Edwards v. Arizona, concluding that, once an individual, subject to custodial interrogation, expresses a desire for counsel, the individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. at 484-85.  See id., 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."); Davis v. United States, 512 U.S. 452, 458 (1994)("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.").  The Tenth Circuit has held that Edwards v. Arizona applies -- and a suspect can invoke a right to counsel -- before the officers have issued a Miranda warning.  See United States v. Kelsey, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning."); United States v. Santistevan, 701 F.3d 1289, 1294 (10th Cir. 2012)(concluding that the defendant properly invoked his right to counsel where he was under arrest and held in custody such that interrogation was imminent).

This rule amounts to a "second layer" of protection for the accused who has invoked his right to an attorney in that further communication with law enforcement does not mean that he waived his right to an attorney, unless he initiates the conversation.  Maryland v. Shatzer, 559 U.S. 98, 104 (2010).  "When an accused has invoked his right to have counsel present during custodial

interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."

Maryland v. Shatzer, 559 U.S. at 104 (quoting Edwards v. Arizona, 451 U.S. at 484-85).

> The rationale of Edwards is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect."

Maryland v. Shatzer, 559 U.S. at 104-05 (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988))(alteration in Maryland v. Shatzer, but not in Arizona v. Roberson).  Accordingly, "a voluntary Miranda waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel."  Maryland v. Shatzer, 559 U.S. at 105. The Supreme Court noted, however, that the "Edwards rule is not a constitutional mandate, but judicially prescribed prophylaxis."  Maryland v. Shatzer, 559 U.S. at 105.  A break in custody of fourteen days or more ends the Edwards v. Arizona rule that a subsequent attempt to obtain a Miranda waiver is ineffective when the suspect initially requested counsel.  See Maryland v. Shatzer, 559 U.S. at 110.

The request for counsel must be clear and unequivocal.  See Davis v. United States, 512 U.S. at 459.  A "suspect need not 'speak with the discrimination of an Oxford don,'" Davis v. United States, 512 U.S. at 459 (quoting Davis v. United States, 512 U.S. at 476 (Souter, J., concurring)), but "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" Davis v. United States, 512 U.S. at 459 (quoting McNeil v. Wisconsin, 501 U.S. at

178).   The applicability of the rule that law enforcement cease custodial interrogation upon a clear request for counsel "requires courts to determine whether the accused actually invoked his right to counsel."  Davis v. United States, 512 U.S. at 453.  An individual's "ambiguous" or "equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning.  Davis v. United States, 512 U.S. at 453 (emphasis in original).   The Supreme Court later explained: "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'"  Berghuis v. Thompkins, 560 U.S. 370, 382 (2010)(quoting Davis v. United States, 512 U.S. at 461).   "Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity."  Berghuis v. Thompkins, 560 U.S. at 382.

The Supreme Court held in Davis v. United States that a defendant's statement to law enforcement agents that "[m]aybe I should talk to a lawyer" was not a clear-and-unequivocal request for counsel.  512 U.S. at 462.  See Maryland v. Shatzer, 559 U.S. at 112 (noting that a defendant's statement that "'he would not talk about this case without having an attorney present'" satisfactorily invoked the defendant's right to an attorney (quoting Shatzer v. State, 405 Md. 585, 589, 954 A.2d 1118, 1120 (Md. 2008))); United States v. Zamora, 222 F.3d 756, 765 (10th Cir. 2000)(holding that Zamora's statement "'I might want to talk to my attorney'" is ambiguous and does not invoke the right to counsel)(quoting the agent's testimony at the suppression hearing about Zamora's statements).  In United States v. Santistevan, the Tenth Circuit held that a letter a defendant handed to a law-enforcement agent, which read "Mr. Santistevan does not wish to speak

with you without counsel" is "an unambiguous invocation of the right to counsel."  United States

v. Santistevan, 701 F.3d at 1292-93.  Although the defendant agreed to speak with law enforcement

without his attorney present almost immediately after handing over the letter, the Tenth Circuit

determined that, "once the suspect unambiguously invokes the right to counsel -- as

Mr. Santistevan did here by giving the letter to the agent -- all questioning must stop."  United

States v. Santistevan, 701 F.3d at 1293.

In United States v. Lux, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit agreed with a

district court finding that a defendant did not make an unambiguous request for counsel when she

asked how long it would take if she wanted a lawyer and whether she would have to stay in jail

while she waited for a lawyer.  See United States v. Lux, 905 F.2d at 1381.  See Valdez v. Ward,

219 F.3d 1222, 1232-33 (10th Cir. 2000)(holding that a non-native English speaker's statement,

in response to whether he understood his Miranda rights, that "[y]es, I understand it a little bit and

I sign it because I understand it [sic] something about a lawyer and he want [sic] to ask me

questions and that's what I'm looking for [sic] a lawyer" is an ambiguous request for counsel);

Mitchell v. Gibson, 262 F.3d 1036, 1056 (10th Cir. 2001)("Even construed most favorably to

Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the

circumstances, a sufficiently clear request for counsel to require the cessation of questioning under

Davis.");  United States v. Sierra-Estrada, 248 F. App'x 973, 981 (10th Cir. 2007)(unpublished)

(collecting appellate court cases).  The Court previously has ruled that a suspect's question about

"whether she needed an attorney" did not constitute a clear and unequivocal request sufficient to

invoke a right to counsel.  United States v. Alfaro, No. CR 08-0784 JB, 2008 WL 5992268, at *13

(D.N.M. Dec. 17, 2008)(Browning, J.).  See United States v. Martinez, No. CR 02-1055 JB, 2006

WL 4079686, at *12 (D.N.M. Nov. 21, 2006)(Browning, J.)("[A]n inquiry whether he might need a lawyer . . . was not an unequivocal assertion of his right to counsel.").

### 4.     __Midstream__ Miranda __Warnings__.

The Supreme Court first considered midstream Miranda warnings in Oregon v. Elstad, 470 U.S. 298 (1985)("Elstad") -- a home-burglary case.  In Elstad, a witness to the burglary implicated an eighteen-year-old neighbor -- Michael Elstad -- and, on that information, State of Oregon detectives confronted the teenager in his parents' home.  See 470 U.S. at 300.  Without issuing a Miranda warning, detectives briefly questioned Elstad in his parents' living room, and Elstad admitted that he was involved in the burglary.  See Elstad, 470 U.S. at 301.  The detectives then escorted Elstad to the sheriff's headquarters and read him his Miranda rights.  See Elstad 470 U.S. at 301.  Elstad waived them and gave a full written confession.  See 470 U.S. at 301-02.

On appeal, Elstad argued that his "confession was tainted by the earlier failure of the police to provide Miranda warnings," Elstad, 470 U.S. at 305, and, drawing on the Fourth Amendment's fruit-of-the-poisonous-tree doctrine, see Wong Sun v. United States, 371 U.S. 471, he contended that the confession "must be excluded," Elstad, 470 U.S. at 305.  The Supreme Court disagreed with Elstad, concluding that "procedural Miranda violation[s] differ[] in significant respects from" Fourth Amendment violations.  Elstad, 470 U.S. at 306.  The Supreme Court explained that, unlike a Fourth Amendment search-and-seizure violation, a Miranda violation does not necessarily mean that there was a constitutional violation.  See Elstad, 470 U.S. at 306-07.  The Fifth Amendment prohibits the use of compelled testimony; "[f]ailure to administer Miranda warnings," on the other hand, "creates a presumption of compulsion," although Miranda additionally bars "unwarned statements that are otherwise voluntary."  Elstad, 470 U.S. at 306-07.  Thus, the "Miranda

exclusionary rule" is prophylactic, and "sweeps more broadly than the Fifth Amendment itself."

Elstad, 470 U.S. at 307.

That Miranda sweeps more broadly than the Fifth Amendment means that, unlike a Fourth

Amendment violation, a Miranda violation does not necessarily require a confession's exclusion.[21]

_____

[21]There is tension in this reasoning and with the Supreme Court's later determination in Dickerson that Miranda is a constitutional rule.  See Dickerson, 530 U.S. at 437-38, 441.  In Dickerson, although conceding that "we have repeatedly referred to the Miranda warnings as 'prophylactic,' and 'not themselves rights protected by the Constitution,'" Dickerson, 530 U.S. at 437-38 (quoting New York v. Quarles, 467 U.S. 649, 653 (1984); Michigan v. Tucker, 417 U.S. 433, 444 (1974)), the Supreme Court concluded that "Miranda is a constitutional decision," because: (i) it had consistently applied Miranda to state court decisions and (ii) Miranda had invited legislative action "to protect the constitutional right against coerced self-incrimination," Dickerson, 530 U.S. at 438-40.  If Miranda is a constitutional rule, however, it is hard to see how it can "sweep[] more broadly than the Fifth Amendment itself."  Elstad, 470 U.S. at 306.  It is possible that the Supreme Court means that Miranda implicates additional constitutional amendments, such as the Fourteenth, but the statement's context in Elstad suggests that the Supreme Court means that Miranda's exclusionary rule arose from judicial rulemaking and not from some other Amendment beyond the Fifth.  See Elstad, 470 U.S. at 305; Elstad, 470 U.S at 307 ("Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.").  The Supreme Court, in expressly recognizing this tension, noted that Elstad "does not prove that Miranda is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."  Dickerson, 530 U.S. at 441.  But see Dickerson, 530 U.S. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with Miranda's rules does not establish a constitutional violation was central to the holdings of Tucker, [Oregon v.] Hass, [420 U.S. 714 (1975)], Quarles, and Elstad.")(emphasis in original).
Because Elstad's reasoning to exclude fruit-of-the-poisonous-tree evidence rested, in large part, on Miranda being a nonconstitutional rule, Dickerson's determination that Miranda is a constitutional rule reopened the question why fruit-of-the-poisonous-tree evidence is not excluded after a procedurally tainted Miranda warning.  See United States v. Patane, 542 U.S. 630 (2004)("Patane")(plurality op.)("Based on its understanding of Dickerson, the Court of Appeals rejected the post-Dickerson views of the Third and Fourth Circuits that the fruits doctrine does not apply to Miranda violations.").  See also Sanchez-Llamas v. Oregon, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").
The Supreme Court attempted to resolve this tension in Patane, but a divided Supreme Court did not produce a controlling opinion.  See Patane, 542 U.S. at 635-36.  The Honorable Antonin G. Scalia, then-Associate Justice of the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, determined that Miranda was a prophylactic rule and that admitting "fruits" evidence from a voluntary statement did not implicate the Fifth Amendment's self-

See 470 U.S. at 307; Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the exclusionary rule primarily to deter constitutional violations."). Indeed, the prosecution may still use a confession obtained in violation of Miranda for impeachment purposes. See Elstad, 470 U.S. at 307. Moreover, the Supreme Court reasoned that categorically barring a confession after a midstream Miranda warning "undercuts the twin rationales" of the prophylactic Miranda

---

incrimination clause. Patane, 542 U.S. at 636. The plurality reasoned that, even taking Dickerson's holding to heart that Miranda is a constitutional rule, there must be a close fit between the constitutional violation and the remedy. See Patane, 542 U.S. at 643. It concluded that admitting nontestimonial fruits of a voluntary statement do not implicate the self-incrimination clause, so there is no fit between the Miranda violation and the exclusionary remedy. See Patane, 542 U.S. at 643 ("The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial."). In so concluding, the three justices in the plurality reaffirmed that Elstad's reasoning was sound. See Patane, 542 U.S. at 639-40. The Honorable Sandra Day O'Connor and the Honorable Anthony M. Kennedy, then-Associate Justices of the Supreme Court of the United States, concurred in the judgment, and agreed that Elstad is still good law after Dickerson. See Patane, 542 U.S. at 645 (Kennedy, J., concurring). The two Justices did not, however, expressly adopt the constitutional "fit" analysis that the plurality deployed. Patane, 542 U.S. at 645. They concluded that admitting non-testimonial fruits from a voluntary statement "does not run the risk of admitting into trial an accused's coerced incriminating statements against himself." Patane, 542 U.S. at 645 (Kennedy, J., concurring). Instead of concluding that such a remedy would not fit the constitutional violation, however, they concluded that excluding such evidence would not serve the police "deterrence rationale" infusing Miranda. Patane, 542 U.S. at 645 (Kennedy, J., concurring). The concurrence did not comment on Elstad's rationale that Miranda did not justify excluding "fruits" evidence, because, unlike the Fourth Amendment, Miranda is not a constitutional rule.

Elstad's constitutional reasoning, thus, may no longer be good law, but its trustworthiness and deterrence rationales may be. See Elstad, 470 U.S. at 308. Moreover, despite Dickerson's suggestion that "fruits" evidence may need to be excluded as Miranda is a constitutional rule, five justices eschewed that suggestion in Patane. Patane, 542 U.S. at 643, 645. Accordingly, the Court concludes that a procedural Miranda violation does not require the Court to exclude nontestimonal evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory. See Wong Sun v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court agrees with the Justices who have noted that Miranda is not properly rooted or found in the Constitution, but instead is the product of the Supreme Court's power to provide prophylactic rules. See Maryland v. Shatzer, 559 U.S. at 106. It may not be a bad rule in that it has -- with its bright-line application -- made a lot of otherwise fuzzy confessions valuable and protected police in their work, but its constitutional and judicial underpinnings are shaky if not non-existent.

rule -- trustworthiness and deterrence.  Elstad, 470 U.S. at 308.  See Dickerson, 530 U.S. at 433

("The roots of this test developed in the common law, as the courts of England and then the United

States recognized that coerced confessions are inherently untrustworthy.").

> "A free and voluntary confession is deserving of the highest credit, because it is
> presumed to flow from the strongest sense of guilt . . . but a confession forced from
> the mind by the flattery of hope, or by the torture of fear, comes in so questionable
> a shape . . . that no credit ought to be given to it; and therefore it is rejected."

Dickerson, 530 U.S. at 433 (quoting King v. Warickshall, 1 Leach 262, 263-64, 168 Eng. Rep.

234, 235 (K.B. 1783)).  If the post-Miranda confession is otherwise knowing and voluntary, its

trustworthiness is not in doubt.  See Elstad, 470 U.S. at 308.  The deterrence rationale likewise

loses force when the officers acted in good faith compliance with Miranda.  See Elstad, 470 U.S.

at 308 (citing Michigan v. Tucker, 417 U.S. at 447-48).  Accordingly, the Supreme Court has held

that, once the Miranda warning is made, "the admissibility of any subsequent statement should

turn . . . solely on whether it is knowingly and voluntarily made."  Elstad, 470 U.S. at 309.  See

Elstad, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was also

voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding

circumstances and the entire course of police conduct with respect to the suspect in evaluating the

voluntariness of his statements.").

Extrapolating from that test, the Supreme Court concluded that Elstad's pre- and post-

Miranda confessions were voluntary and therefore admissible.  See Elstad, 470 U.S. at 314-15.  It

noted that, "[w]hen a prior statement is actually coerced, the time that passes between confessions,

the change in place of interrogations, and the change in identity of the interrogators all bear on

whether that coercion has carried over into the second confession."  Elstad, 470 U.S. at 310.

However, where the initial confession is voluntary, "a break in the stream of events" is not needed

for the second confession to be admissible.  Elstad, 470 U.S. at 310.  Rather, the Miranda warning

"serves to cure the condition that rendered the unwarned statement inadmissible."  Elstad, 470

U.S. at 311.

In Elstad, the Supreme Court reasoned that the initial confession "took place at midday" in

Elstad's living room with his mother "a few steps away," so it was voluntary.  Elstad, 470 U.S. at

315.  With no additional facts demonstrating that the second confession, post-Miranda was elicited

under coercive conditions, the Supreme Court deemed it admissible.  See Elstad, 470 U.S. at 314.

Elstad had "'let the cat out of the bag by confessing,'" Elstad, 470 U.S. at 311 (quoting United

States v. Bayer, 331 U.S. 532, 540 (1947)), with his first statement in no way creating a

"presumption of compulsion" for the second statement, Elstad, 470 U.S. at 314.   Dissenting

justices noted that there may be a "'psychological impact of a *voluntary* disclosure of a guilty

secret,'" but such disclosure, as a matter of law, does not qualify "'as state compulsion' nor

'compromises the voluntariness' of subsequent confessions."  Elstad, 470 U.S. at 312 (Brennan, J.,

dissenting, joined by Marshall, J.)(emphasis in Elstad)(quoting Elstad, 470 U.S. at 312, 326) .

The Supreme Court next considered midstream-Miranda warnings in Missouri v. Seibert,

542 U.S. 600 (2004)("Seibert"), and issued only a plurality opinion.  Seibert, 542 U.S. at 603-05.[22]

In Seibert, a young boy with cerebral palsy died in his sleep, and his mother feared charges of

neglect, because the boy's body was covered in bedsores.  See 542 U.S. at 604.  The mother, along

_____

[22]The Honorable David H. Souter, then-Associate Justice of the Supreme Court, announced the Court's judgment and delivered an opinion that the Honorable John Paul Stevens, the Honorable Ruth Bader Ginsburg, and the Honorable Stephen G. Breyer, Associate Justices of the Supreme Court, joined.  See Seibert, 542 U.S. at 603.  Justice Breyer filed a concurrence, and Justice Kennedy concurred in the judgment.  See Seibert, 542 U.S. at 617-18.  Justice O'Connor, joined by then-Chief Justice Rehnquist and Justices Scalia and Thomas, dissented.  See Seibert, 542 U.S. at 622.

with two of her remaining sons and family friends, conspired to conceal the evidence of neglect by burning the family's mobile home with the boy's dead body in it.  See 542 U.S. at 604.  To avoid the appearance that they had left the boy unattended, they arranged for Donald Rector, a mentally ill teenager living with the family, to remain in the mobile home while they set fire to it.  See 542 U.S. at 604.  The conspirators executed their plan, and Rector died in the fire.  See 542 U.S. at 604.

Missouri officers subsequently arrested the mother.  See Seibert, 542 U.S. at 604.  Officer Kevin Clinton refrained from issuing her a Miranda warning on instructions from police headquarters.  See 542 U.S. at 604.  Another officer, Richard Hanrahan, questioned her at the police station for thirty-forty minutes without a Miranda warning, and she eventually admitted that Rector "was meant to die in the fire."  Seibert, 542 U.S. at 605.  After a twenty-minute break, Hanrahan issued a Miranda warning, obtained a signed waiver of rights, and secured the same confession with a similar line of questioning.  See Seibert, 542 U.S. at 605.  According to Hanrahan, he consciously decided to withhold the Miranda warning in accordance with a sanctioned interrogation technique that he had been taught: "question first, then give the warnings, and then repeat the question until he got the answer previously given."  Seibert, 542 U.S. at 600.

On appeal, the Supreme Court noted that Hanrahan's tactic of question first, issue Miranda warnings later, did not occur just in Missouri.  See Seibert, 542 U.S. at 609.  The Supreme Court further noted that such a tactic was at odds with Miranda's purpose; Miranda sought to ensure that individuals made a "'free and rational choice,'" Seibert, 542 U.S. at 601 (quoting Miranda, 384 U.S. at 464-65), with full knowledge of their constitutional rights before speaking with officers, whereas "[t]he object of question-first is to render Miranda warnings ineffective by waiting for a

particularly opportune time to give them, after the suspect has already confessed," <u>Seibert</u>, 542

U.S. at 611.  The plurality continued:

> [I]t is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content . . . .   Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. . . .   What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silent being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

<u>Seibert</u>, 542 U.S. at 613-14 (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 424 (1986)).  But <u>see</u> <u>Seibert</u>,

542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the "cat out of

the bag" theory that the Supreme Court rejected in <u>Elstad</u>).  Accordingly, the plurality held that

"[t]he threshold issue when interrogators question first and warn later is thus whether it would be

reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda*

requires."  <u>Seibert</u>, 542 U.S. at 611-12 (quoting <u>Miranda</u>, 384 U.S. at 467).

The plurality concluded that the following factors bear on whether a midstream <u>Miranda</u>

warning can be effective:

> [(i)] the completeness and detail of the questions and answers in the first round of interrogation[; (ii)] the overlapping content of the two statements[; (iii)] the timing and setting of the first and the second[; (iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 542 U.S. at 615.  In its analysis, the plurality adds another factor: whether officers advise the suspect that the pre-Miranda confession could not be used against him.  See Seibert, 542 U.S. at 616 n.7.  Conspicuously absent from those factors is the officer's intent, but the plurality notes that, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work."  542 U.S. at 616 n.6.  The plurality concludes that the midstream Miranda warning was ineffective, because the pre- and post-Miranda questioning occurred in the same location, the post-Miranda phase occurred only twenty minutes after the pre-Miranda phase, the officers treated the two phases of questioning as continuous, and the pre-Miranda phase left "little, if anything, of incriminating potential left unsaid."  Seibert, 542 U.S. at 616-17.

In so holding, the plurality contrasted Seibert with Elstad, and concluded that the officer's failure to warn in Elstad was a good faith Miranda mistake, and that "any causal connection between the first and second [admissions] to the police was 'speculative and attenuated.'"  Seibert, 542 U.S. at 615 (quoting Elstad, 470 U.S. at 313).  "In Elstad, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home," because a reasonable person "could have seen the station house questioning as a new and distinct experience."  Seibert, 542 U.S. at 615.  Moreover, the police station interrogation went "well beyond the scope of the laconic prior admission" in the suspect's living room.  542 U.S. at 614.  Justice Breyer concurred, noting that, "[i]n my view, the following simple rule should apply to the two-stage interrogation technique: Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith."  Seibert, 542 U.S. at 617 (Breyer, J., concurring).  He joined "the plurality's opinion in full," however,

because he believed that "the plurality's approach in practice will function as a 'fruits' test." Seibert, 542 U.S. at 618 (Breyer, J., concurring)(quoting Wong Sun v. U.S., 371 U.S. at 477).

Justice Kennedy concurred in the judgment, but wrote separately and adopts a different test.   See Seibert, 542 U.S at 622 (Kennedy, J., concurring).   First, he extrapolates a general principle from the Supreme Court's Miranda cases: "Evidence is admissible when the central concerns of Miranda are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction."   Seibert, 542 U.S. at 618-19 (Kennedy, J., concurring).   From that general principle, he concludes that an officer's deliberate intent to withhold a Miranda warning in an effort to obtain a confession without informing a suspect of his rights "distorts the meaning of Miranda and furthers no legitimate countervailing interest." Seibert, 542 U.S. at 621 (Kennedy, J., concurring).   He disagreed with the plurality, however, because the test that the plurality articulates "cuts too broadly."   Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

> Miranda's clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity.  Cf. Berkemer v. McCarty, 468 U.S. 420, 430 . . . (1984).  I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning.

Seibert, 542 U.S. at 622 (Kennedy, J., concurring).   Accordingly, Justice Kennedy articulated the following test:

> The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

Seibert, 542 U.S at 622 (Kennedy, J., concurring).[23]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas, dissented.  See Seibert, 542 U.S. at 622 (O'Connor, J., dissenting).  The dissenting justices concluded that Elstad's voluntariness inquiry, and not a multi-factor balancing test or a subjective-intent test, should control.  See Seibert, 542 U.S. at 622-23, 628 (O'Connor, J., dissenting). According to those justices, a test focusing on the officer's subjective intent missed the mark, because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's state of mind is irrelevant.  Seibert, 542 U.S. at 624-25 (O'Connor, J., dissenting)("Thoughts kept inside a police officer's head cannot affect [the suspect's] experience.").  The plurality's approach, on the other hand, is defective, because it adopts the "cat out of the bag theory" that the Supreme Court rejected in Elstad.  542 U.S. at 627 (O'Connor, J., dissenting).  The dissent notes that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court "refused to 'endo[w]' those 'psychological effects' with 'constitutional implications'" in Elstad.  542 U.S. at 627 (O'Connor, J., concurring)(quoting Elstad, 470 U.S. at 311)(alteration in Seibert but not in Elstad). The dissent explains that to adopt this approach "'would effectively immuniz[e] a suspect to pre-Miranda warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity.'"  Seibert, 542 U.S. at 627 (O'Connor, J., dissenting)(quoting Elstad, 470 U.S. at 312)(alteration in Seibert but not in

---

[23]The Supreme Court later applied Seibert in a per curiam review of a habeas petition, but it did not resolve which test was controlling as it applied both the plurality's factors and factors which Justice Kennedy's concurrence articulated.  See Bobby v. Dixon, 565 U.S. 23, 30-32 (2011)(per curiam).

Elstad).  Accordingly, the dissent would have ordered a remand for the state court to determine whether the statements were voluntarily made.  See 542 U.S. at 628 (O'Connor, J., dissenting).

Previously, the Tenth Circuit avoided deciding which opinion in Seibert controls.  See United States v. Carrizales-Toledo, 454 F.3d 1142, 1151-53 (10th Cir. 2006)(determining that the statements at issue would be admissible under either test); United States v. Sanchez-Gallegos, 412 F. App'x 58 (10th Cir. 2011)(unpublished); United States v. Crisp, 371 F. App'x 925 (10th Cir. 2010)(unpublished).  In United States v. Carrizales-Toledo, the Tenth Circuit considered the issue at length, but then declined to decide it.  See 454 F.3d at 1151.  It recognized that the rule from Marks v. United States, 430 U.S. 188 (1977), ordinarily dictates that the Supreme Court's holding "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  United States v. Carrizales-Toledo, 454 F.3d at 1151 (citing Marks v. United States, 430 U.S. at 193).  The Tenth Circuit noted, however, that "the Marks rule produces a determinate holding 'only when one opinion is a logical subset of other, broader opinions'" and that "[w]e do not apply Marks when the various opinions supporting the Court's decision are mutually exclusive."  United States v. Carrizales-Toledo, 454 U.S. at 1151 (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991)(en banc)).  "Determining the proper application of the Marks rule to Seibert is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court."  United States v. Carrizales-Toledo, 454 F.3d at 1151 (citing United States v. Rodriguez-Preciado, 399 F.3d 1118, 1138-41 (9th Cir. 2005)(Berzon, J., dissenting in part)).  In United States v. Guillen, 995 F.3d 1095 (10th Cir. 2021), however, the Tenth Circuit applied the Marks v. United States doctrine and determined that Justice Kennedy's intent-based approach controls:

No matter how vigorously the *Seibert* plurality (and the dissent) may disagree with Justice Kennedy's intent-based approach, his standard will produce results the plurality would necessarily agree with in any case suppressing statements given after midstream *Miranda* warnings. Justice Kennedy's opinion in *Seibert* therefore constitutes the holding of the case and provides the governing standard here. While there is admitted awkwardness in treating as precedential an opinion no other Justice joined, this is the settled practice when that opinion is the determinative one. *See Marks*, 430 U.S. at 193 . . . ; *Glossip*[ *v. Gross*], 576 U.S. [863,] 879 n.2 . . . [(2015)].   And until the Supreme Court itself chooses to reconsider *Marks*, we cannot abandon it from below.

United States v. Guillen, 995 F.3d at 1120.[24]

The Tenth Circuit has applied the subjective-intent test, among the five-factor and Elstad-voluntariness tests, in several situations.  In United States v. Carrizales-Toledo, applying the subjective-intent test, the Tenth Circuit concludes that "the suddenness" of the suspect's initial confession, "the fact that [the suspect's] confession was in response" to the law-enforcement agent's first question, "and the open-ended nature of the question" all suggest that the agent "did not anticipate the confession."  United States v. Carrizales-Toledo, 454 F.3d at 1153.  The Tenth Circuit thus concludes that there was no subjective intent to circumvent Miranda.  See United States v. Carrizales-Toledo, 454 F.3d at 1153.  Because the agent obtained the first confession in good faith, the only remaining question is whether the initial confession was voluntary.  See United States v. Carrizales-Toledo, 454 F.3d at 1153 ("Unless his initial confession was involuntary . . . [the suspect's] motion to suppress the second confession was properly denied.").  The Tenth Circuit determined that the hallmarks of coercion were missing.  See 454 F.3d at 1153.  The suspect was a thirty-three-years-old, was a year shy of obtaining a chemical engineering

---

[24]For an in-depth discussion of the Tenth Circuit's case law as it stood before the Tenth Circuit's decision in United States v. Guillen, including the Tenth Circuit's application of all three tests, see United States v. Woody, No. CR 18-3902 JB, 2020 WL 3513486, at *21-23 (D.N.M. June 29, 2020)(Browning, J.).

degree, the questioning was short, and the agent did not threaten the suspect with physical punishment.  See 454 F.3d at 1153.  Accordingly, the Tenth Circuit approved of the initial confession's admission.  See 454 F.3d at 1153.

In United States v. Sanchez-Gallegos, a per curiam affirmance with three concurring judges, the Honorable David Ebel, Senior United States Circuit Judge for the Tenth Circuit, determined in a concurring opinion that a confession obtained after a midstream Miranda warning was admissible.  See United States v. Sanchez-Gallegos, 412 F. App'x at 72-73 (Ebel, J., concurring).[25]  He adopted Justice Kennedy's concurrence from Seibert.  See United States v. Sanchez-Gallegos, 412 F. App'x at 72 (Ebel, J., concurring)(noting a lopsided Court of Appeals split on the issue with the majority of Courts of Appeals treating Justice Kennedy's concurrence as controlling).  He characterized Justice Kennedy's test as a two-step inquiry: (i) was the two-step interrogation technique used purposefully to undermine the Miranda process; and (ii) if not, the post-Miranda statement is admissible if the pre-Miranda interrogation was not coercive.  See United States v. Sanchez-Gallegos, 412 F. App'x at 72-73 (Ebel, J., concurring).  Judge Ebel determined that there was no evidence that the law-enforcement agents intended to undermine Miranda with the two-step process they employed.  See 412 F. App'x at 72-73 (Ebel, J., concurring).  Instead, the record reflected that Border Patrol agents asked an unplanned question to a driver crossing the Mexican border on legitimate suspicion that the driver was smuggling children into the United States from Mexico.  See 412 F. App'x at 59-60 (Ebel, J., concurring).  Judge Ebel also concluded that the pre-Miranda statements were not coerced, because the

---

[25]In their concurrences, the Honorable Mary Briscoe, then-Chief Judge of the Tenth Circuit, and the Honorable Jerome Holmes, United States Circuit Judge for the Tenth Circuit, did not reach the midstream-Miranda issue.  See United States v. Sanchez-Gallegos, 412 F. App'x at 67 (Holmes, J., concurring); id. at 69 (Briscoe, J., concurring).

questioning, although accusatory, did not have the other hallmarks of coercion -- <u>e.g.</u>, the suspect was not threatened with physical mistreatment, thrown into a holding cell, or questioned for a lengthy period before a <u>Miranda</u> warning was given.  <u>See</u> 412 F. App'x at 71, 73 (Ebel, J., concurring).

In <u>United States v. Crisp</u>, Oklahoma officers arrested Crisp after Crisp fled on foot from his vehicle at a traffic stop.  <u>See</u> 371 F. App'x at 926.  A small bag of marijuana later was found on the route that Crisp took while fleeing from officers.  <u>See United States v. Crisp</u>, 371 F. App'x at 926.  After taking Crisp to a police station, but before issuing a <u>Miranda</u> warning, Crisp and the officers "bantered" about "the pursuit," including "how Mr. Crisp had pulled his hamstring as he fled," Crisp's "social agenda for the evening," and how Crisp's companion in the car smelled of marijuana.  <u>United States v. Crisp</u>, 371 F. App'x at 926.  Responding to an officer's question whether Crisp's companion had smoked marijuana that evening, Crisp admitted that he was the one who had been smoking weed.  <u>See United States v. Crisp</u>, 371 F. App'x at 926.  Officers then issued <u>Miranda</u> warnings, which Crisp waived.  <u>See United States v. Crisp</u>, 371 F. App'x at 926.  Crisp also asserted that he presently was sober and that he understood his rights, noting that the situation was not his "first rodeo."  <u>United States v. Crisp</u>, 371 F. App'x at 926.  The officers re-questioned Crisp about using marijuana and also secured a confession that Crisp possessed a stash of cocaine at his mother's house.  <u>See United States v. Crisp</u>, 371 F. App'x at 926-27.

The Tenth Circuit applied all three tests and concluded that, under all three, Crisp's post-<u>Miranda</u> statements were admissible.  <u>See United States v. Crisp</u>, 371 F. App'x at 929.  The Tenth Circuit concluded that there was no evidence of intent to circumvent <u>Miranda</u>: "[T]o the contrary, the pre-<u>Miranda</u> statement occurred after the parties had bantered about the pursuit and in response to a question about the marijuana use of Mr. Crisp's female companion."  <u>United States v. Crisp</u>,

371 F. App'x at 932.   Moreover, Crisp's pre-<u>Miranda</u> admissions "were unrelated to the post-<u>Miranda</u> statements regarding cocaine." <u>United States v. Crisp</u>, 371 F. App'x at 932.   Accordingly, Crisp's statements were admissible under Justice Kennedy's <u>Seibert</u> concurrence.   See <u>United States v. Crisp</u>, 371 F. App'x at 931-32.

<u>**LAW REGARDING FOURTH AMENDMENT SEIZURES**</u>

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See <u>Oliver v. Woods</u>, 209 F.3d 1179, 1186 (10th Cir. 2000); <u>Dorato v. Smith</u>, 108 F. Supp. 3d 1064, 1118 (D.N.M. 2015)(Browning, J.)(noting that investigative stops are seizures); <u>United States v. Young</u>, 347 F. Supp. 3d 747, 770 (D.N.M. 2018)(Browning, J.)(describing an arrest as a seizure).  "A police officer may seize someone either by physical force or a show of authority." <u>United States v. Roberson</u>, 864 F.3d 1118, 1121 (10th Cir. 2017)(citing <u>United States v. Salazar</u>, 609 F.3d 1059, 1064 (10th Cir. 2010)).  "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" <u>United States v. Salazar</u>, 609 F.3d at 1064 (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991)).  "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" <u>United States v. Salazar</u>, 609 F.3d at 1064 (quoting <u>California v. Hodari D.</u>, 499 U.S. at 628).  "'If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.'" <u>United States v. Ojeda-Ramos</u>, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting <u>United States v. Drayton</u>, 536 U.S. 194, 201 (2002)).  See <u>California v. Hodari D.</u>, 499 U.S. at 627-28 ("[A] person has been 'seized'

- 102 -

within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))).  The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).

1.      **Consensual Encounters.**

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him."  United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).  "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).

2.      **Investigative Stops.**

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit noted: "*Terry* [*v. Ohio*, 392 U.S. 1 (1968),] was the first case to recognize that 'the Fourth Amendment governs 'seizures' of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty."  United States v. King, 990 F.2d at 1557 (first quoting Terry v. Ohio, 392 U.S. at 16; and then quoting Terry v. Ohio, 392 U.S. at 27).  The Tenth Circuit has recognized that, in Terry v. Ohio, the Supreme Court identified two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective

search -- a "frisk." United States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490

U.S. 1, 7 (1989); Adams v. Williams, 407 U.S. 143, 147-48 (1972)).  The Tenth Circuit explained:

> Terry has come to stand for two distinct propositions -- an investigative detention
> ("stop") in which a police officer, for the purpose of investigation, may briefly
> detain a person on less than probable cause, . . . and a protective search ("frisk")
> which permits an officer, in the course of an investigative detention, to conduct a
> limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557.  When evaluating either of these actions, a court asks

whether the action was reasonable under the Fourth Amendment.  See United States v. Wilson, 96

F. App'x 640, 643 (10th Cir. 2004); United States v. King, 990 F.2d at 1557.

### a.      Investigative Detentions and Reasonable Suspicion.

A police-citizen encounter that is not consensual may be a constitutional investigative

detention.  See Dorato v. Smith, 108 F. Supp. 3d at 1118.  An investigative detention occurs when

an officer stops and briefly detains a person "in order to determine his identity or to maintain the

status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186

(quoting Adams v. Williams, 407 U.S. at 146).  Such brief investigative detentions must meet two

distinct requirements to be "reasonable" under the Fourth Amendment.  Dorato v. Smith, 108

F. Supp. 3d at 1118.  First, the officer "must have a particularized and objective basis for suspecting

the particular person stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting

United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that

follows the stop must be "reasonably related in scope to the circumstances" which justified the

stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes

"limitations on both the length of the detention and the manner in which it is carried out," United

States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent

conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)). Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot. See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details."). While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient. See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), a police

officer observed a young girl walking down the street at night.  See 355 F. App'x at 227-28.  A truck pulled alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.  See 355 F. App'x at 228.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See 355 F. App'x at 228.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled behind the truck.  355 F. App'x at 228, 229.  Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, that he did not have a driver's license, and that he had a gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit concluded that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant." 355 F. App'x at 229.  The Tenth Circuit explained, in an opinion that the Honorable Michael R. Murphy, now-Senior United States Circuit Judge for the Tenth Circuit, wrote and the Honorable Mary Beck Briscoe, now-Senior United States Circuit Judge for the Tenth Circuit, and the Honorable Robert H. McWilliams, the late United States Circuit Judge for the Tenth Circuit, joined:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.  She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a

driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking. He parked in a dark location and turned off his lights.

. . . .

We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229. The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion. See 355 F. App'x at 229. The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." 355 F. App'x at 229. The Tenth Circuit demanded only that the officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur. See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's

(1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417. At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vázquez, United States District Court Judge for the District of New Mexico, concluded that, because the defendant's conduct in standing outside a private residence and looking in was "'consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance,'" the officer did not have reasonable suspicion at the time of the stop

- 107 -

and should have waited longer to rule out innocent conduct.  483 F. App'x at 418 (quoting United States v. Aragones, No. CR 10-2453 MV, 2011 WL 13174481, at *19 (D.N.M. June 10, 2011)(Vázquez, J.)).  The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior."  United States v. Aragones, 483 F. App'x at 418. The Tenth Circuit noted, moreover, that the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling." 483 F. App'x at 417 (quoting Albuquerque, N.M., Ordinance § 12-2-21(B)).  The Tenth Circuit, thus, reversed Judge Vázquez' decision, disagreeing with her conclusion that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 7.

**b.**     **Frisks.**

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)).  An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns,

knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, a court should consider the totality of the circumstances. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

        **c.**    **Traffic Stops.**

"'A traffic stop is a seizure within the meaning of the Fourth Amendment . . . .'" United States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)). "'For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'" United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)). "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's." United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop." United States v. White, 584 F.3d at 945. See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents. Nevertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131; and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))). The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart." United States v. Erwin, 875 F.2d at 270.

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion. See United States v. Holt, 264 F.3d at 1230. "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. 452, 459

(2011)(quoting <u>Brigham City v. Stuart</u>, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

<u>United States v. Wilson</u>, 96 F. App'x at 643 (quoting <u>United States v. Holt</u>, 264 F.3d at 1220).  A court must examine "both the length of the detention and the manner in which it is carried out," <u>United States v. Holt</u>, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" <u>United States v. Wilson</u>, 96 F. App'x at 643 (quoting <u>United States v. Caro</u>, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'"  <u>United States v. Wilson</u>, 96 F. App'x at 644 (alterations in original)(quoting <u>United States v. Wood</u>, 106 F.3d 942, 945 (10th Cir. 1997)).   "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction."  <u>United States v. Winder</u>, 557 F.3d at 1134.

**3.**   **<u>Arrests.</u>**

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention."  <u>Oliver v. Woods</u>, 209 F.3d at 1186 (quoting <u>United States v. Cooper</u>, 733 F.2d 1360, 1363 (10th Cir. 1984)).  A police-citizen encounter that goes beyond the limits of a stop under <u>Terry v. Ohio</u> is an arrest.  <u>See</u> <u>United States v. Perdue</u>, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a <u>Terry</u> stop, however,

may be constitutionally justified only by probable cause or consent.").  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[26]  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011) (Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'" (quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013)(unpublished).  "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001), and citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require 'more than mere suspicion.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction

---

[26]The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning, J.)("The use of handcuffs . . . does not always elevate a detention into an arrest.").

between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio,

and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89,

96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause

for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing

Florida v. Royer, 460 U.S. at 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir.

2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that

probable cause existed to arrest the defendant based on the 'information possessed by the

[arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(quoting

Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)(alterations in Olsen v. Layton Hills Mall but

not in Romero v. Fay)).

### a.   **When a Detention Becomes an Arrest.**

The Tenth Circuit has held that a police-citizen encounter which goes beyond an

investigative stop's limits is an arrest that probable cause or consent must support to be valid.  See

United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which

goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable

cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and]

the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the

circumstances."  United States v. Perdue, 8 F.3d at 1462.  "The government has the burden of

demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

The Court also has engaged in the balancing act of deciding when a detention becomes an arrest. In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. See United States v. Perea, 374 F. Supp. 2d at 976. In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest. See 374 F. Supp. 2d at 976. The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause." 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1463). See United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'" (quoting United States v. Perdue, 8 F.3d at 1462)); United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms but not transforming the vehicle stop into a formal arrest requiring probable cause).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their

protection.'"  United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at

1462).    See  United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding

reasonableness of stop when officers detained the defendant at gunpoint, and placed him in

handcuffs where suspect had threatened to kill someone and was pounding interior of truck with

his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's

"drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United

States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers

did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when

they suspected that the defendant had "just completed a narcotics purchase," there were a number

of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially

hazardous and supports the need for added safeguards").   Similarly, there are circumstances in

which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.

See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th

Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable

precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir.

1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action

designed to provide for the safety of the agents.").   United States v. Perea presents one of those

unique cases, because the police had reasonable cause to believe that the person whom they were

detaining was the suspect whom they sought to arrest -- a man wanted for murder who, it was

believed, might be armed and dangerous.   See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed

the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to
> the perceived threat.  The measures taken during a Terry stop must be "reasonably
> related in scope to the circumstances which justified the interference in the first

place" and may not go beyond what is necessary for officer safety.  *United States v.
King*, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting *Terry v. Ohio,* 392 U.S. 1,
20 . . . (1968)).  The felony stop was justified by suspicion that someone in the
Escalade might have a gun, or at least was dangerous.  The officers displayed their
weapons only as long as necessary to ensure that the vehicle and its occupants posed
no threat.  The officers put their guns away as soon as they handcuffed
Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else
was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

> **b.**    **Officers Have a Duty to Investigate Easily Accessible Evidence Before
> Making an Arrest.**

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily

available at the scene, investigate basic evidence, or otherwise inquire if a crime has been

committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay,

45 F.3d at 1476-77.  Police officers "may not ignore easily accessible evidence and thereby

delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259

(10th Cir. 1998).  However, "[o]nce probable cause is established, an officer is not required to

continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas,

No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *49 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing

Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

In Romero v. Fay, the Tenth Circuit considered when an officer must conduct further

investigation before arresting an individual.  In that case, law enforcement officers interviewed

two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder.

See 45 F.3d at 1474.  Approximately four hours later, without conducting additional investigation

or obtaining a warrant, an officer arrested the plaintiff for murder.  See 45 F.3d at 1474.  After he

was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi.

See 45 F.3d at 1474.  The plaintiff stated that three individuals would establish that he was asleep

at home when the murder occurred.  See 45 F.3d at 1474.  The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  See 45 F.3d at 1474.  The plaintiff was incarcerated for three months before the government dismissed the case and he was released.  See 45 F.3d at 1474.

The plaintiff brought a 42 U.S.C. § 1983 action for, among other claims, violations of his Fourth Amendment rights.  See Romero v. Fay, 45 F.3d at 1474.  The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and of Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him.  See 45 F.3d at 1476.  The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, now-Senior United States Circuit Judge for the Tenth Circuit, authored, and the Honorable Deanall Reece Tacha, former-United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit joined.  See 45 F.3d at 1476.  The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit determined:

> Once [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store

surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything. See 147 F.3d at 1254-55. The Tenth Circuit, in an opinion that Judge Murphy, authored, and the Honorable Stephen Hale Anderson, Senior United States Circuit Judge for the Tenth Circuit, and the Honorable James Kenneth Logan, the late United States Circuit Judge for the Tenth Circuit joined, concluded that qualified immunity did not apply. See 147 F.3d at 1257-59. The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape." 147 F.3d at 1257. The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause." 147 F.3d at 1257. The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations." 147 F.3d at 1257. The Tenth Circuit added that

> police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation . . . . Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff]. They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest. Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her. See 478 F.3d at 1113. Without: (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers

arrested the boyfriend.  See 478 F.3d at 1113.  The Tenth Circuit, in an en banc opinion that the

Honorable Paul Joseph Kelly Jr., now-Senior United States Circuit Judge for the Tenth Circuit,

authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of
> insufficient information, *see Valenzuela*, 365 F.3d at 902, or inadequate
> corroboration, what the officers had fell short of reasonably trustworthy
> information indicating that a crime had been committed by [the defendant].  *See*
> *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close
> her or his eyes to facts that would help clarify the circumstances of an arrest.
> Reasonable avenues of investigation must be pursued especially when, as here, it
> is unclear whether a crime had even taken place.").  Based on the facts above, [the
> defendant] was arrested without probable cause.

Cortez v. McCauley, 478 F.3d at 1116 (footnotes omitted).  The Tenth Circuit further held that

> it was established law that "the probable cause standard of the Fourth Amendment
> requires officers to reasonably interview witnesses readily available at the scene,
> investigate basic evidence, or otherwise inquire if a crime has been committed at
> all before invoking the power of warrantless arrest and detention."  *Romero*, 45
> F.3d at 1476-77 (footnote omitted); *see also Baptiste v. J.C. Penney, Co.*, 147 F.3d
> [at] 1259  ("[P]olice officers may not ignore easily accessible evidence and thereby
> delegate their duty to investigate and make an independent probable cause
> determination based on that investigation.").  In the present case, witnesses were
> readily available for interviews, physical evidence was available, and a medical
> diagnosis was forthcoming.  Defendants, however, . . . conducted no investigation.
> Instead, the Defendants relied on the flimsiest of information conveyed by a
> telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted).  The Tenth Circuit concluded,

therefore, that qualified immunity did not apply.  See Cortez v. McCauley, 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica

Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.  See 2011 WL

7444745, at *8.  The plaintiff ultimately was exonerated, and subsequently filed a § 1983 claim

against the arresting officer and Rio Rancho for, among other things, unlawfully arresting him in

violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The Court concluded

that the officer had probable cause to arrest the plaintiff based on information gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz. See 2011 WL 7444745, at *43-46. Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses." 2011 WL 7444745, at *15. Garcia contended, moreover, that Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him violated his constitutional rights. See 2011 WL 7444745, at *15. Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered Katz' and Odom's motivations to lie. See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again . . . . Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . . .

> Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him . . . . The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause. In Romero v. Fay, the Tenth Circuit held:

>> Plaintiff contends that regardless of whether the statements by Duran and Gutierrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have

negated the probable cause to arrest.  We disagree.

45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest."  147 F.3d at 1257 n.8.

. . . .

These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses.  Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J.  Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom.  Garcia only speculates that Casuas *might* have found something.  An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment.  In Romero v. Fay, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him.  When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . . Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . .  During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives.  The cases that Garcia cites establish only that the police may not ignore available material witnesses.  Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed.  Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses . . . .  Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it

- 120 -

does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview. Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49 (alterations added)(emphasis in original).

## RELEVANT LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government generally will be prohibited from using that evidence in a criminal prosecution of that person. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations . . . including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process . . . .")(citing Mapp v. Ohio, 367 U.S. 643, 655-57 (1961); Dickerson, 530 U.S. at 435); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment, and a causal nexus between the violation and the evidence sought to be excluded. See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006). Once the defendant makes this showing, the burden shifts to the government to prove that an exception to the exclusionary rule applies. See United States v. Torres-Castro, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary rule. See United States

v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015).

1.    **The Attenuation Exception.**

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. 232, 238 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions." Utah v. Strieff, 579 U.S. at 238. The Supreme Court in Brown v. Illinois, 422 U.S. 590 (1975) has articulated three factors for courts to consider in determining whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence.

First, courts look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained. Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam). The Supreme Court previously has concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence. Brown v. Illinois, 422 U.S. at 604.

Second, courts consider "the presence of intervening circumstances." Brown v. Illinois, 422 U.S. at 603-04. The Supreme Court identified sufficient intervening circumstances to admit

the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the independent-source doctrine.[27] See 468 U.S. at 799-801, 814. There, agents had probable cause to believe that apartment occupants were dealing cocaine. See 468 U.S. at 799-800. The agents sought a warrant. See 468 U.S. at 799-800. In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep. See 468 U.S. at 800-01. The next evening, they obtained a search warrant. See 468 U.S. at 800-01. The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggests that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Utah v. Strieff, 579 U.S. at 240 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 604. See Utah v. Strieff, 579 U.S. at 241 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. See Davis v. United States, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, 579 U.S. at 241. The Tenth Circuit finds purposeful and flagrant misconduct "where: '(1) the impropriety of the official's misconduct was obvious or the official

---

[27]The independent-source doctrine is an exception to the exclusionary rule that "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." Utah v. Strieff, 579 U.S. at 238 (citing Murray v. United States, 487 U.S. 533, 537 (1988)).

knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless and (2) the misconduct was investigatory in design and purpose and executed "in the hope that something might turn up."'" United States v. Fox, 600 F.3d at 1261 (quoting United States v. Simpson, 439 F.3d 490, 496 (8th Cir.2006)).  Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, 579 U.S. at 241.  See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.)(concluding that an officer's behavior was not flagrant and purposeful where the officer "was at most negligent in extending" a traffic stop and "did not engage in a fishing expedition" to find evidence of an unrelated crime), aff'd 723 F. App'x. 632 (10th Cir. 2018).

2.      **Good-Faith Exception.**

Recognizing that the exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. United States v. Davis, 564 U.S. at 236-37.  To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)).  The Supreme Court has explained that "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. 135, 143 (2009))(second alteration in United States v. Davis, but not Herring v. United States).  Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is

strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting

Herring v. United States, 555 U.S. at 144).  By contrast,

> when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon*, [468 U.S.] at 909 . . . , or when their conduct involves only simple, "isolated" negligence, *Herring*, [555 U.S.] at 137 . . . , the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way." *Leon*, [468 U.S.] at 919, 908, n.6 . . . (quoting *United States v. Peltier*, 422 U.S. 531, 539 . . . (1975)).

United States v. Davis, 564 U.S. at 238.

### a.  **Warrants Based on Illegally Obtained Information.**

"When a search is conducted pursuant to a warrant that is based on illegally obtained

information, a court is not to blindly apply the good-faith exception." United States v. Alabi, 943

F. Supp. 2d at 1260.  "Instead, the court is to consider the warrant with the illegally obtained

information excluded and determine, based on the remaining information, whether probable cause

nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260.  If the warrant affidavit's

remaining content establishes probable cause, the search pursuant to that warrant was appropriate,

and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information.  [*United States v.*] *Cusumano*, 83 F.3d [1247,] 1250 [(10th Cir. 1996)]. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).  See United States v. Cusumano, 83

F.3d at 1250 ("In our review, we may disregard allegedly tainted material in the affidavit and ask

whether sufficient facts remain to establish probable cause.").  "The apparent rationale for this rule

is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a

fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

### b. United States v. Leon.

In United States v. Leon, the Supreme Court faces the question whether to apply the good-faith exception when a police officer mistakenly thought probable cause supported a warrant from which he obtained evidence. See 468 U.S. at 905. The Supreme Court notes that excluding this evidence would not deter police misconduct. See 468 U.S. at 918-19. The officer had taken all the necessary steps to comply with the Fourth Amendment, and reasonably thought his warrant, and, thus, his search, was valid. See 468 U.S. at 918-19. The Supreme Court explains that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence would not have a significantly deterrent effect on judicial conduct. See 468 U.S. at 916-17. The Supreme Court, thus, concludes that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as the police were acting in good-faith reliance on that warrant. See 468 U.S. at 922-23.

"The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant." United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.) (citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [*United States v. Leon*, 468 U.S.] at 918 . . . . "Where an

officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, the Tenth Circuit has explained that, "[u]nder *Leon*, we presume good-faith when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).  Those four contexts are:

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth."  [*United States v. Leon*, 468 U.S.] at 923 . . . .  Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role."  *Id.*  Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Id.* (quotation omitted).  Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.  *See id.*

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23)(alteration in United States v. Danhauer, but not in United States v. Leon).  See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008).  "If any of these situations is present, the good-faith exception should not be applied, and the evidence should be excluded."  United States v. Romero, 743 F. Supp. 2d 1281, 1316 (D.N.M. 2010)(Browning, J.), aff'd, 749 F.3d 900 (10th Cir. 2014).

### c.   **Herring v. United States.**

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in the Dale County, Alabama, warrant database.  See 555 U.S. at 137.  In the search incident to that arrest, officers found drugs and a gun on Herring's person.  See 555 U.S. at 137.  Herring was then indicted on federal gun- and drug-possession charges.  See 555 U.S. at 138.  It turned out, however,

that the warrant under which the officers arrested Herring had been recalled, but the database had

not been updated to reflect that recall.  See 555 U.S. at 138.  Asserting that the evidence found

during the search was fruit of an unlawful arrest, Herring sought to suppress it.  See 555 U.S. at

138.  The district court denied Herring's motion to suppress, and the United States Court of

Appeals for the Eleventh Circuit affirmed.  See 555 U.S. at 138.

 The Supreme Court affirms the Eleventh Circuit's affirmation of the district court's denial

of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary

rule.  See 555 U.S. at 140-46.  The Supreme Court agrees with the Eleventh Circuit that, although

the police's failure to update the warrant database to reflect that Herring's warrant was withdrawn

was negligent, it was not reckless or deliberate.  See 555 U.S. at 140.  The Supreme Court reiterates

its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of

probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable

reliance' on the subsequently invalidated search warrant."  Herring v. United States, 555 U.S. at

142 (quoting United States v. Leon, 468 U.S. at 922).  Tracing the history of cases applying and

declining to apply the exclusionary rule, the Supreme Court distills a general principle: "To trigger

the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can

meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the

justice system."  Herring v. United States, 555 U.S. at 144.  The Supreme Court further explains

that "'evidence should be suppressed only if it can be said that the law enforcement officer had

knowledge, or may properly be charged with knowledge, that the search was unconstitutional.'"

Herring v. United States, 555 U.S. at 143 (quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)).

As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system,

or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion

of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  Herring v. United States, 555 U.S. at 146.

        **d.**      **Davis v. United States.**

In Davis v. United States, the Supreme Court confronts the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent.  See 564 U.S. at 239.  At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009), which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  See Arizona v. Gant, 556 U.S. at 341-48.  The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).  Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant. United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determines that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explains that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144).  The Supreme Court states: "The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] Fourth

Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement."  United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144).  The Supreme Court concludes that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  United States v. Davis, 564 U.S. at 240.

### 3.      Inevitable-Discovery Exception.

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"  United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. at 444).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit notes that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  782 F.2d at 152.  Relying on this statement from United States v. Owens, the Court states in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "'permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it.'"  810 F. Supp. 2d at 1274 (quoting United States v. Cunningham, 413 F.3d at 1203).  On appeal, however, the Tenth Circuit clarifies that the inevitable-discovery exception does not require a second, independent investigation that would have discovered the evidence in question.  See United States v. Christy, 739 F.3d at 540.  The Tenth Circuit explains:

In *Cunningham* and [*United States v.*] *Souza*[, 223 F.3d 1197 (10th Cir. 2000),] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal." *Cunningham*, 413 F.3d at 1204 n.1.   In *Cunningham*, police searched the defendant's home after getting his consent. *Id.* at 1202.   The defendant later contested the search, claiming his consent was coerced. *Id.*   We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred. *Id.* at 1205.   In *Souza*, police illegally opened a UPS package that contained drugs.   223 F.3d at 1200, 1202.   We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred. *Id.* at 1206.   Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.

. . . .

Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [*United States v.*] *Larsen*, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203.   The Tenth Circuit states that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. The Tenth Circuit adopts four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search," [*United States v. Cabassa*, 62 F.3d 470,]

473 [(2d Cir. 1995)]; 2) the strength of the showing of probable cause at the time the search occurred, *see id.* at 473-74; 3) whether a warrant ultimately was obtained, albeit after the illegal entry, *see id.* at 473; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli," *id.* at 473 n.2.

United States v. Souza, 223 F.3d at 1204.  Applying the first factor, the Tenth Circuit states:

> [T]he prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this case.  Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office.  Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

223 F.3d at 1205.  Regarding the second factor, the Tenth Circuit states:

> [A]t the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong.  The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed.  Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

223 F.3d at 1205-06.  The Tenth Circuit notes that a sergeant eventually obtained a search warrant.

See 223 F.3d at 1206.  Regarding the third factor, the Tenth Circuit states that, unlike "*Cabassa*, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued."  United States v. Souza, 223 F.3d at 1206.  The Tenth Circuit does not reach the fourth factor, but concludes that, although it is

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convinces us that this is one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasizes the "'danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway.'" 782 F.2d at 152-53 (quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)). The Tenth Circuit considers whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine. See United States v. Owens, 782 F.2d at 152-53. Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concludes:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine. First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers. In fact, such an intrusion would have been a significant invasion of his privacy. Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable. The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it. Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband. Alternatively, a friend could have returned to claim the closed bag.

782 F.2d at 153. "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.), aff'd 643 F.3d 1292 (10th Cir. 2011).

In United States v. Cunningham, the Tenth Circuit "appl[ies] the inevitable discovery doctrine . . . because we are convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have

been discovered." 413 F.3d at 1205.  The Tenth Circuit, in addressing the first factor -- the extent

to which the warrant process had been completed at the time those seeking the warrant learn of the

search -- states:

> Here, the officers took substantial steps to obtain a warrant before the contested
> search occurred.  The record demonstrates that they had focused their investigation
> on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search
> warrant for one of these homes.  As a result of their conversation with the [assistant
> United States attorney], the officers decided that further surveillance on the two
> homes was necessary before they specifically selected one to search, and they
> proceeded to conduct that surveillance immediately.  The officers' actions clearly
> indicate they took steps to obtain a search warrant and that they intended to obtain
> the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204.  Regarding the second factor -- the strength of the showing of probable cause at

the time the search occurred -- the Tenth Circuit states:

> The officers also possessed strong probable cause for their search of 1179
> East 76th Terrace by the time Mr. Cunningham arrived at the home.  Prior to that
> time, they had acquired background information about the alleged check-writing
> ring, narrowed their investigation to one residential block, and focused on the two
> homes sharing a common driveway.  The officers' surveillance had uncovered the
> following additional information: a red car containing two individuals identified
> earlier in the investigation arrived, parked briefly, and then pulled out from behind
> 1179 East 76th Terrace; a black pickup truck previously observed in the
> investigation was stopped containing Mr. Cunningham, who said that he lived at
> 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that
> the home next door had been receiving all of the traffic that evening, and the officers
> ruled out 1175 East 76th Terrace as the location visited by the alleged check
> supplier; and a gray Blazer previously observed in the investigation was seen
> parked by 1179 East 76th Terrace.  The government thus had sufficient probable
> cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's
> disputed consent to search his home.

413 F.3d at 1204-05.  Regarding the third factor -- whether a warrant ultimately was obtained,

albeit after the illegal entry -- the Tenth Circuit states: "Moreover, the officers ultimately did obtain

a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home."  413

F.3d at 1205.  Regarding the fourth factor -- evidence that the officers "jumped the gun," because

they lacked confidence in their showing of probable cause and wanted to force the issue by creating

a fait accompli -- the Tenth Circuit states:

> There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue. [*Souza*, 223 F.3d] at 1204. Instead, the record indicates that the search occurred at the time it did because of the coincidental arrival of Mrs. Cunningham. Her presence on the scene led to a series of events that culminated in her son's release from jail, his return home, and his consent to search. As a result, we are satisfied the government has demonstrated that, as in *Souza*, but for Mrs. Cunningham's arrival at 1179 East 76th Terrace on the evening of the search, the officers would have obtained a search warrant and the evidence in question would have been found. *Id.* at 1205.

United States v. Cunningham, 413 F.3d at 1205. The Tenth Circuit, therefore, applies the

inevitable-discovery doctrine. See 413 F.3d at 1205.

In United States v. Christy, the Court applies the four United States v. Souza factors and

determines that the inevitable-discovery exception applies. See 810 F. Supp. 2d at 1275-79.

Regarding the first factor -- the extent to which the warrant process had been completed at the time

those seeking the warrant learn of the search -- the Court states: "The deputies did not take any

steps to obtain a warrant before entering Christy's residence. The United States concedes that they

did not attempt to obtain a warrant before entering Christy's residence . . . . This factor thus weighs

against applying the inevitable discovery exception." 810 F. Supp. 2d at 1275 (citations to the

record omitted). As to the second factor -- the strength of the showing of probable cause at the

time the search occurred -- the Court concludes:

> The Court finds that Carvo had strong probable cause that Christy committed crimes. At the time of the search, Carvo believed he had probable cause for the California crime of unlawful sexual intercourse, because Christy and K.Y. exchanged naked pictures through electronic mail transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to run away with Christy.
>
> . . . .

Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the belief that there was a sexual relationship or sexual interest between the two was reasonable." These circumstances are sufficient to form "a reasonable ground for belief of [Christy's] guilt," for the California crime of unlawful sexual intercourse. Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the California crime of unlawful sexual intercourse.

Carvo also had strong probable cause for the federal crime of coercion or enticement. Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

. . . .

Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement. Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and

footnote omitted). Regarding the third factor, -- whether a warrant ultimately was obtained, albeit

after the illegal entry -- the Court holds:

The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy. *United States v. Cunningham*, 413 F.3d at 1205. Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation. Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so. Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO

or from the Albuquerque FBI.  Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information.  Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature."  If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant.  Carvo is cross designated to acquire both state and federal search warrants.  This factor thus weighs in favor of application of the inevitable-discovery doctrine.  *See United States v. Cunningham*, 413 F.3d at 1205 (finding that the law enforcement officers ultimately obtained a warrant, albeit based in part on information illegally obtained, and holding that the inevitable discovery doctrine applied).

810 F. Supp. at 1278-79 (second and third alterations in original)(citations to record omitted).  As

to the fourth factor -- the existence of evidence that the officers jumped the gun, because they

lacked confidence in their showing of probable cause and wanted to force the issue by creating a

fait accompli -- the Court determines:

> There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue."  *United States v. Cunningham*, 413 F.3d at 1205.  The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence.  This factor thus weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279.  Consequently, the Court applies the inevitable-

discovery doctrine.  See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirms the Court's decision.  See 739 F.3d at 539-44.

Addressing the United States v. Souza factors, the Tenth Circuit noted that the defendant

challenged the Court's ruling only on factors two and four -- the strength of the probable cause

showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep

the warrant requirement." United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of

Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)). Regarding

the second factor -- the strength of the showing of probable cause at the time the unlawful search

occurred -- the Tenth Circuit states:

> The district court found that Officer Carvo knew that K.Y. was a minor,
> there was a large age difference between her and Mr. Christy, the two exchanged
> sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y.
> Given those factual findings, it is a reasonable inference that a sexual relationship
> existed between Mr. Christy and K.Y. Officer Carvo also knew that K.Y. was
> potentially suicidal, had left her depression medication behind, and ran away from
> home with Mr. Christy. Based on that knowledge, Officer Carvo's belief that K.Y.
> was at risk for sexual victimization and assault was reasonable. Thus, Officer
> Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity
> in violation of California law and coerced or enticed K.Y. to travel across state lines
> to engage in criminal sexual activity in violation of federal law. The district court
> was correct in weighing this factor in favor of applying inevitable discovery.

739 F.3d at 542 (citations to record omitted). Analyzing the fourth factor -- evidence that the

officers jumped the gun, because they lacked confidence in their showing of probable cause and

wanted to force the issue by creating a fait accompli -- the Tenth Circuit explains:

> Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his
> home due to their lack of confidence about probable cause. Yet as the district court
> found, no evidence supports the theory that the deputies forced entry for that reason.
> Instead, the deputies forced entry because they believed K.Y. was in danger. Mr.
> Christy argues that the search was not in fact justified by exigent circumstances and
> points to the district court's conclusion that it was not. But that is beside the point.
> The record fully supports the reasonableness of the deputies' assessment of danger.
> The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543 (citations to record omitted). The Tenth Circuit

concludes, therefore, that the Court properly applies the United States v. Souza factors. See United

States v. Christy, 739 F.3d at 542.

<u>ANALYSIS</u>

The Court reviews Colbert's arguments below.  Specifically, the Court considers whether: (i) the officers arrested Colbert unlawfully inside Apartment A; (ii) the consent that Colbert gave resulted from his unlawful arrest, and that, therefore, the search of Apartment A premised on that consent is unlawful; and (iii) the search of Apartment A was unlawful, because Colbert did not consented to the search freely and voluntarily.[28]  The Court concludes that: (i) the officers arrested Colbert unlawfully; (ii) Colbert's consent is sufficiently attenuated from his unlawful arrest; and (iii) Colbert consented to the search freely and voluntarily.  Accordingly, the Court will not suppress the evidence obtained as a result of the officers' search of Apartment A.

## I.  THE OFFICERS' WARRANTLESS IN-HOME ARREST OF COLBERT WAS UNLAWFUL.

Colbert's first argument is that officers arrested him unlawfully inside Apartment A.  <u>See</u> Suppression Motion ¶¶ 7-21, at 3-10.  He argues that it is "a simple matter" to establish that officers placed him under arrest, as he "was removed from a residence after the police forcefully breached two doors, and gave him commands to submit to their authority.  Suppression Motion ¶ 7, at 3-4.  There is also an admission by the officers that he was 'taken into custody.'"  Suppression Motion ¶ 7, at 4 (no citation given for quotation)(citing <u>United States v. Serna</u>, 406 F. Supp. 3d at 1104 (citing <u>United States v. Melendez-Garcia</u>, 28 F.3d at 1052-53)).  The United States does not dispute that the officers on the scene arrested Colbert.  Colbert argues that the officers conducted this arrest without a search warrant or an arrest warrant and, therefore, the arrest is unlawful, noting that

---

[28]The parties also present arguments whether Colbert has standing to bring his Fourth Amendment challenge.  <u>See</u> Suppression Response at 9-12; Suppression Reply ¶¶ 1-4, at 1-3.  At the October 4, 2022, hearing, the United States indicated that, based on discussion with Colbert, it withdraws any objection to Colbert's standing to bring his Fourth Amendment challenge.  <u>See</u> Oct. 4 Tr. at 392:7-393:3 (Fernandez, Ramirez).

"[t]here is a strong and long-standing presumption against warrantless in-home arrests." Suppression Motion ¶ 8, at 4 (citing Payton v. New York, 445 U.S. at 586).  He notes that there is an exigent-circumstances exception to the presumption that a warrantless in-home search is unlawful, but argues that the circumstances here do not satisfy the exception's four factors.  See Suppression Motion ¶ 12, at 6.  The United States counters that the exigent-circumstances exception applies, and asserts that, in the alternative, the officers were justified in entering Apartment A without a warrant to conduct a protective sweep.  See Suppression Response at 15; U.S. Closing at 11-12.  The Court concludes that neither exception to the general prohibition against a warrantless entry to a home applies here, and that the officers' entry and subsequent arrest of Colbert are unlawful.

### A.   OFFICERS ARRESTED COLBERT WHEN THEY PLACED HIM IN CUSTODY IN APARTMENT A.

The Court agrees with Colbert that officers arrested him when they placed him in custody in Apartment A, see Suppression Motion ¶ 7, at 3-4, because the officers used forceful techniques to enter Colbert's room and put him in handcuffs.  An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d at 1363).  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d at 1052-53.  "'If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.'"  United States v. Ojeda-Ramos, 455 F.3d at 1183 (quoting United States v. Drayton, 536 U.S. at 201).  See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person

would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. at 554)).

Here, the circumstances indicate that the officers' intrusion was sufficient to signal that Colbert had been placed under arrest and that a reasonable person in his situation would not have felt free to terminate the encounter.  Salcido directed Benstein to retrieve breaching tools, and knocked and made announcements at Apartment A's front door for approximately one minute before Benstein returned with the tools.  See Factual Background, supra ¶¶ 67-70, at 14-15 (citing Oct. 4 Tr. at 244:23-245:4 (Salcido); id. at 245:14-20 (Ramirez, Salcido)).  Once Salcido breached Apartment A's wrought iron gate and wooden front door, Booth and Salcido, among other officers, entered Apartment A, and swept each room of the apartment.  See Factual Background, supra ¶¶ 71-72, at 13 (citing Aug. 31 Tr. at 138:18-140:6 (Booth, Ramirez); Oct. 4 Tr. at 250:1-2 (Ramirez, Salcido); id. 250:10-24 (Ramirez, Salcido); id. 251:2-12 (Ramirez, Salcido); id. at 251:22-252:5 (Ramirez, Salcido)).  Booth approached the west bedroom where Colbert was located, announced his presence, knocked on the locked door, and, receiving no response, kicked in the door, tearing off the door's lower half and leaving the top half still on its hinges.  See Factual Background, supra ¶ 73, at 15 (citing Aug. 31 Tr. at 140:16-19 (Booth); Oct. 4 Tr. at 253:4-7 (Salcido)); Factual Background, supra ¶¶ 75-76, at 15 (citing Oct. 4 Tr. at 254:23-25 (Salcido); id. at 255:3-9 (Salcido)).  While Booth was knocking, he held his weapon in front of him.  See Factual Background, supra ¶ 74, at 15 (citing Oct. 4 Tr. at 254:18-20 (Salcido)).  Colbert opened the door's remnants, at which point the officers placed him in handcuffs with his hands behind his back, took him into custody, and removed him immediately from Apartment A.  See Factual Background, supra ¶¶ 81-83, at 16 (citing Aug. 31 Tr. at 140:24-141:3 (Booth); Oct. 4 Tr. at 255:23-256:18 (Ramirez, Salcido)).  Given these circumstances, in addition to the United States' not disputing

that officers arrested Colbert, the Court concludes that officers arrested Colbert in Apartment A after entering the apartment and removing him in handcuffs.

### B.   EXIGENT CIRCUMSTANCES DID NOT JUSTIFY THE OFFICERS' WARRANTLESS ENTRY INTO APARTMENT A.

It is undisputed that the officers did not have a warrant to search Apartment A or to arrest Colbert when they breached the apartment door on August 3, 2021.  Colbert notes that there is an exigent-circumstances exception to a warrantless seizure's presumptive unreasonableness, which requires that the United States prove four factors when arguing that an officer's fear that a suspect may destroy evidence constitutes a circumstance sufficiently exigent to permit an otherwise warrantless entry into a home.  See Suppression Motion ¶ 9, at 5.  Specifically, Colbert asserts that the entry into the home must be:

> "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse."

Suppression Motion ¶ 10, at 5 (quoting United States v. Aquino, 836 F.2d at 1272).  Colbert contends that the United States fails to satisfy each United States v. Aquino factor.  See Suppression Motion ¶ 12, at 6.  The Court determines below that the United States has not demonstrated that the officers' entry aligns with each of the United States v. Aquino factors, and concludes therefore that exigent circumstances did not justify the officers' warrantless entry into Apartment A.

1.   **There Is Sufficient Evidence of Probable Cause to Warrant a Reasonable Officer to Believe that Colbert was Engaged in Criminal Activity Inside Apartment A.**

The Court concludes that the United States has satisfied United States v. Aquino's first factor to demonstrate exigent circumstances: that the entry to the home be "pursuant to clear evidence of probable cause." 836 F.2d at 1272. The Tenth Circuit has noted that "'probable cause requires only a *probability* or substantial chance of criminal activity, not an *actual showing* of such activity.'" United States v. Cruz, 977 F.3d at 1005-06 (quoting Illinois v. Gates, 462 U.S. at 243 n.13)(emphasis in United States v. Cruz, but not in Illinois v. Gates). Colbert argues that the officers surveilling Apartment A did not have probable cause to believe that a crime was being committed, because officers based their belief that street-level drug transactions had taken place "on the appearance of money, . . . the brevity of the encounters, and that there were several." Suppression Motion ¶ 12, at 6. He argues that "[n]othing . . . was done to confirm these suspicions, and the officer could not himself see the object of exchange." Suppression Motion ¶ 12, at 6. He argues that, consistent with the Court's opinion in United States v. Serna, "'the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention.'" Suppression Motion ¶ 12, at 6 (quoting United States v. Serna, 406 F. Supp. 3d at 1107). Finally, he asserts that the circumstances here could have justified an investigatory seizure based on reasonable suspicion, but do not satisfy the clear-evidence-of-probable-cause standard. See Suppression Motion ¶ 13, at 6-7 (quoting United States v. Serna, 406 F. Supp. 3d at 1104).

The United States, by contrast, argues that "there was probable cause to believe the defendant was trafficking narcotics" and asserts that "[p]robable cause to support a warrantless

entry exists 'when under the totality of the circumstances there is a reasonable probability that a

crime is being committed.'"  Suppression Response at 12 (quoting United States v. Gordon, 173

F.3d at 766).[29]  The United States argues that the Court additionally should apply a reasonable,

_____

[29]Colbert disputes the United States' citation to United States v. Gordon, arguing that the quoted language does not appear in the opinion, that "law enforcement does not have to believe a crime is 'being committed' only that one was committed," and that the Tenth Circuit did not consider a warrantless entry to a home, but "whether a luggage search on a public conveyance was lawful.  Gordon states no rules with respect to 'entries' or in-home warrantless arrests." Suppression Reply ¶ 6, at 3 (quoting United States v. Gordon, 173 F.3d at 766).  Colbert is correct that United States v. Gordon does not include the language which the United States quotes.  This language appears, however, in United States v. Traxler, 477 F.3d 1243 (10th Cir. 2007), which cites United States v. Gordon for the proposition that "[p]robable cause exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed." United States v. Traxler, 477 F.3d at 1247 (citing United States v. Gordon, 173 F.3d at 766).  Thus, although the United States erroneously cites United States v. Gordon as the quoted language's source, rather than to United States v. Traxler, the Tenth Circuit has cited to United States v. Gordon in support of the same proposition.
     Further, although Colbert is correct that United States v. Gordon involves the investigation of a locked bag on a train, the Court does not conclude that its -- or United States v. Traxler's -- definition of probable cause is inapplicable in this case.  In United States v. Aquino, the Tenth Circuit cites to Dunaway v. New York to explain when the officers involved in that case had established probable cause.  See United States v. Aquino, 836 F.2d at 1273 (citing Dunaway v. New York, 442 U.S. at 208 n.9).  In Dunaway v. New York, the Supreme Court explains:

> "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested]." Brinegar v. United States, 338 U.S. 160, 175-176 . . . (1949), quoting Carroll v. United States, 267 U.S. 132, 162 . . . (1925).  See generally 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment 436-480 (1978).

Dunaway v. New York, 442 U.S. at 208 n.9 (alterations in Dunaway v. New York, but not in Brinegar v. United States).  This standard does not deviate substantially from the standard in United States v. Gordon or United States v. Traxler that, based on the totality of the circumstances, there be a reasonable probability that a crime is being committed.  Dunaway v. New York concerned a custodial questioning's legality, see 442 U.S. at 202, Brinegar v. United States concerned the warrantless search of an automobile, see 338 U.S. at 162-63, and United States v. Aquino concerned the warrantless entry of a residence, see 836 F.2d at 1272-73.  The concept of probable cause applies to a broad set of circumstances when police officers suspect that a crime is being committed, and the Court identifies no reason why it should limit the standard in United

prudent officer standard to determine whether probable cause exists, see Suppression Response at 12-13 (quoting United States v. Snow, 82 F.3d at 942; United States v. Morgan, 936 F.2d at 1568), and that probable cause "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity,'" Suppression Response at 13 (quoting Illinois v. Gates, 462 U.S. at 243 n.13). The United States asserts that, here, officers had probable cause to believe Colbert was trafficking narcotics "based on their observations," a belief which "was only heightened when the red bag that came from Apartment A carried by Bland and discarded by Edwards during their escape attempt, was recovered." Suppression Response at 13. The United States also highlights that Edwards ran to one of Apartment A's windows "and was believed to be conversing with an occupant of Apartment A," and states that Colbert "was believed to be in possession of and trafficking drugs, which is a serious crime." Suppression Response at 13.

The Court determines that, based on the totality of the circumstances, a reasonable officer would have had probable cause to believe that Colbert was engaged in criminal activity -- specifically, drug trafficking. During the surveillance operation, Marreel identified Bland, the target of the officers' surveillance, and he and the other Task Force members set up a perimeter around 524 Vermont Street NE. See Factual Background, supra ¶ 12, at 7 (citing Aug. 31 Tr. at 31:23-32:11 (Marreel, Ramirez); id. at 112:17-20 (Booth, Ramirez)). The operation was taking place in "a high crime area in Albuquerque, if not the highest crime area in Albuquerque." Factual Background, supra ¶ 13, at 7 (quoting Oct. 4 Tr. at 239:14-16 (Salcido)). While surveilling

_____

States v. Gordon and in United States v. Traxler to establishing probable cause incident solely to searches on public conveyances as opposed to other circumstances where probable cause is relevant, including entries to a home. Accordingly, although the Court recognizes the United States' mistake in citing United States v. Gordon instead of United States v. Traxler, it does not conclude that the United States relies on these cases for the wrong definition of probable cause.

Apartment A, Marreel and Booth witnessed two Black males conduct what they believed to be hand-to-hand drug sales. See Factual Background, supra ¶¶ 14, at 7 (citing Aug. 31 Tr. at 34:9-17 (Marreel, Ramirez); id. at 35:16-18 (Marreel); id. at 117:17-22 (Booth, Ramirez)). In total, Marreel witnessed "three to four hand-to-hands." Factual Background, supra ¶ 21, at 8 (quoting Aug. 31 Tr. at 37:12). Specifically, Marreel observed the two men exit Apartment A at different times, approach vehicles which had driven up to the apartment complex, and engage in short interactions, after which the vehicles drove away. See Factual Background, supra ¶ 14, at 7 (citing Aug. 31 Tr. at 34:14-17 (Marreel); id. at 35:16-18 (Marreel)). One of the two men, who was wearing a black T-shirt and camouflage shorts, was Edwards. See Factual Background, supra ¶ 17-18, at 7 (citing Aug. 31 Tr. at 35:19-25 (Marreel, Ramirez); id. at 35:15-16 (Marreel); id. at 117:23-118:15 (Booth, Ramirez); id. 118:24-120:24 (Court, Booth, Fernandez, Ramirez); id. at 222:4-7 (Salcido)). The other man was wearing a gray T-shirt, and the officers did not identify what pants he was wearing. See Factual Background, supra ¶ 19, at 8 (Aug. 31 Tr. at 35:13-15 (Marreel)). Both Marreel and Booth identified the second man as Colbert. See Factual Background, supra ¶ 17, at 7 (citing Aug. 31 Tr. at 35:19-25 (Marreel, Ramirez); id. at 117:23-118:15 (Booth, Ramirez)). Although Marreel did not see drugs in Edwards' or Colbert's hands while the two men engaged the vehicles, Booth witnessed Colbert exchange currency. See Factual Background, supra ¶ 20, at 8 (citing Aug. 31 Tr. at 78:23-79:2 (Fernandez, Marreel); id. at 160:14-18 (Booth, Fernandez)). During the surveillance operation, Marreel witnessed an individual from Apartment A conducting counter-surveillance. See Factual Background, supra ¶ 14, at 7 (citing Aug. 31 Tr. at 33:17-34:10 (Marreel, Ramirez)). After the officers witnessed the hand-to-hand sales, Bland, Edwards, the individual conducting counter-surveillance, and a fourth individual exited Apartment A. See Factual Background, supra ¶ 21, at 8 (citing Aug. 31 Tr. at 37:16-38:7

(Marreel, Ramirez); id. at 121:13-15 (Booth)). Colbert was not among these four individuals. See Factual Background, supra ¶ 22, at 8 (citing Aug. 31 Tr. at 38:8-10 (Marreel, Ramirez)). Upon exiting Apartment A, Bland was carrying a red backpack, which officers recovered after Bland and Edwards attempted to flee in the black Kia, and which contained one pound of crystal methamphetamine, marijuana, a Batman-themed pencil case, fentanyl, black tar heroin, crack cocaine, powdered cocaine, a scale, and cash. See Factual Background, supra ¶ 23, at 8 (citing Aug. 31 Tr. at 38:17-22 (Marreel, Ramirez)); Factual Background, supra ¶ 60, at 13 (citing id. at 65:21-66:9 (Marreel, Ramirez); id. at 67:3 (Marreel); id. at 67:18 (Marreel); id. at 68:1-2 (Marreel); id. at 68:15-18 (Marreel, Ramirez); id. at 69:1-2 (Marreel); id. at 69:9 (Marreel); id. at 69:15 (Marreel); Oct. 4 Tr. at 295:16-23 (Coffey, Ramirez)). Edwards was holding the red backpack after exiting the Kia. See Factual Background, supra ¶ 34, at 10 (citing Aug. 31 Tr. at 129:21-23 (Booth)).

Colbert argues that, because "the officer could not himself see the object of exchange," there was not probable cause. Suppression Motion ¶ 12, at 6. The Tenth Circuit does not require, however, "an *actual showing*" of criminal activity, but rather "only a *probability* or substantial chance of criminal activity." United States v. Cruz, 977 F.3d at 1005-06 (quoting Illinois v. Gates, 462 U.S. at 243 n.13)(emphasis in United States v. Cruz, but not in Illinois v. Gates). Here, the area's high-crime nature, Colbert's behavior which was consistent with hand-to-hand drug dealing, the exchange of currency, and the red backpack full of drugs -- which Edwards, the other individual whom the officers witnessed conduct what looked like hand-to-hand sales, was carrying upon exiting the Kia -- all tilt toward a conclusion that criminal activity probably was occurring, and support a reasonable officer's determination of probable cause.

Colbert argues additionally that the officers were obligated to interview readily available witnesses, investigate basic evidence, and inquire whether a crime had been committed at all before making a warrantless entry.  See Suppression Motion ¶ 12, at 6 (quoting United States v. Serna, 406 F. Supp. 3d at 1107).  Although this statement is a correct statement of Fourth Amendment law, it is not helpful to Colbert, because "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect."  Garcia v. Casuas, 2011 WL 7444745, at *49.   Cases in which courts have determined that officers inappropriately avoided investigating basic evidence include where: (i) a suspect explained that he had three individuals that could confirm his alibi but the officer reused to interview those individuals, see Romero v. Fay, 45 F.3d at 1474; (ii) officers relied on a security guard's allegations that a suspect had shoplifted, but watched a video that corroborated the suspect's story that she had not stolen, thus rupturing probable cause, see Baptiste v. J.C. Penney Co., 147 F.3d at 1254-59; and (iii) officers arrested a suspect for molesting a child based solely on a telephone call reporting the alleged molestation and without interviewing the child, inspecting her clothes, or waiting for the medical examination's results, see Cortez v. McCauley, 478 F.3d at 1113.  The Tenth Circuit in Cortez v. McCauley states:

> [W]hether we view it as a need for more pre-arrest investigation because of insufficient information, *see Valenzuela*, 365 F.3d at 902, or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant].  *See BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").

Cortez v. McCauley, 478 F.3d at 1116 (footnotes omitted).  Here, the officers did not enter Apartment A on the basis of a telephone call or a single witness's allegations.  Although the

officers here did not chase down the two individuals that left Apartment A before Bland and Edwards to interview them, the evidence which they observed was sufficient to establish probable cause, and the officers were not required to seek out additional exculpatory evidence before making a warrantless arrest on that basis.[30]

### 2.   Although Drug Trafficking is a Serious Crime, the United States Has Not Shown that Destruction of the Evidence Was Likely.

The Court concludes that drug trafficking is a serious crime -- the first prong of United States v. Aquino's second requirement -- but concludes that the United States has not satisfied the second requirement's second prong -- that destruction of the evidence be likely.  United States v. Aquino, 836 F.2d at 1272.  Colbert acknowledges that the Tenth Circuit has identified drug trafficking as a serious crime, but contends that Tenth Circuit caselaw on the issue has been "focused on very large quantities or actual manufacturing, not the pittance that can be exchanged in two hand-to-hand sales . . . ."  Suppression Motion ¶ 14, at 7 (citing United States v. Cuaron, 700 F.2d at 582; at United States v. Scroger, 98 F.3d at 1259).  He argues additionally that "there was no indication that the destruction of evidence was likely," because: (i) although the individuals in Apartment A may have evinced an intent to abandon or flee from their drugs, no one showed evidence of an intent to destroy them; (ii) the amount of drugs found in the red backpack provided "no clear indication that any evidence was left inside of Apartment A"; and (iii) that this case is a drug case does not mean automatically that there was a likelihood of destruction, and that such a

---

[30]This conclusion applies only to whether the circumstances would have been sufficient to establish probable cause and to make a warrantless arrest of Colbert without further investigation, and not to whether the warrantless entry to Apartment A was lawful.  The Court continues its analysis of the remaining United States v. Aquino factors below.

conclusion "threatens to impermissibly swallow the standard." Suppression Motion ¶¶ 15-16, at 8.

The United States argues that the Tenth Circuit considers drug trafficking to be a serious crime, that what the officers observed during the encounter outside of Apartment A, including Colbert's continued presence inside Apartment A, "led the USMS-SWIFT team to believe evidence was being destroyed in Apartment A," and that "[i]t was the defendant who created the exigency by failing to come to the door, then hiding in a locked room." Suppression Response at 13. See id. at 14-15. Specifically, they note that Bland exited the apartment with the red backpack, that Edwards abandoned it while fleeing, that the backpack contained narcotics and paraphernalia, and that

> Edwards ran back to Apartment A and appeared to be conversing with an occupant of Apartment A through a window. Law enforcement made attempts to have the defendant and any other occupant come to the door of Apartment A, which were ignored.
>
> Prudent, cautious, and trained officers believed evidence was begin [sic] destroyed within Apartment A

Suppression Response at 15. Colbert counters that "what the USMS-SWIFT team 'believed' is not a legal standard," and that, in any event, Colbert did not create exigency by not coming to the door, because he "was under no obligation to voluntarily leave Apartment A or to charge towards a law-enforcement demolition team to avoid 'creating exigency.'" Suppression Reply at 4 (quoting Suppression Response at 13).

The Court concludes that drug trafficking is a serious crime. Although the Tenth Circuit has stated that serious crimes are not well defined, see United States v. Mongold, 528 F. App'x at 949, the Tenth Circuit has been consistent in its pronouncements that "the sale of illegal drugs is a sufficiently severe offense to justify a warrantless entry" when coupled with the risk of the

destruction of evidence. United States v. Aquino, 836 F.2d at 1273. Colbert contends that these cases considered large drug quantities and that the amount that the officers saw Colbert exchange is a "pittance" by comparison. Suppression Motion ¶ 14, at 7. The Tenth Circuit has not made this distinction, however, and the Court does not make it here. See United States v. Cruz, No. CR 18-1105 JB, 2019 WL 957108, at *41 (D.N.M. February 27, 2019)(Browning, J.)("No question exists that the Tenth Circuit considers drug trafficking a serious crime for purposes of a warrantless entry into a home under the destruction-of-evidence exception."), aff'd, 977 F.3d 998 (10th Cir. 2020). In United States v. Aquino, officers were investigating Steven Ruebush, who they believed sold cocaine, and the officers offered $2,000.00 in exchange for one ounce of cocaine. See 836 F.2d at 1269. After going back and forth with Ruebush, the officers exchanged $400.00 in exchange for a smaller sample of the drug from Ruebush's supplier, Tony Vega, at which point Ruebush "produced a small amount of cocaine." 836 F.2d at 1270. Without seeing any additional amounts of cocaine or other drugs, the officers entered the apartment of Vega's supplier, Luis Aquino, without a warrant. See 836 F.2d at 1270. The Tenth Circuit determined that the circumstances were not sufficiently exigent, and was concerned that the officers did not seek a warrant promptly upon identifying probable cause, but did not take issue with the amount of drugs in play. See 836 F.2d at 1273-74. Here, the small amounts that Colbert exchanged, coupled with the larger quantities which the officers found in the red backpack, indicate that the street-level drug sales were a smaller part of a larger drug selling operation, and that Colbert, therefore, was involved with a serious crime.

The Court concludes that the United States has not satisfied the second requirement's second prong -- whether the destruction of evidence is likely. "[I]n order to justify a warrantless entry, the police had to have a reasonable basis for believing that suspects would destroy evidence

[before they could get a search warrant]." United States v. Aquino, 836 F.2d at 1272. Tenth Circuit caselaw indicates that officers have a reasonable basis to believe that suspects are likely to destroy evidence where the suspects' actions lead the officers to believe that the suspects are aware of police presence. See United States v. Cruz, 977 F.3d at 1007-08 (concluding that officers were justified in believing that the defendant would try to destroy evidence where he likely was carrying drugs on his person, saw police officers, and "fled into his home upon seeing the officers, where there was ample opportunity for the destruction"); United States v. Hendrix, 664 F.3d at 1339 (concluding that the officers were justified in believing suspects were destroying evidence, where they "heard considerable movement, opening and closing of doors, and a toilet flushing"); United States v. Carr, 939 F.2d at 1448 (affirming the district court's conclusion that "the smelling of the PCP and the commotion and shouting inside the room . . . gave the officers reasonable suspicion to believe that evidence was being destroyed"); United States v. Aquino, 836 F.2d at 1273 (concluding that "the required release of [individuals who gave evasive answers to police questions, which] created the possibility that news of the arrests would reach others in the drug connection," coupled with the fact that the drug supplier called an informant, which "provided additional evidence that the source of the cocaine was growing suspicious," was sufficient to justify officers' belief that suspects would destroy evidence); United States v. Parra, 2 F.3d 1058, 1063-64 (10th Cir. 1993)(upholding a warrantless search of a motel room where the door to the room "was open four to six inches and the detectives believed that the other suspects might have observed Castillo's arrest"). But see United States v. Carter, 360 F.3d at 1241-42 (concluding that "[t]here was simply no evidence that destruction of evidence was likely" where the United States could "point[] to no reason to believe that other people were in the garage, or even the house").

There are some circumstances, however, in which the Tenth Circuit has identified a reasonable belief that suspects are likely to destroy evidence even where the suspects do not know yet of law enforcement's involvement, particularly where officers have additional knowledge about the suspect that causes them to believe that the suspect will get nervous, and flee or destroy evidence.  See United States v. Anderson, 154 F.3d 1225, 1234 (10th Cir. 1998)("To constitute 'exigent' circumstances, the government must present something more than an unfounded belief by law enforcement officers on the scene that the suspect is becoming suspicious or nervous."); United States v. Cuaron, 700 F.2d at 586 (affirming the district court's determination that the destruction of evidence was likely where officers knew that, because the supplier was operating out of his home, he was "very nervous about being discovered," officers had observed multiple people coming and going from the supplier's house, and the officers believed the supplier would become suspicious after an individual selling the supplier's product did not return after leaving to make a large sale, because the officers had arrested that individual); United States v. Weeks, 995 F.2d at 971 (concluding that, where the defendant was demonstrating "increasing nervousness," had "suspicions about [an informant]" and the motel out of which he was conducting business, and had shown a pattern of leaving locations after a short "cycle," which had almost elapsed, "coupled with an awareness that he sometimes was armed," there were sufficient exigency indicators).  In United States v. Anderson, the United States presented three factors which it asserted supported a finding of exigent circumstances: (i) the officer's belief that more evidence was stored in an office building into which the defendant had entered and locked the door behind him; (ii) the officer's belief that the defendant had access to an incinerator; and (iii) the defendant's lack of response "to the agents knocking on the officer doors or to the patrol car siren."  154 F.3d at 1234.  The Tenth Circuit concludes:

Based on his previous law enforcement experience, it may have been reasonable for Agent Bradley to believe other contraband was stored inside the office building. Nevertheless, that factor alone was insufficient to justify a warrantless entry and search. *Anderson*, 981 F.2d at 1567-68.  As for the presence of an incinerator, that was simply speculation on the part of Agent Bradley and there were no objective indications that an incinerator (or any other item) was being used to destroy evidence.  With respect to the third factor, we are not convinced Anderson's failure to respond to the knocks or the siren could have led a reasonable officer to conclude destruction of evidence was imminent.  We note Anderson was inside a large, two-story, multi-room office building and there was no evidence the agents knew precisely where he was in the building.  Under these circumstances, we are not convinced Anderson (whether hearing impaired or not) reasonably could have been expected to hear the knocks or the siren or to respond to them.

> As an additional matter, we are concerned with the potential for government manipulation under the facts of this case.  The agents testified at the suppression hearing they were concerned Anderson would destroy any evidence stored in the office building if he was alerted to their presence.  However, notwithstanding this alleged concern, the agents proceeded to knock on the doors and activate a siren to alert Anderson to their presence.   In short, the agents helped create the circumstances they allegedly believed would cause Anderson to attempt to destroy evidence.

> For these reasons, we believe the district court correctly concluded "the government presented no evidence that would permit a 'prudent, cautious' officer to assume that destruction of evidence was imminent or that an emergency was occurring in the building."  Thus, exigent circumstances did not exist at the time of the warrantless search of the ATD office building.

United States v. Anderson, 154 F.3d at 1234 (citation to record omitted).

This case's facts are most analogous to those in United States v. Anderson, in that: (i) the officers believed additional contraband was located in the apartment; (ii) the officers had "no objective indications" that Colbert was using a toilet or other means to destroy evidence; and (iii) Colbert did not respond to indications of police presence.  United States v. Anderson, 154 F.3d at 1234.  Here, the officers believed that additional contraband was located inside of Apartment A and were aware that one individual remained unaccounted for inside of the apartment.  See Factual Background, supra ¶¶ 45-46, at 11 (citing Aug. 31 Tr. at 58:25-59:1 (Marreel); id. at 59:21-61:20

(Marreel, Ramirez)).  They also were conscious that, in arresting Bland and Edwards, there had been significant commotion, with police lights and sirens going off and the black Kia briefly having escaped around the apartment building's backyard.  See Factual Background, supra ¶ 48, at 11 (citing Aug. 31 Tr. at 105:8-9 (Marreel); id. at 149:1-5 (Booth, Fernandez)).

The officers did not have, however, any information about where Colbert was in Apartment A, whether he could hear the sirens, or whether he had any awareness of the police presence around the apartment.  See Factual Background, supra ¶ 52, at 12 (citing Aug. 31 Tr. 101:19-22 (Fernandez, Marreel); id. at 107:9-12 (Fernandez, Marreel); id. at 149:9-10 (Booth)).  Although the officers witnessed Edwards run up to one of Apartment A's windows and shout something into it, see Factual Background, supra ¶ 36, at 10, they could not identify what Edwards shouted, and did not indicate that they saw Colbert move around inside the room, approach or open the closed window, open the blinds, pull back the curtains, or give any other indication that he had heard Edwards, or that he was even in the same room as the window into which Edwards shouted, see Factual Background, supra ¶ 37, at 10 (citing Aug. 31 Tr. at 132:5-8 (Booth, Ramirez); id. at 154:21-23 (Booth)); Factual Background, supra ¶ 40, at 10 (citing Aug. 31 Tr. at 147:23 (Booth)); Factual Background, supra ¶¶ 49-51, at 12 (citing Aug. 31 Tr. at 93:25-94:6 (Fernandez, Marreel))). The officers did not indicate that they heard any sounds that would indicate that Colbert was attempting to destroy evidence, such as a flushing toilet, stomping or shuffling, or the opening and closing of doors.  Salcido noted that "[w]e don't know if he's barricading, if he's arming himself, or if he's destroying evidence," and noted that he had seen suspects burrow through neighboring apartment walls to evade detection, and that it would have been possible for Colbert to do the same.  Oct. 4 Tr. at 246:4-15 (Ramirez, Salcido).  See Factual Background, supra ¶ 47, at 11 (citing

Oct. 4 Tr. at 239:21-25 (Salcido); id. at 242:21-243:1 (Ramirez, Salcido); id. at 248:10-24 (Ramirez, Salcido)).

Although Apartment A is smaller than the two-story office building at issue in United States v. Anderson, the Court is unwilling to conclude that a suspect's failure to respond to officers' presence, without more, is sufficient to create a reasonable belief that the suspect imminently is destroying evidence. "As an exception to the warrant requirement, exigent circumstances must be 'jealously and carefully drawn,'" United States v. Anderson, 981 F.2d at 1567 (quoting United States v. Aquino, 836 F.2d at 1270), and allowing law enforcement officers to justify a warrantless entry solely because suspects have not responded to their announced presence without any indication that the suspect has heard the announcements and is aware of the police presence threatens to swallow the rule. Accordingly, the Court concludes, given the officers' lack of any indications that Colbert was aware of police presence and was at risk of destroying evidence, that the officers did not have a reasonable basis to believe that Colbert would destroy evidence before they could obtain a warrant to search Apartment A. See United States v. Aquino, 836 F.2d at 1272.

### 3.   If the Officers Had a Reasonable Basis to Believe the Destruction of Evidence Was Likely, the Intrusion Was Limited in Scope to the Minimum Necessary to Prevent the Destruction of Evidence.

The third requirement to show exigent circumstances is that the intrusion be "limited in scope to the minimum intrusion necessary to prevent the destruction of evidence." United States v. Aquino, 836 F.2d at 1272. Colbert argues that, because "there were no indications that evidence was being destroyed, . . . 'the minimum intrusion *necessary*' is likely none at all," and that, even if some intrusion had been necessary, it would have been sufficient to "mak[e] sure that Mr. Colbert was seized inside of the home," because the officers then could have taken their time to get a warrant, which they did not do. Suppression Motion ¶ 17-18, at 8-9 (emphasis in Suppression

Motion)(no citation given for quotation).  The United States asserts that the entry was limited, stating:

> It was only when the defendant refused to respond that law enforcement made entry into the apartment, continuously calling out to the defendant and any other occupants.  When the defendant continued to ignore commands, law enforcement moved through the apartment to a locked door.  Knowing there was at least one person inside the apartment, the door was breach.  Law enforcement did not search the apartment for contraband.

Suppression Response at 15.  Although the Court concludes above that the officers did not have a reasonable basis to belief that Colbert was likely to destroy evidence, in the alternative situation where there was a likelihood of destruction of evidence, the intrusion was limited appropriately.

The Tenth Circuit has stated that, where officers search a home to find an individual, but do "not search anywhere else in the house" until they obtain the defendant's consent, the search appropriately is limited in scope.  United States v. Cruz, 977 F.3d at 1008.  Officers who conduct a protective sweep of a residence before obtaining a search warrant similarly meet this requirement.  See United States v. Scroger, 98 F.3d at 1260.  In United States v. Scroger, officers approached a home and announced themselves, at which point the defendant opened the door.  See 98 F.3d at 1258.  Once the officers indicated that they were investigating alleged methamphetamine manufacturing, the defendant attempted to push the officers away and shut the door, at which point the officers took the defendant into custody and "then conducted a protective sweep of the residence and found [the] co-defendant . . . in the back yard hiding behind a shed." 98 F.3d at 1258.  The Court previously has found that a warrantless entry was limited in scope where "deputies entered [the defendant's] home initially only so far as required to arrest him outside the bathroom."  United States v. Cruz, 2019 WL 957108, at *43.

The facts here, assuming that officers had a reasonable basis to believe that evidence was being destroyed, are sufficient to establish that the search was limited in scope.  Salcido knocked and made announcement at Apartment A's front door before retrieving breaching tools to force the front gate and door open.  See Factual Background, supra ¶ 70, at 15 (citing Oct. 4 Tr. at 245:14-20 (Ramirez, Salcido)).  The officers then moved through the house searching for the apartment's remaining occupant.  See Factual Background, supra ¶ 72, at 15 (citing Aug. 31 Tr. at 138:18-140:6 (Booth, Ramirez); Oct. 4 Tr. at 250:1-2 (Ramirez, Salcido); id. 250:10-24 (Ramirez, Salcido); id. 251:2-12 (Ramirez, Salcido); id. at 251:22-252:5 (Ramirez, Salcido)).  Upon reaching the west bedroom door, which was fastened shut, Booth kicked the door, breaking its lower half.  See Factual Background, supra ¶ 73, at 15 (citing ; Aug. 31 Tr. at 140:16-19 (Booth); Oct. 4 Tr. at 253:4-7 (Salcido)); Factual Background, supra ¶¶ 75-76, at 15 (citing Oct. 4 Tr. at 254:23-25 (Salcido); id. at 255:3-9 (Salcido)).  Colbert opened the door, at which point Booth and Salcido took him into custody.  See Factual Background, supra ¶ 81, at 16 (citing Aug. 31 Tr. at 140:24-141:3 (Booth)).  After arresting Colbert, although the officers on the scene had conducted a "search for persons," they did not search Apartment A for contraband.  Factual Background, supra ¶ 141, at 25 (quoting Oct. 4 Tr. at 318:22-24 (Coffey)).  In United States v. Scroger, "[a] full search of the residence was not conducted until after the search warrant was obtained."  98 F.3d at 1260.  Here, officers similarly did not conduct a full search of Apartment A, including looking under mattresses and in cupboards, until after Colbert had given consent to search the entire apartment.  Accordingly, the Court concludes that, assuming that the officers on the scene had a reasonable basis to believe that Colbert was going to destroy evidence, the initial search's scope was appropriately limited in nature.

### 4.    The United States Has Not Shown Clearly Defined Indicators of Exigency That Are Not Subject to Police Manipulation or Abuse.

The fourth requirement to show exigent circumstances is that the entry be "supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse." United States v. Aquino, 836 F.2d at 1272.  Colbert argues that, as with prong two, there was no indication that he likely was going to destroy evidence and, therefore, no clear indicators of exigency.  See Suppression Motion ¶ 19, at 9.  He argues additionally that his "arrest features precisely the concern that 'police not be placed in a situation where they can create the exception' or 'exploit such opportunities without sufficient regard for the privacy interests of the individuals involved.'"  Suppression Motion ¶ 21, at 10 (quoting United States v. Aquino, 836 F.2d at 1272).  Specifically, he argues that his alleged activity was incidental to Bland's arrest, and that "[p]ermitting Mr. Colbert's in-home warrantless arrest would allow the police to exploit the opportunity created by an arrest warrant for Mr. Bland, without any regard for Mr. Colbert's deepest privacy interests."  Suppression Motion ¶ 21, at 10.  Aside from the arguments which the United States makes in favor of concluding that the entry in this case satisfies the preceding three factors, the United States does not respond to Colbert's argument on prong four.

The Court concludes above that the officers did not have a reasonable basis to believe that Colbert imminently was destroying evidence.  See supra at 156.  Accordingly, the Court concludes here that no "clearly defined indicators of exigency" existed, regardless whether they were subject to police manipulation or abuse.  United States v. Aquino, 836 F.2d at 1272.  If the Court had concluded, however, that the officers had a reasonable belief that Colbert imminently was destroying evidence, the lack of evidence suggesting that the officers took any steps to obtain a

warrant or explaining why they did not take such steps undermines the suggestion that there existed

clearly defined indicators of exigency.

The Court's first inquiry is whether, assuming the police reasonably believed that the

destruction of evidence was imminent, there exist any factors that would preclude a finding of

exigency. The Tenth Circuit looks to the amount of time that elapses between when officers learn

of the exigent circumstance and when they conduct the warrantless search, and have considered a

gap as little as one day to be sufficient to demonstrate that the circumstances were not truly exigent.

In United States v. Aquino, the Tenth Circuit states:

> [W]e are distressed by the lack of any evidence in the record that the police ever
> began the process of procuring a warrant even though a local magistrate was on
> duty at the time . . . . Nine officers were directly involved in this operation' any
> one of them could have been dispatched to the magistrate.

United States v. Aquino, 836 F.2d at 1273. The Court notes with similar concern that there is no

evidence that the officers on the scene ever attempted to contact a Magistrate Judge to obtain a

warrant. Thompson testified, for example, that he "wasn't aware of" whether anyone on the scene

had taken steps to speak telephonically with a Magistrate Judge or to file an affidavit requesting a

warrant. Aug. 31 Tr. at 205:3. See Factual Background, supra ¶ 138, at 24 (citing Aug. 31 Tr. at

204:19-205:6 (Fernandez, Thompson)). It appears instead that the officers relied on Colbert's

consent, after already having entered Apartment A, to enter the apartment a second time to conduct

a full search. See Factual Background, supra ¶ 140, at 25 (citing Aug. 31 Tr. at 205:7-13

(Fernandez, Thompson); Oct. 4 Tr. at 364:9-13 (Coffey)("[P]robable cause could be used to obtain

a search warrant . . . . But his consent would provide us what we need legally to enter his

apartment and conduct a search . . . .")). The officers on the scene feasibly could have begun the

warrant process as soon as they had probable cause to believe Colbert was engaging in narcotics

trafficking once they witnessed him conducting multiple hand-to-hand drugs sales.  Instead, they continued to surveil Apartment A, waited for Bland, their target, to exit the apartment, engaged in a chase, and entered the apartment at the fracas' conclusion.

The Tenth Circuit has stressed that it is in the public's and the officers' best interests to seek a warrant as soon as possible to avoid the risks of a Fourth Amendment violation, see United States v. Mendoza-Salgado, 964 F.2d at 1010 n.7 ("Not only does proper observance of the warrant requirement protect individuals' privacy interests, but it also prevents police from needlessly jeopardizing the government's case against suspected drug dealers."), and has stated that its "previous exigent circumstance cases have emphasized that the police began the process of obtaining a warrant as soon as they had probable cause," United States v. Aquino, 836 F.2d at 1273-74 (citing United States v. Chavez, 812 F.2d at 1300; United States v. Mabry, 809 F.2d at 678-79; United States v. Cuaron, 700 F.2d at 587-89; United States v. Erb, 596 F.2d at 419).  At the same time, however, the Tenth Circuit in United States v. Cuaron determined that, "[a]t the time of Jon's arrest, the officers could not count on even thirty minutes to obtain a telephone warrant."  700 F.2d at 590.  The Tenth Circuit was clear that it limited its conclusion to the case's facts, stating:

> We emphasize that our holding is limited to the facts of this case.  We do not hold that 30 minutes is never sufficient time to obtain a telephone warrant; we hold only that 30 minutes was inadequate time to obtain and serve a warrant under these circumstances.  As the Second Circuit remarked in an analogous situation, "in law as in life, today's satisfactory explanation may be tomorrow's lame excuse . . . . [L]aw enforcement officials must be expected to learn from their own experiences and those of others."  *United States v. Vazquez*, 605 F.2d 1269, 1280 (2d Cir.1979) (upholding admissibility of tapes recorded during wiretaps despite certain delays in sealing), *cert. denied*, 444 U.S. 981 . . . (1979), 444 U.S. 1019 . . . (1980).

United States v. Cuaron, 700 F.2d at 590 n.6.  The Court's understanding of the interaction that law enforcement officers have with magistrate judges for purposes of obtaining a warrant is similar

to the understanding of the Honorable Patrick F. Kelly, United States District Judge for the United

States District Court for the District of Kansas, sitting by designation on the Tenth Circuit, who

dissented in United States v. Cuaron:

> [T]here is no evidence on the record that a telephone warrant would require as much
> as thirty minutes to obtain; it must be remembered that the investigation leading up
> to the search of defendant's house involved the simultaneous, coordinated actions
> of over twenty law enforcement officers, including more than a dozen DEA agents.
>
> Consistent with my views, experience in similar proceedings suggests that
> at least one or two of these agents should have been (and probably were) assigned
> to the task of obtaining a telephone warrant.  Typically, at such a time as when
> Neet's car is traced to the defendant's residence, and his entry confirmed, or
> certainly when Jon Neet called back to his brother, William, from the defendant's
> home, a magistrate should have been first called and simply alerted to "stand by."
> I am convinced from the record probable cause existed sufficient to support a
> warrant as early as when Jon Neet left the defendant's home at 1:35 P.M., but most
> assuredly at the time of the Neets' arrest at 2:00 P.M.  Within minutes from either
> instance the noticed magistrate could have been recalled either from the motel or at
> a convenient site adjacent to the surrounded Cuaron premises, at which time a
> warrant would doubtless issue.  Viewed in this light, the time frame is
> inconsequential.

700 F.2d at 594 (Kelly, J., dissenting).  The Court is under a similar understanding that the process

for obtaining a telephone warrant is relatively quick, particularly in the District of New Mexico,

which has an on-duty Magistrate Judge ready to take such telephone calls.  See Factual

Background, supra ¶ 139, at 25.  The Court concludes above that the officers on the scene did not

initiate the process of obtaining a warrant.  See Factual Background, supra ¶ 138, at 24.  The Court

acknowledges Salcido's testimony that it would have taken only "[a] couple seconds" for Colbert

to have flushed contraband down the toilet.  Oct. 4 Tr. at 242:14 (Salcido).  Nevertheless, even if

the Court had concluded above that the officers on the scene had a reasonable belief that Colbert

was likely to destroy evidence, the United States has not presented evidence regarding the

complete timeline of events or any difficulties the officers may have encountered in trying to get

a warrant on short notice.  See Factual Background, supra ¶ 138 n.11, at 24.  Accordingly, the Court would conclude that there were not clearly defined indicators of exigency, because the officers did not take any steps to obtain a warrant once they had probable cause to believe that Colbert was engaging in drug trafficking.

Regarding the second prong, that the indicators must not be subject to police manipulation or abuse, the Tenth Circuit has announced that "police manipulation is present only when officers 'engag[e] or threaten[] to engage in conduct that violates the Fourth Amendment.'"  United States v. Cruz, 977 F.3d at 1008 (quoting United States v. Hendrix, 664 F.3d at 1339-40)(alterations in United States v. Cruz, but not in United States v. Hendrix); Kentucky v. King, 563 U.S. at 462. Here, although the warrantless entry itself is a Fourth Amendment violation, there is no evidence that it was predicated on a prior Fourth Amendment violation or that the officers on the scene threatened to engage in conduct violative of the Fourth Amendment.  Accordingly, the Court does not conclude, if there had been clearly defined indicators of exigency, that they were subject to police manipulation or abuse.

In summary, the Court concludes that: (i) the officers had probable cause to believe Colbert was engaging in drug trafficking; (ii) drug trafficking is a serious crime; (iii) the officers did not have a reasonable basis to believe that Colbert likely was to destroy evidence; (iv) the entry was limited appropriately in scope; (v) clearly defined indicators of exigency did not support the entry; and (vi) there is no evidence of police manipulation or abuse.  See United States v. Aquino, 836 F.2d at 1272.  Accordingly, the Court concludes that the officers' concern that Colbert would destroy evidence is insufficient to justify their warrantless entry into Apartment A.  On this basis, the officers' warrantless entry into Apartment A is unlawful.

### C.   OFFICERS   WERE   NOT   JUSTIFIED   IN   CONDUCTING   A   <u>BUIE</u> PROTECTIVE SWEEP.

The Court addresses next the United States' arguments that a <u>Buie</u> protective sweep of Apartment A was necessary to protect officer safety, and concludes that the officers were not justified in conducting a <u>Buie</u> protective sweep, because the United States has not shown articulable facts that would have led a reasonably prudent officer to believe that Colbert posed a danger to those on the arrest scene.  <u>See</u> <u>United States v. Nelson</u>, 868 F.3d at 888 (quoting <u>Buie</u>, 494 U.S. at 335).  In the U.S. Closing, the United States argues that the officers, in addition to being justified in entering Apartment A on the basis of exigent circumstances, were justified in conducting a protective sweep under <u>Buie</u>.  <u>See</u> U.S. Closing at 9-12 (citing <u>Buie</u>, 494 U.S. at 327). The United States argues that a protective sweep is justified and constitutionally permissible where officers have reasonable suspicion based on articulable facts which lead the officers to believe there is an individual in the area to be swept that presents a danger to those on the scene, and that the sweep must last only as long as necessary to "'dispel the reasonable suspicion of danger and . . . no longer than it takes to complete the arrest and depart the premises.'"  U.S. Closing at 10 (quoting <u>Buie</u>, 494 U.S. at 335-36).  The United States argues that, here, law enforcement on the scene knew that Colbert was located in Apartment A, had seen Colbert conducting hand-to-hand drug sales, knew that guns often accompany drugs, and had observed Edwards calling into Apartment A's rear window after he and Bland had attempted to flee.  <u>See</u> U.S. Closing at 11.  The United States argues that, although Marreel used a shield to protect the officers arresting Edwards, he could not fully block the window, and that, even after Edwards was in custody, officers continued investigating the red backpack, which was in 520 Vermont Street NE's backyard.  <u>See</u> U.S. Closing at 11-12.  The United States argues that these circumstances -- particularly Colbert's

presence in Apartment A -- were sufficiently exigent to justify a protective sweep.  See U.S. Closing at 12.

Colbert argues, meanwhile, that the "officers were unable to show that they had an objectively reasonable basis to believe there was an immediate need to protect the lives or safety of themselves or others."  Colbert Closing ¶ 32, at 15.  He argues that, when officer safety is the basis for an exigent-circumstance exception, "police have clear indications of a specific threat." Colbert Closing ¶ 35, at 16 (citing United States v. Banks, 884 F.3d 998, 1012 (10th Cir. 2018); United States v. Najar, 451 F.3d at 719-20).  See Colbert Closing ¶ 36, at 17 (citing Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006)).  He argues that the testimony around Bland and Edwards' arrests does not show that Colbert was dangerous in the same way that Bland and Edwards were, and that no officer saw any weapon before entering Apartment A.  See Colbert Closing ¶ 33, at 15-16.  He argues that, even if the officers witnessed Colbert conducting hand-to-hand drug sales, those sales were peaceable and indicated no threat to anyone.  See Colbert Closing ¶ 37, at 17-18.  Finally, he argues that, even if the officers needed to conduct a protective sweep, the officers' search here surpassed that necessity, and that, in any event, caselaw surrounding protective sweeps "assume[s] a primary and legitimate in-home arrest after which the search is expanded to include areas in which dangerous people might be hiding."  Colbert Closing ¶ 39, at 18-19 (citing Buie, 494 U.S. at 335; United States v. Bagley, 877 P.3d at 1151).

Protective sweeps fall into two categories: (i) in conjunction with an in-home arrest, officers may "'as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched,'" United States v. Nelson, 868 F.3d at 888 (quoting Buie, 494 U.S. at 334); and (ii) officers otherwise may sweep "beyond areas immediately adjoining the arrest if there

are 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene,'" United States v. Nelson, 868 F.3d at 888 (quoting Buie, 494 U.S. at 335). Here, Bland's and Edwards' arrests took place outside of Apartment A. See Factual Background, supra ¶ 36, at 10 (citing Aug. 31 Tr. at 55:23-56:3 (Marreel); id. at 57:3-12 (Marreel, Ramirez); id. at 129:24-130:5 (Booth); id. at 131:10-22 (Booth, Ramirez); id. at 132:11-12 (Booth)); Factual Background, supra ¶¶ 42-43, at 11 (citing Aug. 31 Tr. at 60:4-6 (Marreel); id. at 99:9-12 (Fernandez, Marreel); id. at 131:24-132:4 (Booth); id. at 154:3 (Booth)). Accordingly, Tenth Circuit precedent suggests that Buie's second prong is the appropriate vehicle for analyzing the protective sweep. See United States v. Bagley, 877 F.3d at 1155.[31] The United States must demonstrate, therefore, articulable facts that would have led a reasonably prudent officer to believe that Apartment A harbored: (i) a person; (ii) who posed a danger to those on the arrest scene. See United States v. Nelson, 868 F.3d at 888 (quoting Buie, 494 U.S. at 335). The Court concludes that the United States has shown that the officers reasonably believed that Apartment A harbored a person -- Colbert -- but that it has not shown articulable facts that would have led the officers to believe that Colbert posed a danger to those on the arrest scene.

---

[31]In United States v. Bagley, the Tenth Circuit considered a case where officers arrested the defendant "near the front door," noting that it was unclear whether he was inside or outside, but stating that, "[i]f he was outside the house, *Buie's* first situation would probably not allow a protective sweep in the southeast bedroom," because that prong does not apply to arrests that occur outside the home. United States v. Bagley, 877 F.3d at 1154 (citing United States v. White, 748 F.3d at 510). Thus, although the officers arrested Edwards below Apartment A's rear window, see Factual Background, supra ¶ 34, at 10, the Court analyzes the protective sweep under Buie's second prong, namely, whether "there are 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" United States v. Nelson, 868 F.3d at 888 (quoting Buie, 494 U.S. at 335).

First, the Court concludes that officers reasonably believed that someone else was inside Apartment A after they arrested Bland and Edwards.  As discussed above, while surveilling Apartment A, Marreel and Booth witnessed Colbert and Edwards conduct what they believed to be three to four hand-to-hand drug sales.  See Factual Background, supra ¶ 14, at 7 (citing Aug. 31 Tr. at 34:9-17 (Marreel, Ramirez), id. at 35:16-18 (Marreel); id. at 117:17-22 (Booth, Ramirez)); Factual Background, supra ¶ 17, at 7 (citing Aug. 31 Tr. at 35:19-25 (Marreel, Ramirez); id. at 117:23-118:15 (Booth, Ramirez); id. 118:24-120:24 (Court, Booth, Fernandez, Ramirez)); Factual Background, supra ¶ 21, at 8 (citing Aug. 31 Tr. at 37:12; id. at 37:16-38:7 (Marreel, Ramirez); id. at 121:13-15 (Booth)).  During the surveillance operation, Marreel witnessed a third individual from Apartment A conducting counter-surveillance.  See Factual Background, supra ¶ 14, at 7 (citing Aug. 31 Tr. at 33:17-34:17 (Marreel, Ramirez)).  After the officers witnessed the hand-to-hand sales, Bland, Edwards, the individual conducting counter-surveillance, and a fourth individual exited Apartment A.  See Factual Background, supra ¶ 21, at 8 (citing Aug. 31 Tr. at 37:16-38:7 (Marreel, Ramirez); id. at 121:13-15 (Booth)).  Colbert was not among these four individuals.  See Factual Background, supra ¶ 22, at 8 (citing Aug. 31 Tr. at 38:8-10 (Marreel, Ramirez)).  Having not seen Colbert leave Apartment A after having engaged in the hand-to-hand sales, then, a reasonable officer could have concluded that at least one other individual was inside Apartment A after the four individuals left the apartment, and after the officers arrested Bland and Edwards.

The next question is whether, knowing that Colbert was inside Apartment A, articulable facts would have led a reasonably prudent officer to believe that Colbert posed a danger to those on the arrest scene.  See United States v. Nelson, 868 F.3d at 888 (quoting Buie, 494 U.S. at 335).  The Court concludes that the United States has not shown such facts.  At the outset, the Court

acknowledges the United States' argument that the officers were justified in conducting a protective sweep, because guns often accompany drugs, see U.S. Closing at 11, as well as the officers' testimony that they have come into contact with individuals involved with narcotics trafficking that had firearms, see Aug. 31 Tr. at 21:23-25 (Marreel, Ramirez), or that "[t]he majority of arrests that . . . have narcotics involved, there is usually . . . a weapon, if not two," Oct. 4 Tr. at 243:23-244:1 (Salcido). The Court does not assume, however, that firearms or other dangerous weapons were at play during the incident solely because the officers had probable cause to believe that Colbert was engaged in narcotics trafficking. See United States v. Hauk, 412 F.3d at 1187 (declining to presume that "drug houses" are inherently dangerous); United States v. Garza, 125 F. App'x at 932 (stating that it is unpersuaded by the United States' argument that officers had a reasonable basis to fear for their safety, because drug distribution likely involves weapons). The Court also acknowledges the United States' argument that the officers on the scene were exposed after the arrests and during the subsequent investigation and that a dangerous individual could have attacked officers despite Marreel's efforts to shield the scene. See U.S. Closing at 11-12 (asserting that officers had no cover, that they could not fully block the window, and that bullets could pierce the apartment's walls). That a dangerous actor could have attacked the officers, however, is not an assertion of articulable facts that Colbert himself was a dangerous actor. Allowing officers to enter a home without a warrant any time they cannot fully secure a scene after an arrest takes place outside risks nullifying the Fourth Amendment's protections.

Aside from the officers' witnessing Colbert conduct hand-to-hand drug sales, their experience that weapons often accompany drugs, and their inability to fully cover the arrest scene, the remaining facts that the United States references in supporting its assertion that the protective sweep was justified do not demonstrate that the officers had any reason to believe that Colbert was

dangerous.  They note that Bland and Edwards fled from law enforcement in the black Kia, and that Edwards shouted into Apartment A's rear window before Booth and Gambone arrested him beneath it.  See U.S. Closing at 11; Factual Background, supra ¶¶ 26-36, at 9-10.  Marreel did not observe anyone look out of Apartment A's rear window, observe make threats from the window, or observe any weapons inside Apartment A through the window.  See Factual Background, supra ¶¶ 49-51, at 11-12 (citing Aug. 31 Tr. at 93:25-94:6 (Fernandez, Marreel)).  Although the red backpack that Bland and Edwards were carrying contained drugs and drug paraphernalia, it did not contain any firearms or other weapons.  See Factual Background, supra ¶¶ 60-62, at 13-13. Neither Bland nor Edwards had guns on them when the officers arrested them, and the officers did not find a gun in the Kia or anywhere outside of Apartment A.  See Factual Background, supra ¶ 44, at 11 (citing Aug. 31 Tr. at 84:8-15 (Fernandez, Marreel); Oct. 4 Tr. at 266:16-21 (Fernandez, Salcido)); Factual Background, supra ¶ 56, at 12 (citing Oct. 4 Tr. at 267:4-6 (Fernandez, Salcido); id. at 267:17-19 (Fernandez, Salcido)).  Similarly, officers did not hear any gunshots during the operation.  See Factual Background, supra ¶ 57, at 12 (citing Aug. 31 Tr. at 84:23-25 (Fernandez, Marreel)).  None of the officers involved testified that they previously had searched Apartment A and found weapons, or that they had any information regarding the dispositions -- violent or otherwise -- of Apartment A's residents, including Colbert.  See, e.g., Fishbein ex rel. Fishbein v. City of Glenwood Springs, Colo., 469 F.3d at 962 (upholding a protective sweep where "[o]fficers knew that the Fishbeins had at least one teenaged son and that firearms had recently been present inside the home"); United States v. Tucker, 1999 WL 44073, at *2 (upholding protective sweep where "the officers were told the numerous suspects . . . had a history of violent behavior and were known to possess firearms").  Without evidence that the officers were aware of such information, the United States has not presented any articulable facts that Colbert presented a danger to the

officers on the arrest scene. Accordingly, although the officers were aware that a third person was inside Apartment A, the Court does not conclude that the facts support a protective sweep such that the officers were permitted to conduct a warrantless entry into the apartment. The Court concludes, therefore, that the officers' warrantless entry to Apartment A violated the Fourth Amendment, and that the exigent-circumstances and protective-sweep exceptions do not apply. Because "'[t]he Fourth Amendment . . . prohibits police from effectuating a warrantless and non-consensual entry into a suspect's home to make a routine felony arrest'" in the absence of exigent circumstances, Colbert's arrest premised on the warrantless entry was unlawful. Mascorro v. Billings, 656 F.3d 1198, 1205 (10th Cir. 2011)(quoting Howard v. Dickerson, 34 F.3d 978, 982 (10th Cir. 1994))(ellipsis in Mascorro v. Billings but not in Howard v. Dickerson).

## II.     COLBERT GAVE HIS CONSENT TO SEARCH FREELY AND VOLUNTARILY, AND COLBERT'S UNLAWFUL ARREST DOES NOT TAINT THE SUBSEQUENT SEARCH PREMISED ON COLBERT'S CONSENT.

The Tenth Circuit has held that, when a Fourth Amendment violation precedes a consensual search, "the government must prove not only the voluntariness of the consent under the totality of the circumstances . . . , but the government must also 'establish a break in the causal connection between the illegality and the evidence thereby obtained.'" United States v. Melendez-Garcia, 28 F.3d at 1053 (quoting United States v. Recalde, 761 F.2d 1448, 1458 (10th Cir. 1985), overruled on other grounds as recognized in United States v. Enriques-Hernandez, 94 F.3d 656 (table), 1996 WL 464027, at *4 n.4 (10th Cir. August 15, 1996), and citing Schneckloth v. Bustamonte, 412 U.S. at 227). Colbert asserts that the United States cannot meet either of these requirements. See Suppression Motion at 10-14. First, he argues that, because his arrest was unlawful, the consent that he gave subsequently to the officers to search Apartment A was unlawful as well. See Suppression Motion at 10-11. He argues that the United States must show that

Colbert's consent was voluntary in fact, and that there is a "break in the causal connection between the illegality and the consent, so that the court will be satisfied that the consent was sufficiently an act of free will to purge the primary taint." Suppression Motion at 10 (quoting United States v. Melendez-Garcia, 28 F.3d at 1054). He argues that, because the officers violated the Fourth Amendment, Colbert's consent is invalid, and the Court therefore must suppress the evidence which the officers found inside Apartment A. See Suppression Motion at 11 (citing United States v. Flynn, 309 F.3d 736, 738 (10th Cir. 2002); United States v. Hernandez, 7 F.3d 944, 947 (10th Cir. 1993); Wong Sun v. United States, 371 U.S. at 485; United States v. Nava-Ramirez, 210 F.3d at 1131). The United States does not respond to this argument specifically, but asserts that Colbert gave his consent freely and voluntarily, because he had previous experience with law enforcement and signed a consent waiver. See Suppression Response at 15-19. Colbert disputes that he gave his consent freely and voluntarily, because the encounter was coercive and a "military style breach," Suppression Motion ¶ 28, at13, and the consent form was preprinted and "gave little room for lawful consent," Suppression Motion ¶ 30, at 14. Accordingly, he argues that, even if his arrest was lawful or otherwise does not taint his consent, his consent was not free and voluntary. See Suppression Motion at 11.

### A. UNDER THE TOTALITY OF THE CIRCUMSTANCES, COLBERT GAVE CONSENT TO SEARCH APARTMENT A FREELY AND VOLUNTARILY.

The Court first concludes that, under United States v. Melendez-Garcia's first prong, under the totality of the circumstances, Colbert gave his consent freely and voluntarily. See 28 F.3d at 1053 (citing Schneckloth v. Bustamonte, 412 U.S. at 227). The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and

(ii) "the officers must have used no 'implied or express duress or coercion.'" United States v. Sanchez, 608 F.3d at 690 (quoting United States v. Taverna, 348 F.3d at 878). Colbert does not dispute that he gave unequivocal consent specifically and intelligently, but instead argues that the consent was the result of coercive force. See Suppression Motion at 12-13. The Court concludes that Colbert's consent was unequivocal, specific, and intelligent. While Coffey read Colbert his Miranda advisements, Colbert was coherent, understood English, and, when given the chance to ask questions, did not ask any questions. See Factual Background, supra ¶ 101, at 20 (citing Aug. 31 Tr. at 188:2-13 (Ramirez, Thompson); Oct. 4 Tr. at 299:7-14 (Coffey, Ramirez); ); id. at 299:20 (Coffey); id. at 303:4-9 (Coffey, Ramirez)). Similarly, each time Coffey read one of the Miranda advisements, he asked Colbert whether he understood, to which Colbert replied yes. See Factual Background, supra ¶ 102, at 20 (citing Oct. 4 Tr. at 303:10-23 (Coffey, Ramirez)). Coffey and Colbert had a conversation about Apartment A and what was inside it, and Coffey presented Colbert with the Consent Form, read each of the Consent Form's sections, and gave Colbert a chance to ask questions, but Colbert did not ask any questions. See Factual Background, supra ¶¶ 104-127, at 20-23. Accordingly, the Court concludes that Colbert's consent satisfies United States v. Sanchez' first requirement.

The next requirement is that "the officers must have used no 'implied or express duress or coercion.'" United States v. Sanchez, 608 F.3d at 690 (quoting United States v. Taverna, 348 F.3d at 878). The Court considers a non-exhaustive list of factors when determining whether a defendant gave consent freely and voluntarily, including:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;"

(iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d at 1314 (citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, 2010 WL 965743, at *12 (alterations in United States v. Sedillo, but not in United States v. Ledesma or United States v. Anderson).

Here, Coffey and Thompson arrived after the enforcement activities had ended and the officers had taken Colbert into custody.  See Factual Background, supra ¶ 85, at 16 (citing Aug. 31 Tr. at 181:5 (Coffey); Oct. 4 Tr. at 296:24-297:1 (Coffey)).  There were as many as twenty officers and marshals on the arrest scene.  See Factual Background, supra ¶ 87, at 17 (citing Oct. 4 Tr. at 293:16-19 (Coffey)).  Coffey and Thompson took Colbert across the street and slightly to the south of 524 Vermont Street to question him.  See Factual Background, supra ¶ 89, at 17 (citing Aug. 31 Tr. at 186:4 (Thompson); id. at 185:13-186:10 (Ramirez, Thompson); Oct. 4 Tr. at 297:12-21 (Coffey)).  No other agents were present while Coffey and Thompson spoke to Colbert.  See Factual Background, supra ¶ 90, at 17 (citing Aug. 31 Tr. at 187:23-188:1 (Ramirez, Thompson)).  The two agents dealt with Colbert in this manner, "[b]ecause people would hear what we're talking about during the interview," and so that Colbert would not "feel an overwhelming sense of law enforcement."  Factual Background, supra ¶ 91, at 17 (first quoting Aug 31 Tr. at 186:16-17 (Thompson), and then quoting Oct. 4 Tr. at 298:12 (Coffey)).  Thompson was wearing "'a vest with law enforcement markings'" that said: "'Police US Marshal.'"  Factual Background, supra ¶ 95, at 18 (quoting Aug. 31 Tr. at 187:16-17 (Thompson)).  Coffey was dressed in tennis shoes, shorts, and a t-shirt, which covered his holstered gun.  See Factual Background, supra ¶ 96, at 18 (citing Oct. 4 Tr. at 201:19-302:12 (Coffey, Ramirez)).  Coffey's badge of authority was not

visible, and his shirt covered his weapon and holster.  See Factual Background ¶¶ 96-97, at 18 (citing Oct. 4 Tr. at 301:19-302:12 (Coffey, Ramirez)).  Neither Thompson nor Coffey had their guns drawn.  See Factual Background, supra ¶ 98, at 18 (citing Aug. 31 Tr. at 187:18-22 (Ramirez, Thompson); Oct. 4 Tr. at 301:13-16 (Coffey, Ramirez)).  Coffey read Colbert his Miranda advisements.  See Factual Background, supra ¶ 99, at 18 (citing Aug. 31 Tr. at 186:21-187:2 (Thompson)).  After Coffey finished reading Colbert his Miranda advisements, Colbert stated verbally that he was willing to speak to Coffey.  See Factual Background, supra ¶ 103, at 20 (citing Aug. 31 Tr. at 188:14-22 (Ramirez, Thompson)).  Coffey and Colbert discussed Apartment A, after which Coffey asked for Colbert's consent to search the apartment.  See Factual Background, supra ¶ 104, at 20 (quoting Aug. 31 Tr. at 189:6-7 (Thompson)); Factual Background, supra ¶ 109, at 21 (citing Aug. 31 Tr. at 189:14-16 (Ramirez, Thompson); Oct. 4 Tr. at 311:18-19 (Coffey)).  Colbert responded that he consented to Coffey's search of the apartment and Coffey retrieved the blank Consent Form.  See Factual Background, supra ¶¶ 110-111, at 21 (citing Oct. 4 Tr. at 311:19 (Coffey); id. at 311:21-25 (Coffey)).  Coffey read each of the Consent Form's sections aloud before giving Colbert the chance to ask questions, which Colbert did not do.  See Factual Background, supra ¶¶ 112-113, at 21 (citing Aug. 31 Tr. at 191:4-10 (Ramirez, Thompson); Oct. 4 Tr. at 316:4-8 (Coffey, Ramirez)).  Coffey and Thompson did not tell Colbert that he was not obligated to sign the Consent Form.  See Factual Background, supra ¶ 131, at 23 (citing Aug. 31 Tr. at 198:24-199:3 (Fernandez, Thompson)).  Coffey did not threaten Colbert or make any promises of leniency before Colbert signed the Consent Form.  See Factual Background, supra ¶ 129, at 23 (citing Oct. 4 Tr. at 316:11-18 (Coffey, Ramirez)).  Colbert had been in handcuffs throughout his interaction with Coffey and Thompson, but the agents released his hands in order to initial and sign the Consent Form, after which they replaced the restraints.  See Factual Background, supra ¶ 130, at 23 (citing

Aug. 31 Tr. at 194:19-195:15 (Fernandez, Thompson)).  After Colbert signed the Consent Form, Coffey walked Colbert back to 524 Vermont Street, transferred custody over Colbert to two marshals, and instructed the marshals to stay with Colbert in case Colbert decided to revoke his consent to search Apartment A.  See Factual Background ¶¶ 134-135, at 24 (citing Oct. 4 Tr. at 317:20-25 (Coffey)).

These facts do not support a conclusion that Coffey and Thompson used implied or express duress or coercion to extract Colbert's consent to search Apartment A.  See Factual Background, supra ¶ 132, at 23.  Although many officers were on the scene, that Coffey and Thompson removed Colbert from the area eliminated the "'threatening presence of several officers.'"  United States v. Sedillo, 2010 WL 965743, at *12 (quoting United States v. Ledesma, 447 F.3d at 1314).  There is no indication that Coffey or Thompson used aggressive language, see Factual Background, supra ¶ 93, at 17 (quoting Oct. 4 Tr. at 390:22-24 (Coffey)), and, although there is not an indication that other members of the public were nearby, the conversation took place outside during the daytime and in public view, see Factual Background, supra ¶ 89, at 17 (quoting Aug. 31 Tr. at 186:4 (Thompson), and citing  Aug. 31 Tr. at 185:13-186:10 (Ramirez, Thompson); Oct. 4 Tr. at 297:12-21 (Coffey)). See also United States v. Sedillo, 2010 WL 965743, at *12 (quoting United States v. Ledesma, 447 F.3d at 1314).  Additionally, that neither Coffey nor Thompson had their weapons drawn, see Factual Background, supra ¶ 98, at 18 (citing Aug. 31 Tr. at 187:18-22 (Ramirez, Thompson); Oct. 4 Tr. at 301:13-16 (Coffey, Ramirez)), or cajoled or enticed Colbert into signing the Consent Form, see Factual Background, supra ¶ 129, at 23 (citing Aug. 31 Tr. at 193:8-16 (Ramirez, Thompson); Oct. 4 Tr. at 316:11-18 (Coffey, Ramirez)), tilts against a conclusion that they used force or coercion.  These facts are similar to facts which the Tenth Circuit determined "reduced the possibility of intimidation" in United States v. Silva-Arzeta, 602 F.3d 1208, 1215

(10th Cir. 2010).  There, the Tenth Circuit noted that: (i) the defendant gave consent to search on a public street; (ii) an officer had given the defendant a Miranda warning before requesting consent; (iii) no officer had his or her weapon unholstered at any point; and (iv) the officer who requested consent did not use an aggressive or insisting tone or "convey[] in any way to Mr. Silva-Arzeta that he was obligated to allow the search."  United States v. Silva-Arzeta, 602 F.3d at 1215 (citing United States v. Ledesma, 447 F.3d at 1314).  Additionally, although multiple officers were on the scene, only one other officer accompanied the officer who requested the defendants consent, while the rest performed other investigative duties.  See 602 F.3d at 1215.  The Tenth Circuit determined that "[t]he presence of [the two officers] therefore was unlikely to have produced much of a coercive effect on Mr. Silva-Arzeta."  United States v. Silva-Arzeta, 602 F.3d at 1215. Accordingly, the Court concludes that Coffey and Thompson did not use express or implied duress or coercion in requesting Colbert's consent to search Apartment A.

Colbert contends that, because the officers entered his home forcibly and removed him in handcuffs, he could not have consented to the subsequent search freely and voluntarily.  See Suppression Motion ¶ 28, at 13.  Colbert's removal from the apartment, however, does not factor strongly into the consent inquiry, because the Court considers the circumstances as they existed when Coffey requested Colbert's consent.  See United States v. Silva Arzeta, 602 F.3d 1208, 1214-15 (10th Cir. 2010)("We consider the circumstances when Mr. Silva-Arzeta gave his consent, shortly after his arrest several blocks from his apartment.").[32]  Additionally, that Colbert was under

---

[32]Colbert implores the Court to "[i]magine the horrors that would befall society if free and voluntary consent could be obtained this way.  In other aspects of civil society we would be aghast."  Suppression Motion ¶ 29, at 13.  Colbert's understanding of voluntariness, however, is overbroad.  The Supreme Court writes in Schneckloth v. Bustamonte:

"The notion of 'voluntariness,'" Mr. Justice Frankfurter once wrote, "is itself an

arrest does not mean he was unable to consent to a search, because "'[c]onsent to search may be voluntary even though the consenting party is being detained at the time consent is given.'" United States v. Dozal, 173 F.3d 787, 796 (10th Cir. 1999)(quoting United States v. Doyle, 129 F.3d 1372, 1377 (10th Cir. 1997))(alteration in United States v. Dozal but not in United States v. Doyle). See United States v. Perea, 374 F. Supp. 2d at 978-79 (concluding that the defendant's being in handcuffs in the back of a police car did not render his consent automatically involuntary). The

_____

amphibian." Culombe v. Connecticut, 367 U.S. 568, 604-605 . . . [(1961)]. It cannot be taken literally to mean a "knowing" choice. "Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all incriminating statements -- even those made under brutal treatment -- are 'voluntary' in the sense of representing a choice of alternatives. On the other hand, if 'voluntariness' incorporates notions of 'butfor' cause, the question should be whether the statement would have been made even absent inquiry or other official action. Under such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind." It is thus evident that neither linguistics nor epistemology will provide a ready definition of the meaning of "voluntariness."

Rather, "voluntariness" has reflected an accommodation of the complex of values implicated in police questioning of a suspect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws. See Culombe v. Connecticut, supra, at 578-580 . . . . Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. Haynes v. Washington, 373 U.S. 503 . . . [(1963)]. At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice.

412 U.S. at 224-225. Colbert's understanding of voluntariness leans too far towards the notion of but-for causation, because he argues that he would not have given consent had the officers not entered his apartment and extracted him in a "military style breach." Suppression Motion ¶ 28, at 13. Concluding that a suspect cannot give consent to search freely and voluntarily whenever law enforcement officers have used forcible means to enter a home disrupts the Supreme Court's and Tenth Circuit's balancing of police needs with societal values, particularly where the courts have carved out exceptions which allow officers to enter homes, for example, on the basis of exigent circumstances, as the Court discusses in detail above.

Tenth Circuit states that "[t]he proper inquiry centers on whether the defendant suffered, inter alia, 'physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery.'"  United States v. Dozal, 173 F.3d at 796 (quoting United States v. Glover, 104 F.3d 1570, 1584 (10th Cir. 1997), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009)).  Although the officers' entry was forcible, there is no indication that the officers physically mistreated or were violent toward Colbert, who exited his bedroom willingly and whom Booth took into custody without further incident.  See Factual Background, supra ¶¶ 65-66, at 14 (citing Aug. 31 Tr. at 140:24-141:3 (Booth); Oct. 4 Tr. at 256:16-18 (Ramirez, Salcido)).

Colbert argues that "whether consent is freely given turns on whether Mr. Colbert was free to subsequently deny the request to search," and that "[t]here is no reasonable interpretation of the encounter that suggests Mr. Colbert was at liberty to revoke his consent once the cuffs were put back on, and he was further detained in a police cruiser."  Suppression Motion ¶ 30, at 14 (citing United States v. Guerrero, 472 F.3d at 786).  The Court disagrees with Colbert's argument, however, because nothing suggests that Colbert was prohibited or otherwise restricted from rescinding his consent at any time.  See Factual Background, supra ¶ 136, at 24 (citing Oct. 4 Tr. at 388:25-389:24 (Coffey, Fernandez)).  In fact, that Coffey directed the marshals who retook custody over Colbert after the interview to inform Coffey if Colbert revoked his consent, see Factual Background, supra ¶ 135, at 24 (citing Oct. 4 Tr. at 317:23-25 (Coffey)). suggests that Colbert could have revoked his consent at any time and only would have needed to inform the marshals who had custody over him.

Finally, Colbert disputes whether the Consent Form "gave . . . room for lawful consent," because "if a person cannot delimit the scope of the search, then it cannot as easily be construed as a consensual search."  Suppression Motion ¶ 39, at 14.  The Tenth Circuit has stated that "[a]

signed consent form is indicative of a voluntary consent," <u>Eidson v. Owens</u>, 515 F.3d at 1147, and

has upheld searches based on a defendant's signed consent form where there is no evidence of

coercion or duress, <u>see United States v. Rodriguez-Garcia</u>, 983 F.2d at 1567-68.  Further, the facts

do not support Colbert's contention that he was unable to delimit the search's scope, as the Consent

Form contained blank spaces for exactly that purpose.  <u>See</u> Factual Background ¶ 91, at 17 (citing

Consent Form § 1, at 1).  Coffey wrote that Colbert consented to a search of 524 Vermont Street

before confirming that Colbert was consenting to a search of the entire apartment, at which point

he wrote "entire Apartment A."  Factual Background, <u>supra</u> ¶ 101, at 18 (quoting Oct. 4 Tr. at

313:14 (Coffey)).  <u>See</u> Factual Background, <u>supra</u> ¶¶ 97-101 (citing Oct. 4 Tr. at 313:4-14

(Coffey)).  If Colbert had wanted to limit the search to specific areas in the apartment, he had the

opportunity to do so.  <u>See</u> Factual Background, <u>supra</u> ¶ 126, at 23.  Because the Court does not

conclude that Coffey used coercion or duress to induce Colbert to sign the Consent Form,

therefore, the Court concludes that Colbert's signing of the Consent Form supports a conclusion

that, under the totality of the circumstances, he freely and voluntarily consented to the search of

Apartment A.  <u>See</u> Factual Background, <u>supra</u> ¶ 133, at 24.

### B.    COLBERT'S UNLAWFUL ARREST DOES NOT TAINT COLBERT'S CONSENT, BECAUSE COFFEY EXPLAINED CAREFULLY THE CONSENT FORM AND THE OFFICERS' CONDUCT WAS NOT PURPOSEFUL AND FLAGRANT, ATTENUATING THE UNLAWFUL ENTRY'S TAINT.

Given that the Court has concluded that Colbert gave his consent to search Apartment A

freely and voluntarily, the Court next must examine whether his consent was sufficiently

attenuated from the Fourth Amendment violation -- <u>i.e.</u>, the unlawful entry and arrest -- such that

the violation does not taint the consent that Colbert gave the officers to search Apartment A.  <u>See</u>

<u>United States v. Melendez-Garcia</u>, 28 F.3d at 1053 (quoting <u>United States v. Recalde</u>, 761 F.2d at

1458).  The Supreme Court and Tenth Circuit direct courts to consider three factors in determining whether there is sufficient attenuation: (i) "the temporal proximity between the police illegality and the consent to search"; (ii) "the presence of intervening circumstances"; and (iii) "the purpose and flagrancy of the official misconduct."  United States v. Melendez-Garcia, 28 F.3d at 1054 (citing Brown v. Illinois, 422 U.S. at 603-04; United States v. Recalde, 761 F.2d at 1458).  See Brown v. Illinois, 422 U.S. at 603-04.  The Tenth Circuit "require[s] the government to demonstrate that any taint of an illegal search or seizure has been purged or attenuated not only because [it is] concerned that the illegal seizure may affect the voluntariness of the defendant's consent, but also to effectuate the purposes of the exclusionary rule."  United States v. Melendez-Garcia, 28 F.3d at 1054 (citing Brown v. Illinois, 422 U.S. at 599).  See Kaupp v. Texas, 538 U.S. at 633 ("Demonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State." (citing Brown v. Illinois, 422 U.S. at 604).

Generally, "substantial time" must pass for the police illegality to be sufficiently attenuated.  Kaupp v. Texas, 538 U.S. at 633.  In Brown v. Illinois, the Supreme Court concludes that a statement which Brown made was inadmissible where "less than two hours" separated the statement from the illegal arrest and where "there was no intervening event of significance whatsoever."  422 U.S. at 604-05.  The Tenth Circuit in United States v. Shrum, 908 F.3d 1219 (10th Cir. 2018), considers a similar situation, in which two-and-a-half hours transpired between the defendant's unlawful seizure and his execution of a consent-to-search form.  See 908 F.3d at 1237.  The Tenth Circuit concludes that, particularly given that investigators had control over the defendant's home "throughout the duration of the day long episode," the two-and-a-half hour period was insufficient to demonstrate attenuation.  908 F.3d at 1237.

- 180 -

As the Court discusses in detail above, see Factual Background, supra ¶ 100 n.7, at 18, at most two hours and fifteen minutes elapsed between Colbert's arrest and Coffey's reading Colbert his Miranda advisements.  Approximately twenty officers still were on the scene when Coffey and Thompson arrived, and the two agents had to move Colbert down the street to remove him from the other officer's presence.  See Factual Background, supra ¶ 87, at 17 (citing Oct. 4 Tr. at 293:16-19 (Coffey)); Factual Background, supra ¶¶ 89-91, at 17.  Accordingly, the Court does not conclude that substantial time elapsed between the officers' unlawful entry into Apartment A and Colbert's consent to search, particularly given that the officers remained on the premises for the duration of the day's events, a fact which led the Tenth Circuit to conclude that two-and-a-half hours was not sufficient on its own to attenuate the officers' illegality.  See United States v. Shrum, 908 F.3d at 1237.  See also Taylor v. Alabama, 457 U.S. 687, 691 (1982)(holding that an intervening period of six hours, given the intense investigation to which officers subjected the defendant, was not significantly different from the two-hour period at issue in Brown v. Illinois).

The Court next looks to whether intervening circumstances sufficiently attenuate the officers' unlawful entry into Apartment A from Colbert's consent to search, and concludes that Coffey's careful explanation of the Consent Form constitutes an intervening circumstance.  See United States v. Melendez-Garcia, 28 F.3d at 1054 (citing Brown v. Illinois, 422 U.S. at 603-04; United States v. Recalde, 761 F.2d at 1458).  The Tenth Circuit has explained that "'[t]he facts or events must create a discontinuity between the illegal [seizure] and the consent such that the original illegality is weakened and attenuated.'"  United States v. Fox, 600 F.3d 1253, 1260 (10th Cir. 2010)(quoting United States v. Gregory, 79 F.3d 973, 980 (10th Cir. 1996), and citing United States v. Reed, 349 F.3d 457, 464 (7th Cir. 2003))(alteration in United States v. Fox, but not in United States v. Gregory).  To determine whether a discontinuity exists, courts "look only from

the defendant's perspective in determining whether any intervening event occurred which isolates the defendant from the coercive effects of the original illegal stop so as to render his subsequent consent voluntary in fact." United States v. Gregory, 79 F.3d at 980.

The Tenth Circuit in United States v. Fox provides some examples of intervening circumstances, including "'carefully explain[ing]' a consent form and advising an individual of the right to withhold consent, see Mendoza-Salgado, 964 F.2d at 1012, 'release from custody, an appearance before a magistrate, or consultation with an attorney,' United States v. Washington, 387 F.3d 1060, 1074 (9th Cir. 2004), to name a few." United States v. Fox, 600 F.3d at 1261 (alteration in United States v. Fox, but not in United States v. Mendoza-Salgado). An officer reading a suspect his or her Miranda advisements does not constitute on its own an intervening circumstance. See Kaupp v. Texas, 538 U.S. at 633 (citing Brown v. Illinois, 422 U.S. at 603). Additionally, the Tenth Circuit has concluded that "[t]he district court clearly erred in suggesting that . . . voluntary consent itself [is] an intervening circumstance. [A suspect's] consent is not in itself an intervening event which could remove the taint of the prior illegal seizure." United States v. Fox, 600 F.3d at 1260 (citing United States v. Melendez-Garcia, 28 F.3d at 1054).[33] Whether

---

[33]There is some tension between the Tenth Circuit's announcement in United States v. Fox that a suspect's consent cannot be itself an intervening circumstance and its observation that an officer's careful explanation of a consent form, coupled with advising the suspect of his or her right to withhold consent comprises such a circumstance. See 600 F.3d at 1260-61. Because the Tenth Circuit cites to United States v. Mendoza-Salgado, the Court looks briefly to each case's facts to draw more clearly a distinction between the two situations. In United States v. Mendoza-Salgado, an undercover DEA agent connected with the defendant, Hilario Mendoza-Salgado, to set up a controlled drug buy. See 964 F.2d at 997. As part of the operation, agents entered defendant Ramon Garcia's home after his eleven-year-old son let them inside the residence. See 964 F.3d at 999. Some of officers took Garcia to the police station to verify his identity, while other officers remained in the home with several of Garcia's family members, including his wife. See 964 F.3d at 1000. During this time,

> [t]he agents immediately told Mrs. Garcia the reason for her husband's arrest

and explained that they suspected cocaine on the premises.  Agents indicated they would guard against removal of drug evidence by remaining in the house while other officers completed attempts to obtain a search warrant.  Mrs. Garcia, who agents testified appeared "calm, quiet, observing, listening, friendly [and] cooperative," insisted she knew nothing about cocaine and said, "go ahead and search."  Mrs. Garcia signed a search consent form after agents read her the terms in Spanish and advised her of the right to withhold consent.  Agents insisted Mrs. Garcia understood the signed document.  She asked no questions before or during the search, nor did she withdraw consent at any time.

964 F.2d at 1000 (no citations given for quotations)(alterations in United States v. Mendoza-Salgado).  The Tenth Circuit concludes that "numerous circumstances intervened during this period to purge the primary taint of the agents' warrantless entry."  964 F.2d at 1012.  These circumstances include that: (i) the atmosphere had calmed down such that the officers present holstered their weapons; (ii) agents interviewed Garcia, had enough time to run a warrant check on him, and interviewed the other individuals in the house, all while allowing those individuals to use the kitchen and restroom; (iii) Garcia's wife was no more nervous than would be expected in the situation; and (iv) the agents explained that they believed there was cocaine in the home and that they would seek a search warrant.  964 F.2d at 1012.  Regarding the consent form, the Tenth Circuit reiterates:

> Soon thereafter, Mrs. Garcia invited the agents to search the house.  Before commencing a search, however, the agents provided Mrs. Garcia with a consent form which they carefully explained to her in her native Spanish language.  Agents also advised Mrs. Garcia of her right to withhold consent.  Mrs. Garcia asked no questions about the consent form, her rights or the search itself before signing.  She also indicated she understood the document.  At no time did she withdraw her consent.

964 F.2d at 1012.  The Tenth Circuit states, therefore, that "[w]e firmly believe these events attenuated any duress or coercive effect brought about by the agents' warrantless entry."  964 F.2d at 1012.  On that basis, and because the Tenth Circuit determines that the circumstances satisfied Schneckloth v. Bustamonte's and Brown v. Illinois' requirements, the Tenth Circuit concludes that the district court did not err in admitting evidence of cocaine and weapons which the officers found in Garcia's house subsequent to receiving consent from his wife.  See United States v. Mendoza-Salgado, 964 F.2d at 1013.

In United States v. Fox, the Tulsa police officers were surveilling defendant Lucas Fox's home based on a tip that Fox was driving a stolen vehicle and may have been in possession of drugs, when they witnessed Shawna Chiles park near the house and go inside before leaving thirty minutes later.  See 600 F.3d at 1255.  The officers followed Chiles to her home, where, among other questions, they asked her if they could search her car.  See 600 F.3d at 1256.  Chiles consented to the search and the officers discovered a bag containing what appeared to be methamphetamine.  See 600 F.3d at 1256.  Because the officers were more interested in Fox, they did not arrest Chiles, but requested to search her home, because she told them that Fox was her

husband and that they lived together.  See 600 F.3d at 1256.  Regarding that search, the Tenth
Circuit explains:

> Officer Osterdyk then asked if the police could search the house, and she
> responded: "that would be fine.  There's nothing to hide."  ROA, Vol. II, at 38.
> Officers Osterdyk and Lamb then walked over to the house with Ms. Chiles, and
> she unlocked the door, letting the officers inside.
>
> Once inside the house, the officers asked if she would sign a search waiver
> form, and she said that she would.  Although the officers did not have a waiver
> form with them, they began to search the house.  While searching Fox's bedroom,
> the officers discovered a sawed-off shotgun and ammunition.  Following the search,
> the officers obtained a search waiver form, "read over it with [Ms. Chiles],
> explained everything on it, and asked her if she understood."  ROA, Vol. II, at 39.
> She then signed the form.

United States v. Fox, 600 F.3d at 1256.  On the search's basis, the officers found a shotgun and
ammunition and charged Fox with weapons-related charges.  See 600 F.3d at 1256.  On a
subsequent motion to suppress the evidence of the gun and ammunition, the Tenth Circuit notes
that the district court concluded that "'[t]here was a significant intervening circumstance, namely
at the time [Ms. Chiles] consented to search, she had voluntarily agreed to let the officers inside,
had walked them up to the house, and had let them into the home with a key.'"  600 F.3d at 1260
(quoting ROA, Vol. II, at 78)(second alteration in United States v. Fox but not in ROA).  The
Tenth Circuit recognizes that a signed consent form under United States v. Mendoza-Salgado's
facts amounts to an intervening circumstance, but writes that, under United States v. Fox's facts,
an intervening circumstance does not exist:

> According to the officers' testimony, Ms. Chiles signed a consent form, and
> Officer Osterdyk went over the form with her and told her that she had the right to
> tell him to stop searching at any point.  ROA, Vol. II, at 52.  However, the officers
> went over the form with Ms. Chiles after they had already obtained the initial
> consent and searched the house.  Thus, we do not see how this could be an
> "intervening" event.  See United States v. Santa, 236 F.3d 662, 678 (11th Cir.2000)
> ("[T]he fact that [the defendant] signed a consent form after the search was
> complete does not persuade us that his consent was not the product of the illegal
> arrest.").

United States v. Fox, 600 F.3d at 1261 n.6.  The Tenth Circuit "conclude[d] there were no
intervening events that would have broken or attenuated the causal connection between the illegal
seizure and the consent," and reversed the district court's denial of the suppression motion at issue.
600 F.3d at 1261.  See id. at 1262.

Given the Tenth Circuit's language in United States v. Fox that the suspect's consent itself
is not an intervening circumstance, in neither case was the voluntary consent an intervening
circumstance sufficient to attenuate the taint.  See United States v. Fox, 600 F.3d at 1260.  In other

the officer explains that the suspect has a right to refuse the consent is an "'important factor[]'"

for courts to consider, although it is not a requirement.  See United States v. McSwain, 29 F.3d at

563 (quoting United States v. Fernandez, 18 F.3d 874, 882 (10th Cir. 1994))); United States v.

Ramos,194 F. Supp. 3d at 1185 (quoting United States v. Sandoval, 29 F.3d at 544).  A consent

form which a suspect signs only after officers have begun the search does not constitute an

intervening circumstance.  See United States v. Fox, 600 F.3d at 1261 n.6.

     That Colbert consented to the search voluntarily is not an intervening circumstance.  See

United States v. Fox, 600 F.3d at 1260.  Coffey's presentation and careful explanation of the

Consent Form, and Colbert's subsequent signing of the Consent Form, however, is an intervening

---

words, if the officers in United States v. Mendoza-Salgado had not used a sufficiently explained consent form -- the intervening circumstance -- the verbal, voluntary consent of Garcia's wife itself would not have been an intervening circumstance.  The key differences between United States v. Mendoza-Salgado and United States v. Fox, then, are the timing with which the officers presented the suspect with the consent form and whether the officers explained that the suspect may refuse to provide consent.  In United States v. Mendoza-Salgado, Garcia's wife invited the officers to search the house, the officers presented her with a consent form before commencing the search, and the officers explained the form to her in her native language and advised her that she had the right to withhold consent.  See 964 F.2d at 1012.  In United States v. Fox, meanwhile, the officers already had begun their search based on Chiles' voluntary consent and had found a weapon when they approached her with the consent form.  See 600 F.3d at 1256.  There is also no indication that they explained to her that she could choose to withhold consent.  See 600 F.3d at 1262 (citing United States v. McSwain, 29 F.3d 558, 563 (10th Cir. 1994)).  See also United States v. McSwain, 29 F.3d at 563 (explaining that, although officers are not required to explain that a defendant may refuse to consent to a search, it is an "important factor[] in our consideration")(quoting United States v. Fernandez, 18 F.3d 874, 882 (10th Cir. 1994))); United States v. Ramos,194 F. Supp. 3d at 1185 (noting that, in determining whether the defendant's signing of a consent form was an intervening circumstance, "[t]he Tenth Circuit has 'regularly considered, as "important factors" on the issue of voluntariness although not dispositive, whether the driver was informed of his right to refuse consent or to proceed on his way'")(quoting United States v. Sandoval, 29 F.3d 537, 544 (10th Cir. 1994)(citing United States v. Fernandez, 18 F.3d at 882, United States v. Maez, 872 F.2d at 1456, and United States v. Recalde, 761 F.2d at 1458–59)).  The Court concludes from these cases that: (i) that a suspect consents voluntarily to a search subsequent to a Fourth Amendment violation on its own does not attenuate the violation's taint; (ii) officers must explain the consent form carefully and should, but are not required to, advise the suspect that they may refuse to consent; and (iii) the suspect must sign the consent form before the search begins.

circumstance sufficient to attenuate the taint of the officers' earlier Fourth Amendment violation.

Once Colbert verbally consented to Coffey's search of Apartment A, Coffey left to retrieve the

Consent Form.  See Factual Background, supra ¶¶ 110-111, at 21 (citing Oct. 4 Tr. at 311:18-19

(Coffey); id. at 311:21-25 (Coffey)).  Coffey read each section of the Consent Form aloud to

Colbert before giving Colbert a chance to ask questions.  See Factual Background, supra ¶ 112, at

21 (citing Aug. 31 Tr. at 191:4-10 (Ramirez, Thompson)).  Colbert did not ask any questions about

the form.  See Factual Background, supra ¶ 113, at 21 (citing Oct. 4 Tr. at 316:4-8 (Coffey,

Ramirez)).  Although Coffey and Thompson did not tell Colbert explicitly that he was not obligated

to sign the Consent Form, see Factual Background, supra ¶ 131, at 23 (citing Aug. 31 Tr. at 198:24-

199:3 (Fernandez, Thompson)), Coffey instructed Colbert to read each section and initial next to

each number, but not to initial or sign if he did not agree with each statement, see Factual

Background, supra ¶ 125, at 22 (citing Oct. 4 Tr. at 315:19-24 (Coffey)).  The Consent Form's

third section reads: "I FREELY CONSENT TO THIS SEARCH."  Consent Form § 3, at 1.  See

Factual Background ¶ 118, at 22.  Colbert indicated that he understood, initialed next to each

section, including § 3, and signed the Consent Form.  See Factual Background, supra ¶ 127, at 23

(citing Consent Form at 1; Aug. 31 Tr. at 191:11-193:3 (Ramirez, Thompson); Oct. 4 Tr. at 315:24-

316:3 (Coffey)).  Thus, although Coffey did not instruct Colbert explicitly that Colbert had the

right to withhold consent, Coffey communicated this right to Colbert when he instructed Colbert

that Colbert did not have to initial § 3 or sign the Consent Form if he did not agree with § 3's

statement that he freely consented to the search.  Thus, the Court construes this instruction and

Colbert's subsequent signing of the Consent Form as Coffey's "'carefully explain[ing]' a consent

form and advising an individual of the right to withhold consent."  United States v. Fox, 600 F.3d

at 1261 (quoting United States v. Mendoza-Salgado, 964 F.2d at 1012)(alteration in United States

v. Fox, but not in United States v. Mendoza-Salgado).   Accordingly, Colbert's signing of the

Consent Form is an intervening circumstance which sufficiently attenuates the officers' unlawful

entry into Apartment A from Colbert's consent to search.

Finally, the Court considers "the purpose and flagrancy of the official misconduct." United

States v. Melendez-Garcia, 28 F.3d at 1054 (citing Brown v. Illinois, 422 U.S. at 603-04; United

States v. Recalde, 761 F.2d at 1458).   This factor is "particularly" significant for the Court's

analysis.   Brown v. Illinois, 422 U.S. at 604.   The Tenth Circuit finds purposeful and flagrant

misconduct typically "where: '(1) the impropriety of the official's misconduct was obvious or the

official knew, at the time, that his conduct was likely unconstitutional but engaged in it

nevertheless and (2) the misconduct was investigatory in design and purpose and executed "in the

hope that something might turn up."'" United States v. Fox, 600 F.3d at 1261 (quoting United

States v. Simpson, 439 F.3d at 496 (quoting Brown v. Illinois, 422 U.S. at 605)).

In United States v. Mendoza-Salgado, the Tenth Circuit confronts a similar situation to the

one here, in which officers entered a home without a warrant believing that the resident was storing

large quantities of drugs and that exigent circumstances justified their entry.   See 964 F.2d at 1013.

The Tenth Circuit explains:

> With respect to the purpose and flagrancy of the violation, the record does
> not indicate the officers intentionally disregarded the warrant requirement.   Unlike
> *Brown*, the agents here were not aware of the possible impropriety of their actions.
> *See* 422 U.S. at 605 . . . .   Agents entered the house believing Mr. Garcia stored
> large quantities of cocaine on the premises and reasoning they had no time to obtain
> a warrant.   Defendant does not dispute that officers had probable cause for their
> entry but questions only whether exigent circumstances overshadowed the need for
> a warrant.   Although we question the wisdom of entering the house without at least
> initiating the warrant process, the agents produced uncontradicted testimony that
> they intended only to secure the residence and then either obtain consent or a search
> warrant before proceeding further.   Aside from a protective sweep of the premises
> for the safety of the officers, no search took place until Mrs. Garcia volunteered her
> consent.   Whether exigent circumstances justified the officers' warrantless entry

remains a close call.  However, we see no evidence of other police actions amounting to purposeful or flagrant misconduct.

United States v. Mendoza-Salgado, 964 F.2d at 1013.  Here, Colbert has not suggested that the officers' true purpose in instigating the protective sweep secretly was to conduct a full sweep or otherwise engage in nefarious conduct.  Indeed, although the Court concludes above that the officers' warrantless entry into Apartment A constitutes a Fourth Amendment violation and that exigent circumstances do not justify that entry, the Court determines as part of that analysis that the officers had reasonable cause to believe that Colbert was engaging in drug trafficking.  See supra, at 145.  The officers did not have a warrant to search Apartment A, and the United States has not indicated that they ever initiated the process of obtaining a warrant.  See Factual Background, supra ¶ 137-138, at 24 (citing Aug. 31 Tr. at 204:16-21 (Fernandez, Thompson)).  The Court, like the Tenth Circuit, "question[s] the wisdom of entering the house without at least initiating the warrant process," United States v. Mendoza-Salgado, 964 F.2d at 1013, but recognizes that, at the time that Colbert gave his consent, although the officers on the scene had conducted a "search for persons," they had not searched Apartment A for contraband yet.  Factual Background, supra ¶ 141, at 25 (quoting Oct. 4 Tr. at 318:22-24 (Coffey)).  There is thus no indication that the officers knew that exigent circumstances did not justify their entry but proceeded to enter regardless.  See United States v. Martinez, 696 F. Supp. 2d 1216, 1253 (D.N.M. 2010)(Browning, J.)(concluding that, because "officers acted in a manner they subjectively believed was lawful," their misconduct was not purposeful or flagrant).  Accordingly, the Court does not conclude that the officers' conduct here is "police misconduct most in need of deterrence," which is the exclusionary rule's purpose.  United States v. Strieff, 579 U.S. at 241 (citing Davis v. United States, 564 U.S. 229, 236-37 (2011)).  Thus, although the Court recognizes that the

constitutional violation weighs in favor of suppression, see United States v. Fox, 600 F.3d at 1261 (citing United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003)), in the absence of other indicators of purpose or flagrancy, the Court does not conclude that the officers' misconduct here satisfies the third attenuation factor. Accordingly, although the Court determines that there was not a substantial temporal distance between Colbert's arrest and his signing the Consent Form, the Court concludes that, because the signing of the Consent Form constitutes an intervening circumstance, and because the officers' misconduct was not purposeful and flagrant, Colbert's consent to search Apartment A sufficiently is attenuated from the Fourth Amendment violation so as to purge the unlawful entry's taint.

### C. THE OFFICERS' DISCOVERY OF THE EVIDENCE IN APARTMENT A WAS NOT INEVITABLE.

As an alternative argument, the United States contends that the officers inevitably would have discovered the evidence in Apartment A, even if there were no exigent circumstances and Colbert did not consent to the search, and that the Court therefore should admit the evidence. See Suppression Response at 19-20. They assert that there would have been "ample evidence to support probable cause and to obtain a search warrant" if Colbert had declined to consent. Suppression Response at 20. Colbert argues that this assertion overlooks the Tenth Circuit's thinking in United States v. Cunningham, in which the Tenth Circuit sets out a four-pronged test for determining whether evidence's discovery was inevitable. Suppression Reply ¶ 8, at 5 (quoting United States v. Cunningham, 413 F.3d at 1203-04). The Court concludes that the discovery of the evidence in Apartment A was not inevitable.

The Tenth Circuit first adopted this four-pronged test in United States v. Souza, explaining that "[t]he key issue in these cases . . . is how likely it is that a warrant would have been issued and

that the evidence would have been found pursuant to the warrant," and that the following factors are relevant to this determination:

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search," [*United States v. Cabassa*, 62 F.3d] at 473; 2) the strength of the showing of probable cause at the time the search occurred, *see id.* at 473-74; 3) whether a warrant ultimately was obtained, albeit after the illegal entry, *see id.* at 473; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli," *id.* at 473 n.2.

United States v. Souza, 223 F.3d at 1204.   "Factors (1) and (3) are of particular importance." United States v. Christy, 739 F.3d at 541 (citing United States v. Souza, 223 F.3d at 1204).   The Tenth Circuit notes that this analysis' purpose is to evaluate the likelihood that: (i) a magistrate judge would have issued a warrant in the first place; and (ii) the evidence still would be in place when officers executed the warrant.   See United States v. Souza, 223 F.3d at 1204-05.   The more contingencies that are required to connect the warrant process' initiation to the evidence's discovery, the less likely it is that the inevitable-discovery doctrine applies.   See United States v. Souza, 223 F.3d at 1204-05.

Here, the facts do not indicate that the officers inevitably would have obtained a warrant to search Apartment A.   As the Court mentions above, the officers did not have a warrant to search Apartment A, and the United States has not indicated that they ever initiated the process of obtaining a warrant.   See Factual Background, supra ¶¶ 137-138, at 24 (citing Aug. 31 Tr. at 204:16-21 (Fernandez, Thompson)).   Although the United States argues that "law enforcement would have had sufficient information to support the issuance of a search warrant for Apartment A," they do not represent, and the record does not reflect, that the officers planned on getting a warrant in the event the Colbert did not consent.   Suppression Motion at 20.   Although taking steps to obtain a warrant before the constitutional violation is not a requirement, see United States v.

Christy, 739 F.3d at 542-43 (applying the inevitable-discovery doctrine where officers had not taken steps to obtain a warrant before the search, but had a strong probable cause showing and obtained a warrant after the search), the Court notes that the officers here neither initiated the warrant process before entering Apartment A, nor did they complete the warrant process after the entry. Thus, both factors one and three tilt against the inevitable-discovery doctrine's application.

Regarding factor two, the strength of probable cause, the Court reiterates its conclusion above that the officers had probable cause to believe that Colbert was engaged in narcotics trafficking: "Here, the area's high-crime nature, Colbert's behavior which was consistent with hand-to-hand drug dealing, the exchange of currency, and the red backpack full of drugs all tilt toward a conclusion that criminal activity probably was occurring, and support a reasonable officer's determination of probable cause." Analysis, supra, at 134. In United States v. Cabassa, which the Tenth Circuit cites in establishing the United States v. Souza factors, however, the United States Court of Appeals for the Second Circuit declines to apply the inevitable-discovery doctrine, because the "government's showing of probable cause was not 'overwhelming,'" noting that "[t]here is thus a residual possibility that a magistrate judge would have required a stronger showing of probable cause." United States v. Cabassa, 62 F.3d at 473-74 (quoting United States v. Whitehorn, 829 F.2d 1225, 1229, 1231 (2d Cir. 1987)). The Court considers this language persuasive in analyzing the "strength of the showing of probable cause." United States v. Souza, 223 F.3d at 1204. Although the Court concludes that the officers had probable cause to believe that Colbert was engaged in criminal activity, it does not conclude that that showing is especially strong. The officers only saw Bland and Edwards engage with the red backpack, see Factual Background, supra ¶ 23, at 8 (citing Aug. 31 Tr. at 38:17-22 (Marreel, Ramirez); id. at 40:13-15 (Marreel); id. at 123:5-16 (Booth, Ramirez)); Factual Background, supra ¶ 34, at 10 (citing Aug.

31 Tr. at 129:21-23 (Booth)), and the officers did not see Colbert exchange drugs during what looked like hand-to-hands, see Factual Background, supra ¶ 20, at 8 (citing Aug. 31 Tr. at 78:23-79:2 (Fernandez, Marreel); id. at 160:14-18 (Booth, Fernandez)).  Although the Tenth Circuit does not require "an *actual showing*" of criminal activity, but rather "only a *probability* or substantial chance of criminal activity," United States v. Cruz, 977 F.3d at 1005-06 (quoting Illinois v. Gates, 462 U.S. at 243 n.13)(emphasis in United States v. Cruz, but not in Illinois v. Gates), without stronger evidence, the Court concludes that "[t]here is . . . a residual possibility that a magistrate judge would have required a stronger showing of probable cause," United States v. Cabassa, 62 F.3d at 474.  Accordingly, the Court does not conclude that this fact tilts in favor of applying the inevitable-discovery doctrine.[34]

Finally, regarding factor four, although the officers should have waited to obtain a warrant and therefore entered Apartment A prematurely, there is no evidence that they "jumped the gun" for the purpose of buttressing any lack of confidence in their probable cause showing.  United States v. Souza, 223 F.3d at 1204.  Mere premature entry is not sufficient to establish this factor; the officers must have entered unlawfully, because they lacked confidence in their probable cause showing.  See United States v. Christy, 739 F.3d at 542 (noting that "no evidence supports the theory that the deputies forced entry for that reason" -- i.e., "due to their lack of confidence about probable cause" -- and that, although exigent circumstances did not justify the entry in fact, "[t]he

---

[34]In any event, the Court notes the Tenth Circuit's statement that "the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the search."  United States v. Souza, 223 F.3d at 1203.  If the Court had not concluded above that Colbert's consent is sufficient to permit the evidence's entry, the United States' sole argument in favor of the inevitable-discovery doctrine's applicability would be that they had probable cause to believe that Colbert was engaged in criminal activity.  Accordingly, the inevitable-discovery doctrine would not apply here.

record fully supports the reasonableness of the deputies' assessment of danger"). Accordingly, this factor tilts in favor of applying the inevitable-discovery doctrine.

In its totality, the evidence does not support the inevitable-discovery doctrine's applicability, because there are too many contingencies that the officers would have needed to satisfy to ensure that they obtained the evidence which Colbert moves to suppress. See United States v. Souza, 223 F.3d at 1204-05. Most notably, the officers did not initiate the warrant process either before or after entering Apartment A, and their probable cause -- although sufficient to instill the reasonable belief that Colbert was engaged in illegal activity -- is not especially strong. Additionally, it is not clear what any eventual warrant's scope would have been, for example, whether the Magistrate Judge would have issued an arrest warrant or a search warrant, what the scope of a potential search warrant would have been, whether the officers would have been justified in conducting a protective sweep of certain rooms in Apartment A incident to their execution of an arrest warrant, and whether such a sweep would have revealed any contraband in plain view, among other questions. Accordingly, the Court does not conclude that the officers' discovery of this evidence was inevitable on the basis of their probable cause alone. Nevertheless, because the Court concludes above that Colbert's consent is sufficient to permit the evidence's entry, it will not suppress the evidence and will deny the Suppression Motion.

**IT IS ORDERED** that the Defendant's Motion to Suppress Statements and Tangible Evidence, filed December 21, 2021 (Doc. 24), is denied.

UNITED STATES DISTRICT JUDGE

- 193 -

*Counsel:*

Alexander M. M. Uballez
  United States Attorney
Elaine Y. Ramirez
Eva Mae Fontanez
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
Buck T. Glanz
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

*Attorney for the Defendant*